UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSHUA SKEEN and LAURIE FREEMAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BMW OF NORTH AMERICA, LLC, a Delaware limited liability company; BMW (U.S.) HOLDING CORP., a Delaware corporation; and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, a foreign corporation,<br><br>Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT FOR:<br><br>(1) Breach of Express Warranty;<br>(2) Breach of Implied Warranty;<br>(3) Violation of N.J.S.A. 56:8-1, et seq.;<br>(4) Violation of 15 U.S.C. § 2301, et seq.;<br>(5) Violation of Ga. Code Ann. §§ 10-1-390, et seq.; and<br>(6) Violation of 815 Ill. Comp. Stat. 505/1, et seq.<br><br>JURY TRIAL DEMANDED |

Plaintiffs JOSHUA SKEEN and LAURIE FREEMAN (hereinafter "Plaintiffs"), by and through their undersigned counsel, bring this action on behalf of themselves and as a class action against Defendants BMW OF NORTH AMERICA, LLC, BMW (U.S.) HOLDING CORP., and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT (hereinafter collectively referred to as "Defendants"), on behalf of a Class of all persons in the United States who (i) currently own or lease a model year 2007 through 2009 MINI Cooper R56 (commonly known as Cooper Hardtop), or model year 2008 through 2009 MINI Cooper R55 (commonly known as Cooper Clubman) with an N12 or N14 engine (hereinafter "Class Vehicles"), or (ii) previously owned or leased a Class Vehicle and paid to repair or replace any engine component as a result of a defect in the timing chain tensioner. All allegations in this Complaint are based upon information and belief except for those allegations which pertain to Plaintiffs and their counsel. Plaintiffs' information and belief are based upon, *inter alia*, the investigation conducted to date by Plaintiffs and their counsel. Each allegation in this complaint has evidentiary support or is likely to have evidentiary support upon further investigation and discovery.

1

## IDENTIFICATION OF PARTIES

1.      The names and addresses of the named parties to this action are as follows: (a) Plaintiff Joshua Skeen, 660 Ralph McGill Avenue NE, Apt. 4219, Atlanta, Georgia 30312; (b) Plaintiff Laurie Freeman, 7216 South Rawson Bridge Road, Cary, Illinois 60013; (c) Defendant BMW of North America, LLC, 300 Chestnut Ridge Road, Woodcliff Lake, NJ 07677; (d) Defendant BMW (U.S.) Holding Corporation, 300 Chestnut Ridge Road, Woodcliff Lake, NJ 07677; and (e) Defendant Bayerische Motoren Werke Aktiengesellschaft, Petuelring 130, 80788 Munich, Germany.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332. Plaintiffs, citizens of Georgia and Illinois, respectively, bring claims on behalf of a nationwide class against defendants who are citizens of New Jersey and Germany.

3.      This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 1332(d) because the aggregate claims of Plaintiffs and Class Members exceeds the sum or value of $5,000,000, and diversity of citizenship exists between at least one member of the proposed Class and the Defendants.

4.      This Court has personal jurisdiction over Defendants because the Defendants maintain a principle place of business in this District, and Defendants have made sufficient contacts in this jurisdiction, including marketing, distribution, and sale of class vehicles.

5.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2). Defendants' North American headquarters maintains a principle place of business in Woodcliff Lake, New Jersey, and Defendants conduct substantial business in this District, including marketing, distribution, and sale of the Class Vehicles.

## PRELIMINARY STATEMENT

6.      At all times relevant hereto, Defendants designed, manufactured, distributed, and sold Class Vehicles that contained one or more design flaws and/or defects that cause the timing chain tensioner to fail prematurely (hereinafter "Timing Chain Tensioner Defect"). The Timing Chain Tensioner Defect can at any time cause sudden engine failure, resulting in total loss of power to the

vehicle, including while operating at highway speeds.

7.     The Class Vehicles are uniformly and inherently defective in materials, design, or workmanship, and prematurely fail under ordinary driving conditions and far in advance of their expected useful life. The Timing Chain Tensioner Defect exists regardless of the driving conditions at which the Class Vehicles are driven and regardless of compliance with Defendants' recommended maintenance schedule.

8.     Defendant BMW OF NORTH AMERICA, LLC provides an express warranty against any "defects in materials or workmanship" in Class Vehicles to the first retail purchaser and each subsequent purchaser for 48 months or 50,000 miles, whichever occurs first.

9.     Defendants have sold thousands of Class Vehicles without disclosing to Class Members the existence of the Timing Chain Tensioner Defect. Where the Timing Chain Tensioner Defect manifests after 48 months or 50,000 miles, the Defendants contend that the warranty period has expired and that Class Members bear the cost of the repair, which can be thousands of dollars.

10.     Defendants have purposefully concealed, and continue to conceal, their knowledge of the Timing Chain Tensioner Defect so as to be able to take the position with their customers that the written warranty period "expired" before the defect manifests itself. Despite the safety risk to Class Vehicle occupants, Defendants failed to disclose material information regarding the defect in an attempt to avoid the cost of repair and, instead, unfairly shift the cost of repair to Class Members.

11.     The Timing Chain Tensioner Defect presents a substantial safety risk because the defect can cause sudden engine failure and complete loss of vehicle power at any time and without warning.

12.     Had Plaintiffs and Class Members known about the Timing Chain Tensioner Defect at the time of purchase, including the safety hazard posed by the defect and the monetary cost of repair, they would not have bought the Class Vehicles or would have paid much less for them. As such, Plaintiffs and Class Members have not received the value for which they bargained when they purchased their Class Vehicles.

13.     Defendants have not recalled the Class Vehicles to repair the Timing Chain Tensioner Defect, have not offered all Class Members a suitable repair or replacement free of charge as

required under their own warranty, and have not offered to reimburse Class Members who incurred costs relating to repair of the defect.

## PARTIES

14.     Plaintiff Joshua Skeen is a Georgia citizen who resides in Atlanta, Georgia. In December 2007, Plaintiff purchased a 2007 MINI Cooper S from Cenury BMW MINI in Greenville, South Carolina. Plaintiff Joshua Skeen purchased his MINI Cooper S primarily for personal, family, or household use and paid approximately $29,000. The vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Defendants, and bears the Vehicle Identification No. WMWMF73527TT83283. On or about January 17, 2013, Plaintiff Joshua Skeen paid $3,288.85 for parts and labor required to replace his MINI Cooper S engine and turbo after catastrophic engine failure caused by the Timing Chain Tensioner Defect. At the time of repair, the odometer showed total mileage of 74,248.

15.     Plaintiff Laurie Freeman is an Illinois citizen who resides in Cary, Illinois. On or about September 4, 2007, Plaintiff Laurie Freeman purchased a 2007 MINI Cooper S from Patrick Dealer Group in Schaumburg, Illinois. Plaintiff Laurie Freeman purchased her MINI Cooper S primarily for personal, family, or household use and paid $33,157.82. The vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by defendants, and bears the Vehicle Identification No. WMWMF73527TL92212. On or about July 20, 2009, the timing chain tensioner in Plaintiff's MINI Cooper S was replaced under warranty at no cost to Plaintiff.  At the time of the first repair, the odometer showed total mileage of 33,876.  On or about February 12, 2013, the timing chain tensioner failed again and Plaintiff Laurie Freeman paid $1,381.95 for parts and labor required to remove and replace the timing chain components in her MINI Cooper S. At the time of repair, the odometer showed total mileage of 87,820.

16.     At all times, Plaintiffs drove their vehicles in a foreseeable manner and in the manner in which said vehicles were intended to be used.

17.     Defendant BMW OF NORTH AMERICA, LLC (hereinafter "BMW N.A.") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located in Woodcliff Lake, New Jersey. At all times relevant, BMW N.A.

warrants the Class Vehicles against defects in materials and workmanship to the first retail purchaser and each subsequent purchaser.

18.     Defendant BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT (hereinafter "BMW AG") is a foreign corporation organized and existing under the laws of the Federal Republic of Germany with its principal place of business in Munich, Germany.  At all times relevant, BMW AG transacted business in the State of New Jersey and was lawfully able to do so.

19.     Defendant BMW (U.S.) HOLDING CORPORATION is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Woodcliff Lake, New Jersey. Defendant BMW (U.S.) HOLDING CORPORATION is a subsidiary of Defendant BMW AG and operates as its sales and distribution headquarters for North America. At all times relevant, BMW (U.S.) HOLDING CORPORATION transacted business in the State of New Jersey and was lawfully able to do so.

20.     Plaintiffs are informed and believe, and thereon allege, that at all times herein relevant, each of the Defendants was the alter ego, agent, servant, representative and employee of the remaining Defendants, and in doing the things hereinafter alleged, each was acting within the course and scope of said agency and employment and with the ratification and authorization of their respective principals.

21.     At all relevant times hereto, Defendants engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling the Class Vehicles throughout the United States.

## SUBSTANTIVE ALLEGATIONS

22.     The MINI is a small, distinctive car originally made by the British Motor Company and its successors from 1959 until 2000.  Except for a very small number of MINI vehicles exported to the United States in the 1960s, the original MINI was only available on the European market.  Its distinctive design made it an icon of 1960s England, much the same as the Volkswagen Beetle in the United States.

23.     Defendants acquired MINI and, in 2002, introduced the First Generation MINI in the United States.  The MINI Cooper was marketed as a new class of high-end vehicles—stylish, high

performance, and affordable.  Defendants employed aggressive, unconventional marketing tactics aimed at creating fanfare and excitement over the MINI's design and performance features.  For example, a MINI was photographed by a *Playboy Magazine* photographer and featured as the centerfold of *Playboy Magazine*.

24.     The MINI marketing campaign was revolutionary and so successful that the car received the J.D. Power and Associates Automotive Performance, Execution and Layout award, based on a survey of owner's perceptions of eight categories of vehicle performance and design, including the engine.  *Car and Driver Magazine* described the MINI as "fun to drive and feels of high quality enough to wear the BMW badge." The First Generation MINI was so popular that supply could not keep up with demand.

25.     Beginning with the 2007 model year, MINI released the Second Generation of MINI Coopers in the United States, including the Cooper Hardtop and, in 2008, the Cooper Clubman that are the subject of this litigation.  Although the Second Generation model looks similar to its predecessor, it is based on a completely re-engineered platform incorporating the all-new N12 and N14 engines.  The Second Generation MINI, marketed as a stylish and high-performance vehicle from the BMW family, enjoyed the same popularity and acclaim of its predecessors.

26.     The Second Generation MINI includes the R55 and R56 body styles.  The R55 is commonly called the MINI Clubman and the R56 is the classic MINI Cooper Hardtop.  The Clubman is identical to the Hardtop in its engine and transmission selections, but is slightly larger in size.  Consumers had the option of purchasing an upgraded "S" model of the Clubman or Cooper.  The "base" MINI had the N12 engine, whereas the "S" model included an upgraded turbo-charged engine known as the N14.

Automobile Engines and the Function of the Timing Chain

27.     Four-stroke automobile engines use pistons and valves to produce energy. The crankshaft controls the up and down movement of the pistons. The camshaft controls the opening and closing of the engine's valves. The valves must open and close once per revolution of the crankshaft. Accordingly, the camshaft is geared to turn at one-half the rate of the crankshaft. The timing chain or belt links the crankshaft to the camshaft so that the valves are in sync with the

pistons. If the valve and piston movements are not properly synchronized, the valves will collide with the pistons. A timing chain or belt that is not properly tensioned and synchronized will cause serious damage ultimately resulting in catastrophic engine failure.

28.     Most automobile engines are designed with a rubber-composite timing belt located outside the engine block, the cast metal block containing the cylinders. Engine manufacturers recommend replacement at specific mileage intervals, typically every 60,000 to 100,000 miles. As such, timing belts are protected only by a belt cover that can be easily and quickly removed for belt inspection or replacement. Class Vehicles, however, do not have timing belts, rather, they utilize timing chains.

29.     A timing chain and its components are considered more durable than timing belts and timing chains are expected to last the life of an engine. The U.S. Environmental Protection Agency ("EPA") defines "full useful life" of a light-duty vehicle, such as the MINI Cooper and MINI Cooper S, as 10 years or 120,000 miles, whichever occurs first. 40 C.F.R. § 86.1805-04. While the EPA's definition of useful life is used for emissions testing purposes, consumers reasonably expect vehicles to last well past the 120,000-mile minimum set by the EPA.  This is especially the case since the purchase of an automobile is, after buying a home, the second largest purchase made by most consumers.

30.     Since 2007, MINI vehicles have been powered by a newly-designed family of four-stroke engines. Defendants marketed the new engine family, codenamed "Prince," as "the most advanced engine technology" with a "series of innovative solutions being implemented for the first time."[1] Significantly, the Prince engine incorporates into the engine block a number of components normally found outside the engine, including the timing chain, as shown in Figure 1.

/ / /

/ / /

_____

[1] Source: Media Information, BMW Group, Petrol Engines in the BMW Group/PSA Peugeot Citroën Cooperation (December 2004) (on file with author)(emphasis added).



**Figure 1: Internal Timing Components of MINI engine in Class Vehicles**

31.      In all of the Class Vehicles, the timing chain and timing chain tensioner are inside the engine block and, therefore, not accessible to consumers. Because the timing chain and timing chain tensioner are inside the engine block, they should not require any maintenance or replacement whatsoever for the life of the engine. Indeed, Defendants touted that "[e]ase of service" was among the "essential features in determining the engines' specifications."   Further, Defendants' announcement of the Prince engine stated, "The timing chain driving the camshafts is not only very precise and reliable, ***but also remains maintenance-free throughout the full running life of the engine***. And automatic hydraulic valve play compensation serves last but not least to rule out any service or maintenance of the valve drive."[2]

32.      The timing chain and timing chain tensioner do not require service according to the MINI Maintenance Program nor does it appear that these parts are monitored by the vehicles' on-board computer, further evidencing that these components are expected to last the life of an engine without the need for service or replacement.  The MINI Maintenance Program "covers *all* factory recommended maintenance," including "items that need replacement due to normal wear and tear"

------------------------

[2] *Id.*

and "any adjustments required due to normal operating conditions." In this regard, as is explained in the MINI "Service & Warranty Information" booklet, the necessary maintenance intervals are computed for each Class Vehicle by an on-board Condition Based Service ("CBS") System. The CBS System uses "sensors and sophisticated algorithms" to compute "the actual optimum maintenance requirements" for the vehicle based on accumulated mileage and various conditions of vehicle use. "CBS thus determines the current and future maintenance requirements" of the Class Vehicles and alerts the driver and dealer to the individual vehicle's specific maintenance needs. On information and belief, the CBS System does not monitor the timing chain and timing chain tensioner in Class Vehicles.

<u>The Timing Chain Tensioner Defect</u>

33.    A critical component of the valve drive is the timing chain tensioner. The MINI timing chain tensioner consists of a bolt head, piston, and internal spring, as shown in Figure 2.



**Figure 2: Timing Chain Tensioner Assembled (left) and Disassembled (right)**

34.     The timing chain tensioner maintains proper tension of the guide rails against the timing chain.  The guide rails ensure the timing chain maintains proper synchronization between the camshaft and crankshaft.  A diagram of the various timing components is shown in Figure 3.



**Figure 3: Timing Components**

35.     When the timing chain tensioner begins to fail, the guide rails loosen and the timing chain will stretch out of place. Due to the precise synchronization of engine components, even a small deviation in timing chain tension can result in serious damage to the engine. When the timing chain tensioner fails completely, the timing chain disconnects from its guide.  Without the timing chain coordinating the rotations of the crankshaft and camshaft, the pistons and valves collide with great force.  The engine components suffer so much damage that the engine seizes and all power to the vehicle is lost.

/ / /

/ / /

/ / /



Damaged Sprocket

36.     The first sign of the Timing Chain Tensioner Defect is what has been dubbed by Class Members as the "Death Rattle." The Death Rattle is a knocking noise, sounding almost like a diesel engine, which is especially pronounced when the engine is cold. As the car warms up, the Death Rattle will abate to some degree. As such, drivers tend to dismiss the noise as a common cold-start issue. Indeed, Defendants have instructed Class Members that the noise was normal and expected. In reality, the Death Rattle is the sound of poorly-timed pistons and valves slamming into each other.

37.     While the timing chain and tensioner are intended to last the life of the engine, the defective design causes the tensioner to fail prematurely. Figure 5 shows a disassembled, used tensioner with a short, soft spring that cannot maintain adequate force against the guide rails. Compare this failed spring to Figure 6, a disassembled, new and unused timing chain tensioner with a spring that is stiff and long.



**Figure 5: Disassembled Used Timing Chain Tensioner**



**Figure 6: Disassembled New and Unused Timing Chain Tensioner**

38.      As a result of expert analysis performed at Plaintiffs' counsel's request, it appears that since original manufacture of the Class Vehicles, Defendants have redesigned the spring component of the timing chain tensioner to be more durable. Plaintiffs' expert concluded the new design, while maintaining the same metallurgical composition, is stronger because it has a slightly larger coil diameter and the diameter of the wire used for the spring is also bigger. As set out in the table below, the analysis showed the redesigned timing chain tensioner spring includes significant revisions to the spring diameter, coil diameter, total length, and pitch:

|  | Spring Diameter | Coil Diameter | Total Length | Pitch[3] |
| --- | --- | --- | --- | --- |
| **Original** | 1.27 mm | 9.94 mm | 8.2 cm | 3.77 mm |
| **Redesigned** | 1.39 mm | 10.50 mm | 12.0 cm | 5.35 mm |

39.      Defendants have been aware of the Timing Chain Tensioner Defect since at least January 1, 2008, when the first Technical Service Bulletin ("TSB") addressing the issue was released. TSB M110207 addressed the rattling noise on cold start up. Under the "SITUATION" heading, the TSB states: "The customer complains of a rattle noise from the engine during cold start-up . . . . The rattle noise occurs more frequently when driving short distances. The noise is more

---

[3] "Pitch" is the space between coils as measured from the center of each wire.

prevalent when the outside temperature is approximately [59 degrees Fahrenheit] or below." Updates to the TSB were released on March 1, 2009, May 1, 2009, June 1, 2009, June 2, 2009, March 1, 2010, April 1, 2010, September 1, 2010, October 1, 2010, February 1, 2011, August 1, 2011, and April 1, 2012.

40.    In TSB M110207, technicians are warned never to use the original design of the timing chain tensioner: "Note: [Old Part No.] 11 31 7 607 551, Timing chain tensioner, should not be installed with a new timing chain."

The Effect of the Timing Chain Tensioner Defect

41.    Despite knowledge of the Timing Chain Tensioner Defect, Defendants have not notified class members of the dangerous propensity for catastrophic engine failure and have not initiated a recall or repair campaign. So too, when Class Members have brought in their car to the dealer for service before the timing chain tensioner fails, Defendants have not undertaken to replace the defective part so as to prevent the catastrophic engine damage that will eventually occur as set out herein.

42.    If an owner is able to identify the problem early, before the engine is irreparably damaged, the owner incurs significant costs to remove the defective and, usually, damaged timing components.    Assuming a conservative hourly labor rate of $110, the following chart detailing ALLDATA's[4] suggested retail price for replacement parts and the manufacturer's standard labor hours demonstrates the significant cost of this service:

/ / /

/ / /

/ / /

/ / /

––––––––––––––––––––––

[4] ALLDATA is a source widely used by professional mechanics to obtain a vehicle manufacturers' diagnostic and repair information.

| Part | Retail Price | Installation Hours |
|------|------------|-------------------|
| Timing Chain (Part No. 11311439853) | $68.86 | 10.7 |
| Timing Chain Guide (Part No. 11317577301) | $44.87 | N/A |
| Timing Chain Tensioner (Part No. 11314609483) | $45.47 | 1.0 |
| Timing Chain Tensioner Arm (Part No. 11314609483) | $16.23 | N/A |

43.     However, once the timing tensioner fails and the timing chain gives way, Class Members are forced to pay an even higher price for the Defendants' defective design. The following chart details ALLDATA's suggested retail price for a replacement engine and the manufacturer's standard labor hours billed for the service:

| Engine | Retail Price | Installation Hours |
|--------|------------|-------------------|
| N12 (Part No. 11000444886) | $9,683.41 | 18.3-18.9 |
| N14 (Part No. 11000444899) | $9,369.58 | 19.1-19.7 |

44.     Meanwhile, drivers are unaware of the significant safety risk associated with driving the Class Vehicles. Defendants, however, have received numerous complaints of safety concerns from consumers who suffered the sudden, catastrophic engine failure caused by the Timing Chain Tensioner Defect. Despite such knowledge, Defendants have failed to affirmatively address the problem.

45.     The following are examples of complaints submitted to the National Highway Traffic Safety Administration Office of Defects Investigation by motorists expressing safety concerns due to the Timing Chain Tensioner Defect:

/ / /

**Make:** MINI                **Model:** COOPER S     **Year:** 2007
**Manufacturer:** BMW of North America LLC
**Crash:** No                 **Fire:** No            **Number of Injuries**: 0
**ODI ID Number:** 10471626                           **Number of Deaths:** 0
**Date Complaint Filed:** August 20, 2012             **Date of Incident:** August 18, 2012
**VIN:** Not Available
**Component:** ENGINE
**Summary**:

    THE ENGINE QUIT WHILE PREPARING TO ENTER A HIGHWAY. THE CAR WAS ACCELERATING TO TURN ONTO THE HIGHWAY AND IT JUST QUIT AND PARTIALLY BLOCKED THE HIGHWAY. LUCKILY, THE HIGHWAY WAS ON A SLOPE AND TO PREVENT FROM BLOCKING THE HIGHWAY AND RISK INJURY, I WAS ABLE TO COAST INTO A FIRE STATION ALONG THE HIGHWAY AND FROM THERE PUSH THE CAR OUT OF THE WAY OF TRAFFIC. THE CAUSE OF THE FAILURE IS A BROKEN TIMING CHAIN WHICH BROKE WITH NO WARNING. THE REPAIR WILL COST ABOUT $4000. THE FACT THAT IT BROKE AS I WAS ENTERING A HIGHWAY AND WITH NO ON-COMING TRAFFIC WAS VERY LUCKY. THERE IS NO WARNING FOR THE ENGINE TO STOP. THIS SEEMS LIKE A COMMON PROBLEM FOR 2007 MINIS AND AS THESE CARS AGE THE LIKELY HOOD OF THE PROBLEM OCCURRING INCREASES. THIS CAN HAPPEN AT ANY TIME THE ENGINE IS RUNNING AND WITHOUT WARNING. THIS IS A SAFETY ISSUE AS AN ABRUPT ENGINE FAILURE CAN HAPPEN ANYWHERE AND WITHOUT NOTICE. IT WAS OVER 100F THE DAY MY ENGINE QUIT, I WAS OVER 90MILES AWAY FROM HOME IN A SPARSELY POPULATED RURAL AREA WITH NO CELL PHONE COVERAGE. IF IT HAD HAPPENED 15 MILES IN EITHER DIRECTION IT COULD HAVE BEEN HOURS BEFORE ANYONE FOUND ME AND MY CAR. *TR

**Make:** MINI                **Model:** COOPER S     **Year:** 2007
**Manufacturer:** BMW of North America LLC
**Crash:** No                 **Fire:** No            **Number of Injuries**: 0
**ODI ID Number:** 10452862                           **Number of Deaths:** 0
**Date Complaint Filed:** June 23, 2012               **Date of Incident:** June 23, 2012
**VIN:** WMWMF73537T…
**Component:** ENGINE
**Summary**:

    MINI COOPER 2007 - RATTLES WHEN COLD. TOOK THE CAR TO THE DEALER. FELT TO BE A PROBLEM WITH THE TIMING CHAIN. I DID SOME RESEARCH. IT'S A KNOWN PROBLEM AND CAN LEAD TO THE ENGINE SEIZING DURING DRIVING. IT'S A SAFETY ISSUE THAT MINI IS WELL AWARE OF. MY CAR ONLY HAS 40,000 MILES ON IT. THE REPAIR WOULD COST ~$2500. IF I DON'T REPAIR IT, I WORRY ABOUT THE ENGINE FAILING WHILE I'M ON THE HIGHWAY - OR WORSE, WITH MY KIDS IN THE CAR DURING A DRIVE. MINI KNOWS ABOUT THIS AND HAS DIRECTED DEALERS SPECIFICALLY ON THIS PROBLEM. COUNTLESS ONLINE COMPLAINTS ABOUT THE SAME THING. MINI SHOULD OFFER A RECALL AND FIX THIS KNOWN DEFECT BEFORE ANYONE LOSES CONTROL OF A CAR WHILE DRIVING AND SOMEONE GETS HURT. UPDATED IVOQ 07/19/12 *TT

**Make:** MINI　　　　　　　**Model:** COOPER　　**Year:** 2007
**Manufacturer:** BMW of North America LLC
**Crash:** No　　　　　　　**Fire:** No　　　　**Number of Injuries**: 0
**ODI ID Number:** 104509134　　　　　　　　**Number of Deaths:** 0
**Date Complaint Filed:** June 27, 2011　　　**Date of Incident:** April 28, 2011
**VIN:** Not Available
**Component:** ENGINE AND ENGINE COOLING
**Summary**:

　　MINI COOPER, 2007, 81000 MILES. WITH MINIMAL ADVANCE WARNING (A RATTLE THAT BEGAN WHEN CAR WAS STARTED THAT MORNING) TIMING CHAIN BROKE, LEADING TO CATASTROPHIC ENGINE FAILURE. CAR WAS STOPPED AND BLOCKING TRAFFIC ON BUSY TWO LANE BRIDGE DURING MORNING COMMUTE UNTIL IT WAS TOWED AWAY. NO PREVIOUS ISSUES, WARNINGS EMERGED FROM THIS VEHICLE. WAS MAINTAINED REGULARLY AND BECAUSE OF NOISE ON START, I WAS INTENDING TO TAKE IT IN IMMEDIATELY. IN FACT, I WAS ON THE WAY TO THE GARAGE WHEN THE FAILURE OCCURRED. *TR

**Make:** MINI　　　　　　　**Model:** COOPER S　**Year:** 2007
**Manufacturer:** BMW of North America LLC
**Crash:** No　　　　　　　**Fire:** No　　　　**Number of Injuries**: 0
**ODI ID Number:** 10455462　　　　　　　　**Number of Deaths:** 0
**Date Complaint Filed:** April 17, 2012　　　**Date of Incident:** March 8, 2012
**VIN:** WMWMF73587T…
**Component:** ENGINE AND ENGINE COOLING
**Summary**:

　　TIMING BELT TENSIONER FAILED RESULTING IN SLACK IN THE TIMING BELT. FINAL RESULT WAS THE TIMING BELT SLACK CONTACTED PLASTIC CHAIN GUARDS WHICH BROKE OFF AND LODGED INSIDE THE ENGINE. AFTER BEING TOWED TO MINI SERVICE, THEY RECOMMENDED REPLACING THE ENTIRE ENGINE. THIS IS A SAFETY ISSUE BECAUSE THE CRITICAL TIMING CHAIN FAILURE LED TO PREMATURE ENGINE FAILURE. THERE WAS A STRONG SMELL OF SMOKE AND I HAD INITIAL CONCERN THAT THE CAR WAS GOING TO CATCH ON FIRE. I WAS LUCKY THAT THE INCIDENT DID NOT OCCUR WHILE DRIVING IN TRAFFIC AS I WOULD HAVE BEEN STUCK ON THE ROAD WITHOUT ANY POWER ENDANGERING MYSELF AND OTHER DRIVERS. MINI IS WELL AWARE OF THE ISSUE WITH THE TIMING BELT TENSIONER, BUT HAS FAILED TO PROACTIVELY ADDRESS THE ISSUE. THE SERVICE MANAGER AT MINI EVEN HAS A BAG FULL OF BENT RODS AT HIS DESK THAT HE SHOWED ME AND TOLD ME HE HAS HAD MULTIPLE CARS COME IN WITH THE SAME ISSUE. *JS

/ / /

/ / /

/ / /

/ / /

**Make:** MINI  **Model:** COOPER  **Year:** 2008
**Manufacturer:** BMW of North America LLC
**Crash:** No  **Fire:** No  **Number of Injuries**: 0
**ODI ID Number:** 10384381  **Number of Deaths:** 0
**Date Complaint Filed:** February 24, 2011  **Date of Incident:** February 15, 2011
**VIN:** WMWMF73538T…
**Component:** ENGINE AND ENGINE COOLING
**Summary**:

TL *THE CONTACT OWNS A 2008 MINI COOPER. THE CONTACT WAS DRIVING 65 MPH WHEN THE VEHICLE BEGAN TO MAKE A RATTLING SOUND AND STOPPED ACCELERATING. THE VEHICLE WAS TAKEN TO AN AUTHORIZED DEALER WHO STATED THAT THE TENSIONER GAVE WAY AND CAUSED THE TIMING CHAIN TO STRETCH. THE VEHICLE HAD NOT BEEN REPAIRED. THE CURRENT AND FAILURE MILEAGES WERE 70,000. UPDATED 4/4/11 *CN

**Make:** MINI  **Model:** COOPER S  **Year:** 2008
**Manufacturer:** BMW of North America LLC
**Crash:** No  **Fire:** No  **Number of Injuries**: 0
**ODI ID Number:** 10470682  **Number of Deaths:** 0
**Date Complaint Filed:** August 14, 2012  **Date of Incident:** March 1, 2012
**VIN:** Not Available
**Component:** ENGINE
**Summary**:

I WAS TOLD MY WARRANTY EXPIRED END OF JUNE. I BOUGHT MINI-S 08 USED IN FEBRUARY FROM A MINI DEALERSHIP IN WESTCHESTER, ELMSFORD, NY. I NOTICED A KNOCKING NOISE THAT TO ME DIDN'T SOUND NORMAL NOT TOO LONG AFTER I BOUGHT THE CAR. THE PEOPLE AT MINI TOLD ME IT WAS FROM SOMETHING ELSE, A LOOSE PIECE AND THAT THEY "FIXED THE PROBLEM." THIS NOISE ONLY BECAME WORSE, AND NOW THE CAR IS AT 45,000 MILES AND NOT EVEN 6 MONTHS FROM PURCHASE. THE NOISE BECAME EVEN LOUDER, WHICH THEN IT SOUNDED LIKE A TRACTOR TRAILER. I CHANGED THE OIL, THE NOISE WASN'T AS LOUD BUT STILL THERE. MY MECHANIC SAID THAT THE TIMING BELT IS GOING TO SNAP SOON, AND IS A DANGEROUS PROBLEM THAT CAN CAUSE AN ACCIDENT, AND ONE IT BREAKS, THE WHOLE ENGINE WILL BE DESTROYED. *TR

**Make:** MINI  **Model:** COOPER S  **Year:** 2008
**Manufacturer:** BMW of North America LLC
**Crash:** No  **Fire:** No  **Number of Injuries**: 0
**ODI ID Number:** 10463544  **Number of Deaths:** 0
**Date Complaint Filed:** June 29, 2012  **Date of Incident:** June 25, 2012
**VIN:** WMWMF73568T…
**Component:** ENGINE
**Summary**:

MY CAR STARTED MAKING A WEIRD NOISE IN THE FRONT OF THE CAR NEAR THE ENGINE WHEN I TURNED IT ON. THEN IT CONTINUED TO MAKE THE LOUD NOISE AS I DROVE. I TOOK THE CAR TO THE DEALER AND THEY SAID THE TIMING CHAIN STRETCHED AND CAUSED THE GUARD RAIL TO BREAK, WHICH FELL INTO THE OIL PAN. THE DEALER SAID I WAS LUCKY MY ENGINE DIDN'T LOOK UP WHILE

I WAS ON THE HIGHWAY. THIS WAS A $2100 FIX ON A 4 YEAR OLD CAR WITH 53,000 MILES. *TR

**Make:** MINI                    **Model:** COOPER S    **Year:** 2008
**Manufacturer:** BMW of North America LLC
**Crash:** No                    **Fire:** No              **Number of Injuries**: 0
**ODI ID Number:** 10402729                               **Number of Deaths:** 0
**Date Complaint Filed:** May 25, 2011                    **Date of Incident:** January 25, 2011
**VIN:** WMWMF73548T…
**Component:** ENGINE AND ENGINE COOLING
**Summary**:
    TL*THE CONTACT OWNS A 2008 MINI COOPER S. THE CONTACT STATED WHILE DRIVING APPROXIMATELY 55 MPH THE VEHICLE SUDDENLY STALLED WITHOUT WARNING. THE VEHICLE WAS TOWED TO A DEALER WHO ADVISED HIM THAT THE TIMING BELT TENSIONERS NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED. A FEW DAYS LATER HE HEARD A NOISE COMING IN THE ENGINE AFTER THE VEHICLE WAS REPAIRED. THE VEHICLE WAS TAKEN BACK TO THE DEALER WHO ADVISED HIM THAT THEY WERE UNABLE TO DIAGNOSE THE FAILURE. THE MANUFACTURER WAS CONTACTED AND OFFERED NO ASSISTANCE. THE FAILURE MILEAGE WAS APPROXIMATELY 20,000.

**Make:** MINI                    **Model:** COOPER S    **Year:** 2009
**Manufacturer:** BMW of North America LLC
**Crash:** No                    **Fire:** No              **Number of Injuries**: 0
**ODI ID Number:** 10450757                               **Number of Deaths:** 0
**Date Complaint Filed:** March 8, 2012                   **Date of Incident:** February 3, 2012
**VIN:** WMWMF73599T…
**Component:** ENGINE AND ENGINE COOLING
**Summary**:
    WHILE DRIVING THE VEHICLE THE ABRUPTLY HALTED CAUSING ME TO VEER OFF TO THE SIDE OF THE ROAD SO THAT IT COULD BE STOPPED SOMEWHERE SAFE. VEHICLE WOULD NOT RESTART, NO WARNING LIGHTS OF ANY SORT WERE PRESENT PRIOR TO THIS INCIDENT. VEHICLE NEEDED TO BE PUSHED TO A LOCATION TO ALLOW IT TO BE TOWED. DETAILS OF SERVICE PROVIDED FROM KNAUZ MINI AS FOLLOWS: FOUND CAR NOT STARTING, DURING FAULT INSPECTION FOUND FAULT FOR EXHAUST CAM SENSOR NOT READING. FOUND EXHAUST CAM NOT MOVING THROUGH OIL CAP ON VALVE COVER. REMOVED VALVE COVER FOR CYLINDER, FOUND TIMING CHAIN TO BE BROKEN CAUSING EXHAUST CAM TIMING CHAIN SPROCKET TO BREAK OFF EXHAUST CAM. FOUND THE TIMING CHAIN BREAKING CAUSING DAMAGE TO COMPLETE ENGINE DUE TO TIMING CHAIN BREAKING IN TWO PIECES. FOUND LOWER CRANK DAMAGED FROM TIMING CHAIN WEDGING IN BETWEEN BLOCK AND TIMING CHAIN COVER AREA. REMOVED COMPLETE ENGINE AND REPLACED, NOTE DURING REMOVAL OF SUB-FRAME BOLTS ON RAIL FOUND TREADS TO BE DAMAGED FROM FACTORY (SUBFRAME NEVER REMOVED BEFORE) WHILE BEING INSTALLED. RE-TAPPED TREADS AND REPLACED BOTH BOLTS. TEST DROVE CAR WITH NEW MOTOR OVERNIGHT. NO FURTHER PROBLEMS FOUND. *TR

**Make:** MINI             **Model:** COOPER S   **Year:** 2009
**Manufacturer:** BMW of North America LLC
**Crash:** No             **Fire:** No          **Number of Injuries**: 0
**ODI ID Number:** 10369213                    **Number of Deaths:** 0
**Date Complaint Filed:** December 4, 2010     **Date of Incident:** December 2, 2010
**VIN:** WMWMF73569T
**Component:** ENGINE AND ENGINE COOLING
**Summary**:
    FAILURE OF TIMING BELT TENSIONER IN 2009 MINI COOPER S LEADING TO MASSIVE OIL LEAK LOSS OF POWER TO ENGINE AND NEAR LETHAL ACCIDENT. *TR

**Make:** MINI             **Model:** COOPER S   **Year:** 2009
                                  CLUBMAN
**Manufacturer:** BMW of North America LLC
**Crash:** No             **Fire:** No          **Number of Injuries**: 0
**ODI ID Number:** 10456722                    **Number of Deaths:** 0
**Date Complaint Filed:** April 27, 2012       **Date of Incident:** April 27, 2012
**VIN:** WMWMM33509T…
**Component:** ENGINE AND ENGINE COOLING
**Summary**:
    VEHICLE FAILED DUE TO ISSUE WITH THE TIMING CHAIN TENSIONER. THIS CAUSED THE TIMING CHAIN GUIDES TO BREAK AND DROP INTO THE OIL PAN. ENTIRE ENGINE MAY NEED TO BE REPLACED. ENGINE FAILED AS I WAS PULLING OUT ONTO A VERY BUSY STREET (7TH STREET IN PHOENIX AZ) LEAVING ME STRANDED AND UNABLE TO MOVE IN TRAFFIC. THE CAR HAD TO BE PUSHED ONTO A SIDE STREET. *TR

**Make:** MINI             **Model:** COOPER S   **Year:** 2009
                                  CLUBMAN
**Manufacturer:** BMW of North America LLC
**Crash:** No             **Fire:** No          **Number of Injuries**: 0
**ODI ID Number:** 10371949                    **Number of Deaths:** 0
**Date Complaint Filed:** December 21, 2010    **Date of Incident:** December 19, 2010
**VIN:** WMWMM33589T…
**Component:** ENGINE AND ENGINE COOLING: ENGINE
**Summary**:
    TENSIONER FAILURE 44,406 MILES. CAUSING ENGINE DAMAGE. ALMOST IN ACCIDENT BECAUSE OF FAILURE. FROM DEALER LEARNED THAT AND OTHER MINI COOPER S HAD THE SAME FAILURE. MINI KNOWS OF THE TENSIONER PROBLEM AND HAS NOT FIXED IT. *TR

46.    Despite its issuance of TSBs and reports of catastrophic engine failure occurring in their vehicles, rather than issue a recall or repair campaign, Defendants have shifted the costs of repair to consumers. To alleviate consumer backlash, and deflect attention from their knowingly faulty design, and reduce the perceived financial impact of replacing engines under warranty,

00313940-3

Defendants lowered the wholesale price of a replacement engine from approximately $7,500 to $3,300. In some instances, Defendants have paid some or all of the cost of repair under the guise of a military or goodwill discount. In January 2013, as nearly all of the affected engines are more than 48 months old, Defendants raised the wholesale price of the engine by over $1,100.

47.     While Defendants marketed Class Vehicles as safe, technologically advanced, and built to last, the Timing Chain Tensioner Defect makes the Class Vehicles unreasonably dangerous, prone to premature failure, and incapable of meeting the reasonable performance expectations of Plaintiffs and Class Members.  Indeed, had consumers been aware of the Timing Chain Tensioner Defect they would not have bought the Class Vehicles or would have paid much less for them.

## TOLLING OF STATUTES OF LIMITATIONS

48.     Defendants had exclusive knowledge of the defective nature of the Class Vehicles and knew the Timing Chain Tensioner Defect would not be discovered by Plaintiffs and Class Members unless and until the defect caused damage to the engine. Only Defendants had access to information about the Timing Chain Tensioner Defect, through its dealerships, pre-release testing, customer complaints, and other sources of information.  Further, the part is internal to the engine and is not intended to be a consumer-replaceable part.

49.     Since the Timing Chain Tensioner Defect cannot be detected until it manifests itself, Plaintiffs and Class Members exercising due diligence were not reasonably able to discover the defect until after purchasing the Class Vehicles. Plaintiffs and Class Members could not reasonably have been expected to learn of or discover Defendants' omissions of material information concerning the Class Vehicles until after manifestation of the Timing Chain Tensioner Defect and only then because consumers would be forced to research what had happened to their vehicles. Therefore, the discovery rule applies to all claims asserted by Plaintiffs and Class Members.

50.     Defendants have known about the Timing Chain Tensioner Defect since at least 2008, if not earlier, and have failed to alert Class Members to the defect. To the contrary, Defendants told Class Members who reported the Timing Chain Tensioner Defect that the mechanical failure of Class Vehicles was attributable to causes other than defective design and manufacture.

/ / /

51.     Thus, any applicable statute of limitations has been tolled by Defendants' actions and Defendants are estopped from pleading the statute of limitations because they failed to disclose facts they were obligated to disclose concerning the defect.

## CLASS ACTION ALLEGATIONS

52.     Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, against Defendants on behalf of a Class of all persons in the United States who (i) currently own or lease a model year 2007 through 2009 MINI Cooper Hardtop or model year 2008 through 2009 MINI Cooper Clubman with an N12 or N14 engine, or (ii) previously owned or leased a model year 2007 through 2009 MINI Cooper Hardtop or model year 2008 through 2009 MINI Cooper Clubman with an N12 or N14 engine and paid to repair or replace any engine component as a result of a defect in the timing chain tensioner.

53.     At all relevant times, Plaintiffs named herein were and are within the Class as described in the paragraph above.

54.     Members of the Class are so numerous that joinder of all members would be impracticable. Plaintiffs reasonably estimate there are thousands of Class Members.

55.     There is a well-defined community of interest in the questions of law and fact at issue in this action. Common questions of law and fact predominate over any questions affecting only individual members and will drive the resolution of the litigation. Those questions include:

     a.     Whether the Class Vehicles are affected by the Timing Chain Tensioner Defect;

     b.     Whether Defendants knew or should have known of the Timing Chain Tensioner Defect before it sold the Class Vehicles to Class Members;

     c.     Whether Defendants failed to disclose the Timing Chain Tensioner Defect to Class Members;

     d.     Whether the facts not disclosed by Defendants regarding the Timing Chain Tensioner Defect were material;

     e.     Whether the Timing Chain Tensioner Defect places the safety of Class Vehicle drivers and passengers at risk;

f.      Whether Defendants breached express and/or implied warranties;

g.      Whether Defendants violated N.J.S.A. 56:8-1, et seq.;

h.      Whether Defendants violated 15 U.S.C. § 2301, et seq.;

i.      Whether Defendants violated Ga. Code Ann. §§ 10-1-390, et seq.;

j.      Whether Defendants violated 815 Ill. Comp. Stat. 505/1, et seq.;

k.      Whether Defendants should be financially responsible for notifying Class Members of the Timing Chain Tensioner Defect and for the costs of repairing it; and

l.      Whether Defendants should be required to reimburse those Class Members who paid to repair or replace their Class Vehicles as a result of the Timing Chain Tensioner Defect.

56.    Plaintiffs' claims are typical of the claims of the members of the Class which they seek to represent. Plaintiffs have no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs.

57.    Plaintiffs will fairly and adequately protect the interests of the Class, and Plaintiffs have retained counsel experienced in complex class action litigation.

58.    A class action is superior to any other available methods for the fair and efficient adjudication of the claims of the Class. Without class certification, the prosecution of separate actions by individual class members would create a risk of:

a.      Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants;

b.      Adjudications with respect to the individual members which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication, or which would substantially impair or impede their ability to protect their interests; and

c.      Unnecessary delay and expense to all parties and the courts.

59.    Plaintiffs do not anticipate any difficulty in the management of this litigation.

**FIRST CAUSE OF ACTION**
**Breach of Express Warranty**

60.     Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 59 of this complaint.

61.     Plaintiffs bring this cause of action on behalf of themselves and Class Members against all Defendants.

62.     Defendants marketed the Class Vehicles as safe, technologically advanced, built to last, and in safe working condition. Such representations formed the basis of the bargain in Plaintiffs' and Class Members' decisions to purchase the Class Vehicles.

63.     Defendants, by and through their agent BMW OF NORTH AMERICA, LLC, provide an express warranty against any defects in materials and workmanship in Class Vehicles to the first retail purchaser and each subsequent purchaser for 48 months or 50,000 miles, whichever occurs first. Defendants also represented that defects in materials and workmanship in Class Vehicles that occurred during the initial warranty period would be replaced or repaired at no cost to the consumer.

64.     Defendants knew or should have known at the time of sale that the Class Vehicles were defective and would fail prematurely solely as a result of a defect in design, materials and workmanship, to wit, the Timing Chain Tensioner Defect.

65.     Defendants breached their express warranty by knowingly selling to Plaintiffs and Class Members the defective Class Vehicles without informing consumers of the Timing Chain Tensioner Defect.

66.     Defendants further breached their express warranty by failing to remedy the Timing Chain Tensioner Defect and repair damage caused by the Timing Chain Tensioner Defect without charge to the consumer even though the defect was present during the express warranty period.

67.     As a direct and proximate result of Defendants' actions, Plaintiffs and Class Members have suffered economic damages including, but not limited to, repair costs, loss of use of Class Vehicles, substantial losses in value and resale value of the Class Vehicles, and other damages.

## SECOND CAUSE OF ACTION
### Breach of Implied Warranty

68.     Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 59 of this complaint.

69.     Plaintiffs bring this cause of action on behalf of themselves and Class Members against all Defendants.

70.     Plaintiffs and Class Members purchased the Class Vehicles from Defendants by and through Defendants' authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party.

71.     At all relevant times, Defendants were the manufacturers, distributors, warrantors, and/or sellers of Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased.

72.     At the time of purchase, Defendants provided an implied warranty to Plaintiffs and Class Members that the Class Vehicles and their components, including, but not limited to, the timing chain tensioner, were merchantable and fit for the ordinary purposes for which they were sold.

73.     At the time of purchase, the Class Vehicles were defective, unsafe, and not fit for the ordinary purpose of providing reasonably reliable and safe transportation for a reasonably expected length of time. Under normal circumstances, and as recognized by Defendants, a properly designed and manufactured timing chain tensioner should last for the life of the engine without the need for repair or replacement.

74.     Defendants knew or should have known the Timing Chain Tensioner Defect existed in Class Vehicles at the time of manufacture and that Class Vehicles would fail prematurely.

75.     Defendants sold to Plaintiffs and Class Members the defective Class Vehicles without alerting them to the Timing Chain Tensioner Defect.

76.     After sale, Defendants have failed to notify Plaintiffs and the Class Members of the Timing Chain Tensioner Defect.

/ / /

77.     Defendants knew or should have known that a reasonable consumer exercising due diligence, including Plaintiffs and Class Members, could not have discovered the Timing Chain Tensioner Defect unless and until the defect manifested itself, as the tensioner is an internal part and not consumer-serviceable.

78.     Defendants failed to remedy the Timing Chain Tensioner Defect and repair damage caused by the Timing Chain Tensioner Defect without charge to the consumer.

79.     Plaintiffs and Class Members are third-party beneficiaries to a contract that gives rise to the implied warranty of merchantability, to the extent Defendants challenge such warranty based on a lack of privity.  Plaintiffs and Class Members purchased the Class Vehicles either directly from Defendants or from a network of authorized MINI dealers who are agents of Defendants.  The MINI dealers were not intended to be the ultimate consumers of the Class Vehicles as is made clear by the language used in the warranty that was provided with the Class Vehicles, and, in fact, those dealers have no rights under the warranty.  Indeed, the warranty was designed for and intended to benefit the ultimate consumers only, namely, Plaintiffs and Class Members.

80.     As a direct and proximate result of Defendants' actions, Plaintiffs and Class Members have suffered economic damages including, but not limited to, repair costs, loss of use of Class Vehicles, substantial losses in value and resale value of the Class Vehicles, and other damages.

### THIRD CAUSE OF ACTION
**Violation of N.J.S.A. 56:8-1, et seq.**

81.     Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 59, Paragraphs 61 through 67, and Paragraphs 69 through 80 of this complaint.

82.     Plaintiffs bring this cause of action on behalf of themselves and Class Members against all Defendants.

83.     The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq. ("NJCFA"), prohibits, in relevant part, "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . ." N.J.S.A. 56:8-2.

84.     Plaintiffs and Class Members are consumers who purchased and/or leased Class Vehicles for personal, family, or household use.

85.     Prior to Plaintiffs' and Class Members' purchase of the Class Vehicles, Defendants violated the NJCFA in the following respects:

> a.     Defendants affirmatively misrepresented that "[t]he timing chain driving the camshafts is not only very precise and reliable, but also **remains maintenance-free throughout the full running life of the engine"**; and

> b.     Defendants affirmatively represented that the Class Vehicles are safe and reliable despite knowledge of the Timing Chain Tensioner Defect.

86.     Plaintiffs and Class Members reasonably expected that the Class Vehicles would not be defectively designed such that the timing chain tensioner would fail during normal use and cause sudden catastrophic engine failure.

87.     Defendants knew, or, in the exercise of diligence, should have known, the Class Vehicles were defectively designed or manufactured, posed a safety risk, and were not suitable for their intended and/or expected use.

88.     In failing to disclose the Timing Chain Tensioner Defect, the safety risk it posed, and the associated (potential) repair options and attendant costs, Defendants omitted material facts they were under a duty to disclose to Plaintiffs and Class Members.

89.     The injury to consumers by this conduct greatly outweighs any alleged countervailing benefit to consumers or competition under all of the circumstances.

90.     Had Plaintiffs and Class Members known about the Timing Chain Tensioner Defect at the time of purchase, including the safety hazard posed by the defect and the monetary cost of repair, they would not have bought the Class Vehicles or would have paid much less for them.

91.     Had Plaintiffs and Class Members known about the Timing Chain Tensioner Defect, they would not have paid Defendants to repair the timing chain tensioner and the damage caused by the defect and would have instead insisted it be fixed under warranty and without cost.

92.     As a direct and proximate result of Defendants' actions, Plaintiffs and Class Members have suffered ascertainable loss.

## FOURTH CAUSE OF ACTION
### Violation of 15 U.S.C. § 2301, et seq.

93.     Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 59, Paragraphs 61 through 67, Paragraphs 69 through 80, and  Paragraphs 82 through 92 of this complaint.

94.     Plaintiffs bring this cause of action, on behalf of themselves and Class Members, against all Defendants.

95.     The Class Vehicles are consumer products as defined in 15 U.S.C. § 2301(6).

96.     Plaintiffs and Class Members are consumers as defined in 15 U.S.C. § 2301(3).

97.     Defendants are suppliers and warrantors as defined in 15 U.S.C. §2301(4)(5).

98.     By reason of Defendants' breach of its implied and express warranties that the Class Vehicles were safe, reliable, and free from material defects, and that Defendants would repair any such defects without cost to Class Members, Defendants have violated the rights of Plaintiffs and Class Members.

99.     As a direct and proximate result of Defendants' actions, Plaintiffs and Class Members have suffered economic damages including, but not limited to, repair costs, loss of use of Class Vehicles, substantial losses in value and resale value of the Class Vehicles, and other damages.

## FIFTH CAUSE OF ACTION
### Violation of Ga. Code Ann. §§ 10-1-390, et seq.

100.     Plaintiffs incorporate by reference the allegations contained in  Paragraphs 1 through 59, Paragraphs 61 through 67, Paragraphs 69 through 80,  Paragraphs 82 through 92, and Paragraphs 94 through 99 of this complaint.

101.     Plaintiffs assert that Defendants' wrongful acts and practices were directed and disseminated from Defendants' U.S. headquarters in Woodcliff Lake, New Jersey. Therefore, the New Jersey Consumer Fraud Act may constitutionally be applied to the claims of a nationwide class. If it is later determined by the Court that the choice of law rules require application of each states' laws, Plaintiff Joshua Skeen brings this alternative cause of action on behalf of himself, against all

Defendants.

102.    By engaging in the above-described conduct, Defendants perpetrated unfair competition or unfair or deceptive acts or practices in violation of the Georgia Fair Business Practices Act of 1975, Ga. Code Ann. §10-1-390, et seq.  In particular, Georgia law provides, "(a) A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he: . . . (5) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . . ; . . . (7) Represents that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another; . . . (9) Advertises goods or services with intent not to sell them as advertised." Ga. Code Ann. § 10-1-372.

103.    Georgia law further provides, "(a) Unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce are declared unlawful. (b) By way of illustration only and without limiting the scope of subsection (a) of this Code section, the following practices are declared unlawful: . . . (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . . . ; . . . (7) Representing that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another; . . . (9) Advertising goods or services with intent not to sell them as advertised . . . . " Ga. Code Ann. § 10-1-393(a).

104.    Prior to Plaintiff's purchase of the Class Vehicle, Defendants violated the Georgia Fair Business Practices Act in the following respects:

a.    Defendants knowingly failed to disclose that the Class Vehicles are affected by the Timing Chain Tensioner Defect, a safety hazard which was present on delivery and which can result in sudden and catastrophic engine failure;

b.    Defendants knowingly failed to disclose that the Class Vehicles are incapable of being used safely as the Timing Chain Tensioner Defect can manifest itself at any time, resulting in complete loss of power to the vehicle;

c.    Defendants knowingly failed to disclose in marketing materials and product manuals that the Class Vehicles are unsafe and unusable due to the Timing

Chain Tensioner Defect; and

d.    Defendants knowingly failed to disclose that the Class Vehicles were not of a particular standard and were instead unsafe due to the Timing Chain Tensioner Defect.

105.    Plaintiff reasonably expected that Class Vehicles would not be defectively designed such that the timing chain tensioner would fail during normal use and cause sudden catastrophic engine failure.

106.    Defendants knew, or, in the exercise of diligence, should have known, the Class Vehicles were defectively designed or manufactured, posed a safety risk, and were not suitable for their intended and/or expected use.

107.    In failing to disclose the Timing Chain Tensioner Defect, the safety risk it posed, and the associated (potential) repair options and attendant costs, Defendants omitted material facts they were under a duty to disclose to Plaintiff.

108.    Defendants' conduct has harmed Plaintiff and the general consuming public. The injury to consumers by this conduct greatly outweighs any alleged countervailing benefit to consumers or competition under all of the circumstances.

109.    Had Plaintiff known about the Timing Chain Tensioner Defect at the time of purchase, including the safety hazard posed by the defect and the monetary cost of repair, he would not have bought the vehicle or would have paid much less for it.

110.    Had Plaintiff known about the Timing Chain Tensioner Defect, he would not have paid Defendants to repair the timing chain tensioner and the damage caused by the defect and would have instead insisted it be fixed under warranty and without cost.

111.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered ascertainable loss.

### SIXTH CAUSE OF ACTION
#### Violation of 815 Ill. Comp. Stat. 505/1, et seq.

112.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 59, Paragraphs 61 through 67, Paragraphs 69 through 80, and Paragraphs 82 through 92 of this

complaint.

113.     Plaintiffs assert that Defendants' wrongful acts and practices were directed and disseminated from Defendants' U.S. headquarters in Woodcliff Lake, New Jersey. Therefore, the New Jersey Consumer Fraud Act may constitutionally be applied to the claims of a nationwide class. If it is later determined by the Court that the choice of law rules require application of each states' laws, Plaintiff Laurie Freeman brings this cause of action on behalf of herself and a sub-class of Illinois residents, against all Defendants.

114.     By engaging in the above-described conduct, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1, et seq. In particular, Illinois law provides, "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965, [footnote] in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. . . ." 815 Ill. Comp. Stat. 505/2.

115.     Prior to Plaintiff's and Illinois Sub-Class members' purchases of the Class Vehicle, Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act in the following respects:

> a.     Defendants knowingly failed to disclose that the Class Vehicles are affected by the Timing Chain Tensioner Defect, a safety hazard which was present on delivery and which can result in sudden and catastrophic engine failure;
>
> b.     Defendants knowingly failed to disclose that the Class Vehicles are incapable of being used safely as the Timing Chain Tensioner Defect can manifest itself at any time, resulting in complete loss of power to the vehicle;
>
> c.     Defendants knowingly failed to disclose in marketing materials and product manuals that the Class Vehicles are unsafe and unusable due to the Timing

Chain Tensioner Defect; and

d. Defendants knowingly failed to disclose that the Class Vehicles were not of a particular standard and were instead unsafe due to the Timing Chain Tensioner Defect.

116. In failing to disclose the Timing Chain Tensioner Defect, the safety risk it posed, and the associated (potential) repair options and attendant costs, Defendants omitted material facts they were under a duty to disclose to Plaintiff.

117. Had Plaintiff and Illinois Sub-Class Members known about the Timing Chain Tensioner Defect at the time of purchase, including the safety hazard posed by the defect and the monetary cost of repair, they would not have bought the Class Vehicles or would have paid much less for them.

118. Had Plaintiff and Illinois Sub-Class Members known about the Timing Chain Tensioner Defect, they would not have paid Defendants to repair the timing chain tensioner and the damage caused by the defect.

119. As a direct and proximate result of Defendants' actions, Plaintiff and the Illinois Sub-Class Members have suffered ascertainable loss.

## PRAYER FOR RELIEF

120. WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Defendants as follows:

a. An Order certifying the proposed Class, designating Plaintiffs as the named representatives of the Class, and designating the undersigned as Class Counsel;

b. A declaration that Defendants are financially responsible for notifying all Class Members of the Timing Chain Tensioner Defect and Defendants' obligation to repair the defect or reimburse Class Members for such repairs;

c. An injunction, where applicable, requiring Defendants to repair the Timing Chain Tensioner Defect at no charge to Class Members;

d. An award to Plaintiffs and Class Members of compensatory, exemplary,

and/or statutory damages in an amount to be proven at trial;

e.    An award of restitution;

f.    An award of attorneys' fees and costs, as allowed by law;

g.    An award of pre-judgment and post-judgment interest, as allowed by law;

h.    For leave to amend the Complaint to conform to the evidence produced at trial; and

i.    Such other and further relief as the Court may deem just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

DATED: March 12, 2013

By: _____

William Pinilis, Esq.
**PinilisHalpern LLP**
160 Morris Street
Morristown, N.J. 07960
Tel.: (973) 401-1111
Fax: (973) 401-1114

Raymond P. Boucher, Esq.
**LAW OFFICE OF RAYMOND P. BOUCHER**
8648 Wilshire Boulevard
Beverly Hills, CA 90211
Tel: (310) 854-4444
Fax: (310) 854-0812

Paul R. Kiesel, Esq.
Jeffrey A. Koncius, Esq.
Maria L. Weitz, Esq.
**KIESEL + LARSON LLP**
8648 Wilshire Boulevard
Beverly Hills, CA 90211
Tel: (310) 854-4444
Fax: (310) 854-0812

David Markun, Esq.
**MARKUN ZUSMAN COMPTON LLP**
17383 West Sunset Boulevard, Suite A380
Pacific Palisades, California 90272
Tel: (310) 454-5900
Fax: (310) 454-5970

Attorneys for Plaintiffs

/ / /

/ / /

/ / /

/ / /

## DEMAND FOR JURY TRIAL

Plaintiffs JOSHUA SKEEN and LAURIE FREEMAN, individually and on behalf of all others similarly situated, hereby demand trial by jury.

DATED: March __, 2013

By: _____
William Pinilis, Esq.
**PINILISHALPERN LLP**
160 Morris Street
Morristown, N.J. 07960
Tel.: (973) 401-1111
Fax: (973) 401-1114

Raymond P. Boucher, Esq.
**LAW OFFICE OF RAYMOND P. BOUCHER**
8648 Wilshire Boulevard
Beverly Hills, CA 90211
Tel: (310) 854-4444
Fax: (310) 854-0812

Paul R. Kiesel, Esq.
Jeffrey A. Koncius, Esq.
Maria L. Weitz, Esq.
**KIESEL + LARSON LLP**
8648 Wilshire Boulevard
Beverly Hills, CA 90211
Tel: (310) 854-4444
Fax: (310) 854-0812

David Markun, Esq.
**MARKUN ZUSMAN COMPTON LLP**
17383 West Sunset Boulevard, Suite A380
Pacific Palisades, California 90272
Tel: (310) 454-5900
Fax: (310) 454-5970

Attorneys for Plaintiffs