PINILISHALPERN, LLP
William J. Pinilis (024721992)
160 Morris Street
Morristown, NJ 07960
Tel: (973) 401-1111/Fax: (973) 401-1114
Attorney for Plaintiff
File No.: 11619

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSHUA SKEEN and LAURIE FREEMAN, on behalf of themselves and all others similarly situated, | Civil Action No.: 2:13-cv-01531-WHW-CLW |
| Plaintiffs, | |
| v. | |
| BMW OF NORTH AMERICA, LLC, a Delaware limited liability company; BMW (U.S.) HOLDING CORP., a Delaware corporation; and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, a foreign corporation, | |
| Defendants. | |

**DECLARATION OF RAYMOND P. BOUCHER IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND
NOTICE PROGRAM**

## DECLARATION OF RAYMOND P. BOUCHER

I, Raymond P. Boucher, declare as follows:

1.      I am an attorney admitted *pro hac vice* to practice before this Court. I am a partner with Boucher LLP, a shareholder of the Law Office of Raymond Boucher, A.P.C., and am Interim Co-Lead Class Counsel on behalf of plaintiffs in this action. I am a former member of Khorrami Boucher, LLP, and former partner of Kiesel Boucher Larson, LLP, both of which were former counsel of record for plaintiffs in this action.

2.      I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein. I make this declaration in support of Plaintiff's Motion For Preliminary Approval Of Class Action Settlement And Notice Program.

3.      As explained herein, Plaintiffs' Counsel believe the Settlement to be fair, reasonable, and adequate, and in the best interests of the class.

### BACKGROUND

4.      This action alleges that certain MINI Cooper vehicles marketed and sold by Defendants BMW of North America, LLC and Bayerische Motoren Werke Aktiengesellschaft (collectively, "Defendants" or "BMW") contain a defect in a component part known as the "Timing Chain Tensioner," which causes the engine to malfunction and eventually, if left unrepaired, to fail. This action involves the following turbocharge-equipped MINI Cooper automobiles equipped with "N14" engines and manufactured at any time from start of production in November 2006 through July 2010 (the "Class Vehicles"): model-year 2007 through 2009 MINI Cooper 'S' Hardtop (R56); model-year 2008 through 2009 MINI Cooper 'S' Clubman (R55); and model-year 2009 through 2010 MINI Cooper 'S' Convertible (R57).

5.      On March 12, 2013, Plaintiffs Joshua Skeen and Laurie Freeman filed this action alleging that Defendants knew or should have known of the issues with the timing chain and its components at the time the Class Vehicles were put into the stream of commerce in this jurisdiction and throughout the United States. (ECF No. 1.)

6.      Plaintiffs Julian Mercado, Karla Moreno-Vanni, Lauren Sanders, and Teresa Welch own MINI vehicles equipped with N12 engines (the "N12 Plaintiffs"), which are not part of this class settlement, and are therefore not participating in the class settlement, which covers vehicles equipped with N14 engines.

7.      Multiple other putative class actions, all of which sought relief, similar to this action, under various state and federal laws for the timing chain tensioner issue, were eventually filed in the United States District Court for the Districts of New Jersey, California, New York, and Ohio:

        a.      On  July 31, 2013, Plaintiff Patricia Curran filed a putative class action against Defendants in the United States District Court for the District of New Jersey (*Curran v. BMW of North America, LLC*, Civil Action No. 2:13-cv-4625-WHW-CLW), which was eventually consolidated with this action by Order dated December 6, 2013.

        b.      On April 17, 2014, Plaintiff Richard Kahn filed a putative class action against Defendants in the United States District Court for the Eastern District of New York (*Kahn v. BMW of North America, LLC*, Civil Action No. 2:14-cv-02463-ADS-ARL) (the "*Kahn*" Action);

        c.      Also on April 17, 2014, Plaintiffs Jessica Brown and Wayne Brown filed a putative class action against Defendants in the United States District Court for the Southern District of California (*Brown v. BMW of North America, LLC*, Civil Action No. 3:14-cv-00950-

JLS-BLM). On September 8, 2014, the United States District Court for the Southern District of California granted BMW NA's motion to stay the *Brown* proceedings. Plaintiffs Jessica Brown and Wayne Brown own vehicles equipped with N12 engines, which are not part of this class settlement, and are therefore not participating. The Browns are also "N12 Plaintiffs."

      d.     On June 11, 2014, Plaintiff Judy Quinlan filed a putative class action against Defendants in the United States District Court for the Southern District of Ohio (*Quinlan v. BMW of North America, LLC,* Civil Action No. 1:14-cv-00485-MRB). Plaintiff Judy Quinlan owns a vehicle equipped with an N12 engine, which is not part of this class settlement, and is therefore not participating. Quinlan is also one of the "N12 Plaintiffs."

      8.     On April 23, 2013, Defendants filed a motion to dismiss the first-filed complaint on various grounds (ECF No. 5). In response, the parties agreed to the filing of the First Amended Complaint, which named Plaintiffs Joshua Skeen, Laurie Freeman, Scott Lamb, Gina Romaggi, and Emmanuel Nomikos (ECF No. 13; "FAC").

      9.     On July 23, 2013, Defendants sought to dismiss the FAC (ECF No. 15), and Plaintiffs filed their opposition (ECF No. 28). By order dated January 24, 2014, this Court denied in part and granted in part Defendants' motion. (ECF No. 39). On May 2, 2014, a Second Amended Complaint was filed on behalf of 21 plaintiffs from 12 states (ECF No. 53), to which Defendants ultimately filed their Answer (ECF No. 58) on July 16, 2014.

      10.     On April 29, 2014, the Court appointed Khorrami Boucher Sumner Sanguinetti, LLP (predecessor to Khorrami Boucher LLP), Cafferty Clobes Meriwether & Sprengel LLP, and Markun Zusman Freniere Compton LLP as Interim Co-Lead Class Counsel, with Pinilis Halpern, LLP as Interim Liaison Counsel. (ECF No. 48).

      11.     After the parties exchanged initial disclosures, Plaintiffs' counsel continued to

investigate the timing chain failures being reported to them from consumers across the country (and sometimes outside of it). During the course of the litigation, Plaintiffs' counsel not only had the benefit of the input and service records from their approximately two dozen clients, but also communicated with hundreds of consumers and obtained service records from many who had experienced the defect. Further, the parties exchanged extensive written discovery requests and noticed various depositions. As a result, Plaintiffs' Counsel were well versed before negotiating, and ultimately agreeing to, the details of the Settlement.

## SETTLEMENT NEGOTIATIONS

12.     Following the rulings on the above-referenced dispositive motions, the parties began to discuss settlement. The Settlement was the culmination of lengthy negotiations among the parties, which involved a full-day mediation with the Honorable Theodore Katz (Ret.) on February 14, 2014, a settlement conference with the Honorable Cathy L. Waldor and full day of discussions on October 13, 2014, and multiple in-person, telephonic, and written communications between the parties spanning more than one year. The Settlement fully resolves all claims that were asserted in this matter relating to class vehicles.

13.     Only after the class benefits were negotiated, did the parties discuss attorney's fees and expenses. Unable to agree, the parties first sought assistance from the Honorable Cathy L. Waldor, then retained Judge Joel A. Pisano (Ret.) and mediated the issue in person after written submissions.

14.     The Settlement was the result of a fully informed decision by Plaintiffs' Counsel who had, before the filing of the action, consulted extensively with an independent automotive expert who explained the nature of the timing chain issue, and an expert in material sciences who performed analysis on the differences between the original part used at manufacture and the subsequently introduced part.

## FAIR & REASONABLE SETTLEMENT

15.     This case was settled through arm's length negotiation. The settlement for each participating Class Member is fair, reasonable, and adequate given the inherent risk, cost and length of litigation. The amount recoverable for each Class Member is fair and reasonable based on a review of all objective evidence. The settlement that has been reached, subject to this Court's approval, is the product of tremendous effort, and a great deal of expense by the parties and their counsel.

16.     The relief to be provided to Class Members directly addresses the issues they have experienced, or might experience, relating to the timing-chain tensioner. The Settlement provides, in sum, the following relief to each Class Member: (a) a warranty extension for the Timing-Chain Tensioner and related parts; (b) reimbursement to all Class Members who repaired or replaced a Timing Chain or Timing-Chain Tensioner before the Effective Date of the Settlement; (c) reimbursement to all Class Members who repaired or replaced a damaged or failed engine due to a Timing Chain or Timing-Chain Tensioner failure before the Effective Date of Settlement; and, (d) compensation to all Class Members whose Class Vehicles were sold at a loss due to a failed engine resulting from a failed Timing Chain or Timing-Chain Tensioner. The specifics of each component of the Settlement are outlined in Section VIII of the Settlement Agreement.

17.     All Class Vehicles will receive a warranty extension for the following parts all of which are part of the timing chain and its components: timing-chain tensioner; sealing ring; timing chain; guide rail; tensioner rail; sliding rail; sprocket on the crankshaft; bearing bolts for the tensioner and guide rails ("Covered Parts"). All Class Vehicles were originally covered by the MINI New Vehicle Limited Warranty for a period of 4 years or 50,000 miles from the date the vehicle was first placed into service, whichever comes first. The Settlement extends the

warranty period for Covered Parts to 7 years or 100,000 miles from the vehicle's original in-service date, whichever comes first, and will otherwise be subject to the terms and conditions of the standard MINI New Vehicle Limited Warranty. This extension is in addition to any other warranties applicable to the Class Vehicles. *See* Settlement Agreement ¶ III.A.

18.     All Class Members who repaired or replaced a Timing Chain or Timing-Chain Tensioner before the Effective Date of the Settlement and who submit a valid Claim are entitled to be reimbursed as outlined in Paragraph III.B of the Settlement Agreement.

19.     All Class Members whose Class Vehicle suffered a failed engine due to the failure of the Timing-Chain or Timing Chain Tensioner in their Class Vehicle and who submit a valid Claim (as set forth below) are entitled to be reimbursed for out-of-pocket expenses as outlined in Paragraph III.C of the Settlement Agreement.

20.     All Class Members whose Class Vehicles were sold at a loss due to an unrepaired failed or damaged engine caused by a failed Timing Chain or Timing-Chain Tensioner, and who submit a valid Claim, are entitled to compensation as set forth in Paragraph III.D of the Settlement Agreement.

21.     In order to obtain reimbursement under the Settlement, the Class Member must complete and submit a claim form that seeks information and documents relating to the Class Member and Class Vehicle, including documents evidencing adherence to the vehicle maintenance schedule, in particular, regular oil changes (within 2,000 miles of the recommended schedule), up to date/mileage of replacement/repair. If maintenance records are not available, a "Mechanic's Attestation" may be submitted. *See* Settlement Agreement ¶ III.B.4, III.C.4, III.D.2.

22.     The Settlement requires that almost all notice and administrative costs be paid by Defendants, separate and apart from any benefits to Class Members. Defendants will pay all of

the notice and administrative costs associated with implementing the Settlement, except that Class Counsel will pay for the cost of individual email notice. Notice to the Class will be given as follows: (1) individual direct mail (first class) notice regarding the Settlement will be sent to all current and former owners and lessees of Class Vehicles using BMW NA's database and/or RL Polk data; (2) individual email notice will be sent to all current and former owners and lessees of Class Vehicles using BMW NA's database and RL Polk data for whom a valid email address exists; (3) publication on a website maintained by the Settlement Administrator; (4) maintaining a toll-free telephone line to respond to inquiries regarding the Settlement; and, (5) sending notice to governmental agencies as required by the Class Action Fairness Act.

23.    All claims submitted for reimbursement or compensation will be reviewed  by the Settlement Administrator, which will be responsible for ensuring all information required under the Settlement Agreement has been submitted. Any Claimant whose claim is deemed incomplete, or whose claim is denied in whole or in part, will receive notice from the Settlement Administrator by first-class mail and will have an opportunity to cure the deficiencies. *See* Settlement Agreement ¶ III.E.1.

24.    All claims accepted by the Settlement Administrator as complying with the requirements of the Settlement Agreement will be submitted to Defendants who may challenge the submission based on evidence that: (1) the vehicle's warranty was voided; (2) the VIN number associated with the claim does not match the Settlement Class Member's VIN number; (3) the Settlement Class Member has received "goodwill" or other pricing adjustment, coupon, reimbursement, or refund from BMW NA, a MINI Dealer, or any person or entity equal to the amount of the claim submitted; and/or (4) the claim for reimbursement is for an item or service that is not covered under the Settlement Agreement. *See* Settlement Agreement ¶ III.E.2.

25.     If the Settlement Administrator rejects a claim and the Settlement Class Member is unable to cure the deficiency, or if Defendants object to the claim based on evidence of the above-listed disqualification criteria, and the Settlement Class Member disagrees, the Settlement Class Member may notify Class Counsel that the Settlement Class Member wishes to appeal the denial. In such cases, the Parties will meet and confer in an effort to resolve the dispute. If the Parties are unable to resolve any dispute by meeting and conferring, the claim will be submitted to a Special Master, whose determination will be final and binding. Any other dispute regarding relief under the terms of the Settlement, including the validity of any Claim Form submitted, will also be submitted to the Special Master. *See* Settlement Agreement ¶ III.E.3.

26.     The Settlement provides that Plaintiffs' Counsel may apply to the Court for an award of attorneys' fees and costs not to exceed $2,320,000, and payable by Defendants separate and apart from the relief provided the Class. Settlement Agreement ¶ VIII.A-B. While not agreeing to the total amount of such an award, Defendants have agreed not object to Class Counsel's application for an award of fees and expenses up to $1,820,000. The Parties have further agreed that Class Counsel shall not seek payment of any amount in excess of $2,320,000 if awarded by the Court.

27.     Plaintiffs will also be allowed to make an application to the Court for a service award of $4,000 each, which is intended as compensation for instituting, prosecuting and bearing the laboring oar and risk of this litigation as Class Representatives. This amount will be paid by Defendants in addition to any benefits to be paid under the Settlement to the Class. *See* Settlement Agreement ¶ VIII.C.

28.     The Settlement Agreement contains a narrowly tailored release that is specifically limited to claims arising out of the allegations in this case relating to the timing chain and its

components in the Class Vehicles, and expressly excludes personal injury and subrogation claims. *See* Settlement Agreement ¶ VII.

## THE SETTLEMENT CLASS

29.     Pursuant to the Settlement Agreement, the parties have stipulated, for settlement purposes only, to the following class: "All persons or entities in the United States, the District of Columbia, and Puerto Rico who currently own or lease, or previously owned or leased, a model-year 2007 through 2009 MINI Cooper 'S' Hardtop (R56), a model-year 2008 through 2009 MINI Cooper 'S' Clubman (R55), or a model-year 2009 through 2010 MINI Cooper 'S' Convertible (R57) vehicle, manufactured at any time from start of production in November 2006 through July 2010."

30.     Our investigation revealed that tens of thousands of Class Vehicles were sold to consumers, all of whom are potential members of the settlement class.

31.     Our investigation and analysis of the claims in this case revealed that Defendants' conduct toward all members of the class was the same. All Class Vehicles had the allegedly defective timing chain tensioner installed. All claims are predicated on the core common issue as to whether Defendants are liable for the damages suffered by the Class as a result.

32.     All Class Members assert the same or similar legal theories of liability against Defendants. Common questions of law and fact include, but are not limited to: (a) whether Defendants knew or should have known that the Class Vehicles contained the alleged defect when it placed them into the stream of commerce; (b) whether Defendants have a duty to honor its warranty on the Class Vehicles; and, (c) whether Defendants, in refusing to honor the Class Vehicles' warranty, violated applicable federal and state consumer protection laws.

33.     Plaintiffs, who will serve as Class Representatives, have no interests antagonistic to the class.

34.     Given the relatively small individual claims at issue relating to the alleged defect, there would be little or no interest for each Class Member to proceed with their own cases.

35.     Class Members are represented by attorneys with significant experience in prosecuting complex class and mass action litigation on behalf of Plaintiffs. Lead Class Counsel in this case consists of my firm, Boucher LLP, along with Cafferty Clobes Meriwether & Sprengel LLP, and Markun Zusman Compton LLP. Pinilis Halpern LLP served as Liaison Counsel. The Court previously found in its April 29, 2014 Order (ECF No. 48) that lead and liaison counsel in this case satisfy the Rule 23(g) factors regarding adequacy of representation. Lead Class Counsel worked in cooperation with additional Class Counsel, Kiesel Law LLP, Ahdoot & Wolfson PC, and Morgan & Morgan Complex Litigation Group, all of which are exceedingly qualified in class action and complex litigation. The qualifications of all counsel are outlined in the resumes and curriculum vitae attached hereto as Exhibit 2.

### SETTLEMENT DOCUMENTS

36.     My office, together with other Interim Co-Lead Class Counsel in this action, together with additional Class Counsel from Kiesel Law LLP, Pinilis Halpern LLP, Ahdoot & Wolfson PC, and Morgan & Morgan Complex Litigation Group, and Defendants' counsel, Buchanan Ingersoll & Rooney PC, have finalized the terms of the following documents:

a.     Settlement Agreement and Release (the "Settlement Agreement"), a true and correct copy of which is attached hereto as Exhibit 1;

b.     Timing Chain Tensioner Class Action Settlement Claim Form, a true and correct copy of which is attached as Exhibit A to the Settlement Agreement;

c.     Notice of Proposed Settlement of Class Action ("Notice"), a true and correct copy of which is attached as Exhibit B to the Settlement Agreement; and

/ / /

00040409.8                                                  10

        d.      Proposed Preliminary Approval Order, a true and correct copy of which is attached as Exhibit C to the Settlement Agreement.

      37.      In my judgment, the settlement is fair, adequate, and a reasonable resolution of the Plaintiff's and proposed class members' claims against Defendants.

      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

      Executed on this 19th day of November, 2015, at Woodland Hills, California.

                                    */s/ Raymond P. Boucher*
                                      Raymond P. Boucher

EXHIBIT 1

## <u>SETTLEMENT AGREEMENT AND RELEASE</u>

Plaintiffs and Class Representatives Joshua Skeen, Laurie Freeman, Scott Lamb, Gina Romaggi, Emmanuel Nomikos, Gregory Abbott, Vicki Blasucci, Scott Bookhout, Michelle Colberg, Kevin Kebabjian, Marta Motel, Ginger Roach, James Stoecker, Heather Swango, Patricia Curran, Maryanne Howland, Candi Sossa, and Richard Kahn ("Plaintiffs" or "Class Representatives"), by and through their counsel, and Defendants, BMW of North America, LLC ("BMW NA") and Bayerische Motoren Werke Aktiengesellschaft ("BMW AG") (BMW NA and BMW AG collectively "Defendants"), by and through their counsel, hereby enter into this Settlement Agreement providing, subject to the approval of the Court, for the settlement of the claims herein described against Defendants (the "Settlement").

**WHEREAS**, Plaintiffs Joshua Skeen and Laurie Freeman filed a putative class action against Defendants in the United States District Court for the District of New Jersey (*Skeen v. BMW of North America, LLC,* Civil Action No. 2:13-cv-1531-WHW-CLW) (the "*Skeen*" Action) on March 12, 2013; and

**WHEREAS**, Plaintiffs Joshua Skeen, Laurie Freeman, Scott Lamb, Gina Romaggi, and Emmanuel Nomikos filed a First Amended Complaint in the *Skeen* action on June 14, 2013; and

**WHEREAS**, Plaintiff Patricia Curran filed a putative class action against Defendants in the United States District Court for the District of New Jersey (*Curran v. BMW of North America, LLC,* Civil Action No. 2:13-cv-4625-WHW-CLW) (the "*Curran*" Action), on July 31, 2013; and

/ / /

/ / /

00027785.27                                              1

WHEREAS, the United States District Court for the District of New Jersey consolidated the *Skeen* and *Curran* actions by Order dated December 6, 2013 (collectively, the *Skeen* Action); and

WHEREAS, the Court granted, in part, Defendants' Motion to Dismiss the First Amended Complaint in the *Skeen* Action by Opinion and Order dated January 24, 2014; and

WHEREAS, the Court appointed Khorrami Boucher Sumner Sanguinetti, LLP, Cafferty Clobes Meriwether & Sprengel LLP, and Markun Zusman Freniere Compton LLP as Interim Co-Lead Class Counsel, with Pinilis Halpern, LLP as Interim Liaison Counsel in the *Skeen* Action by Opinion and Order dated April 29, 2014; and

WHEREAS, Plaintiffs[1] Joshua Skeen, Laurie Freeman, Scott Lamb, Gina Romaggi, Emmanuel Nomikos, Gregory Abbott, Vicki Blasucci, Scott Bookhout, Michelle Colberg, Kevin Kebabjian, , Marta Motel, Ginger Roach, James Stoecker, Heather Swango, Patricia Curran, Maryanne Howland, and Candi Sossa filed a Second Amended Complaint in the *Skeen* Action on May 2, 2014; and

WHEREAS, Defendants filed Answers to the Second Amended Complaint in the *Skeen* Action on July 16, 2014; and

WHEREAS, Plaintiff Richard Kahn filed a putative class action against Defendants in the United States District Court for the Eastern District of New York (*Kahn v. BMW of North America, LLC,* Civil Action No. 2:14-cv-02463-ADS-ARL) (the "*Kahn*" Action), on April 17, 2014; and

---

[1] Plaintiffs Julian Mercado, Karla Moreno-Vanni, Lauren Sanders, and Teresa Welch own MINI vehicles equipped with N12 engines, which are not part of this class settlement, and are therefore not participating in the class settlement (the "N12 Plaintiffs").

**WHEREAS** Plaintiffs Jessica Brown and Wayne Brown[2] filed a putative class action against Defendants in the United States District Court for the Southern District of California (*Brown v. BMW of North America, LLC,* Civil Action No. 3:14-cv-00950-JLS-BLM) (the "*Brown*" Action), on April 17, 2014; and

**WHEREAS** Plaintiff Judy Quinlan[3] filed a putative class action against Defendants in the United States District Court for the Southern District of Ohio (*Quinlan v. BMW of North America, LLC,* Civil Action No. 1:14-cv-00485-MRB) (the "*Quinlan*" Action), on June 11, 2014; and

**WHEREAS**, BMW NA moved to stay proceedings in the *Kahn* and *Brown* Actions based on the pending *Skeen* Action; and

**WHEREAS**, the United States District Court for the Southern District of California granted BMW NA's motion to stay proceedings in the *Brown* Action by Opinion and Order dated September 8, 2014; and

**WHEREAS**, Plaintiffs' counsel in the *Skeen* Action and Defendants' counsel conducted a full day of mediation with the Honorable Theodore H. Katz, U.S.M.J. (Ret.) on February 14, 2014, in New York, New York; and

**WHEREAS,** over the course of the next several months Plaintiffs' counsel in the *Skeen* Action and Defendants' counsel continued to engage in settlement discussions and exchanged settlement proposals; and

/ / /

---

[2] Plaintiffs Jessica Brown and Wayne Brown own a MINI vehicle equipped with an N12 engine, which is not part of this class settlement, and is therefore not participating in the class settlement.  The Browns are also "N12 Plaintiffs."

[3] Plaintiff Judy Quinlan owns a MINI vehicle equipped with an N12 engine, which is not part of this class settlement, and is therefore not participating in the class settlement. Quinlan is also one of the "N12 Plaintiffs."

**WHEREAS**, Plaintiffs' counsel in the *Skeen, Brown, Kahn,* and *Quinlan* Actions (collectively, the "Actions") conducted a full day of settlement discussions on October 13, 2014; and

**WHEREAS**, Plaintiffs and Defendants have vigorously contested all of the factual and legal issues in the Actions; and

**WHEREAS**, after two full days of vigorous discussions and negotiations, and numerous exchanges of information and settlement proposals, the Parties were able to reach an agreement to resolve the Actions and the disputes between them; and

**WHEREAS**, Plaintiffs in the *Skeen* Action have filed a Third Amended Complaint incorporating the parties and claims in the *Brown, Kahn*, and *Quinlan* Actions;

**WHEREAS**, for purposes of this settlement only, Plaintiffs and Defendants (the "Parties") agree to the certification of a settlement class ("Class" or "Settlement Class") defined as follows:

> All persons or entities in the United States, the District of Columbia, and Puerto Rico who currently own or lease, or previously owned or leased, a model-year 2007 through 2009 MINI  Cooper 'S' Hardtop (R56), a model-year 2008 through 2009 MINI Cooper 'S' Clubman (R55), or a model-year 2009 through 2010 MINI Cooper 'S' Convertible (R57) vehicle, which was manufactured at any time from start of production in November 2006 through July 2010.

**WHEREAS**, the Parties agree that the following persons and entities should be excluded from the Class: Defendants, as well as Defendants' affiliates, employees, officers and directors, attorneys, agents, insurers, third-party providers of extended warranty/service contracts, franchised dealers, independent repair/service facilities, fleet owners and operators, rental companies and vehicles, the attorneys representing

00027785.27

4

Defendants in this case, the Judges and Mediator to whom this case is assigned and their immediate family members, all persons who request exclusion from (opt-out of) the Settlement, vehicles deemed a total loss (other than vehicles whose engines failed or were damaged due to timing-chain tensioner and/or timing chain failure), vehicles whose true mileage is unknown, all persons who previously released any claims encompassed in this Settlement, and vehicles transported outside the United States; and

**WHEREAS**, Plaintiffs and Defendants have conducted a thorough examination and investigation of the facts and law relating to the matters in the Actions; and

**WHEREAS**, Defendants expressly deny any wrongdoing alleged in the pleadings and do not admit or concede any actual or potential fault, wrongdoing, or liability in connection with any facts or claims that have been or could have been alleged against them in the Actions.   Even though Defendants expressly deny any wrongdoing, Defendants have concluded that settlement is desirable in order to avoid the time, expense, and inherent uncertainties of defending protracted litigation and to resolve, finally and completely, all pending and potential claims of the Plaintiffs and all members of the Class which were or could have been asserted by Plaintiffs and the Class in the Actions; and

**WHEREAS**, Plaintiffs recognize the substantial benefits to Plaintiffs and the Class under the terms of this Settlement Agreement and the costs, risks, and uncertainty of protracted litigation, especially in complex actions such as this, as well as the difficulties and delays inherent in such litigation, and believe that it is in their interest, and the interest of all Class Members, to resolve the Actions, and any and all claims against Defendants, in order to provide effective relief promptly to Plaintiffs and the Class in this Settlement Agreement; and

**WHEREAS**, significant arm's-length settlement negotiations have taken place between the Parties and, as a result, this Settlement Agreement has been reached, subject to the Court approval process set forth herein; and

**WHEREAS**, the undersigned Parties believe that this Settlement Agreement offers significant benefits to Class Members and is fair, reasonable, adequate, and in the best interest of  Class Members; and

**WHEREAS**, this Settlement Agreement is made and entered into by and among Plaintiffs, individually and on behalf of the Class, and Defendants;

**NOW, THEREFORE**, it is hereby stipulated and agreed, by and between the undersigned Parties, as follows:

## I.      DEFINITIONS

As used in this Settlement Agreement and the attached exhibits (which are an integral part of this Settlement Agreement and are incorporated in their entirety by reference), the following terms will have the meaning set forth below, unless this Settlement Agreement specifically provides otherwise.  Where appropriate, terms used in the singular will be deemed to include the plural and vice versa.

A.      **Actions**.  "Actions" means the above-described *Skeen, Brown, Kahn,* and *Quinlan* Actions, excluding the N12 Plaintiffs.

B.      **BMW AG**.  "BMW AG" means Bayerische Motoren Werke Aktiengesellschaft and its predecessors, successors, assigns, parents, affiliates, directors, officers, agents, insurers, attorneys, representatives, and employees.

C.      **BMW NA**.  "BMW NA" means BMW of North America, LLC and its predecessors, successors, assigns, parents, affiliates, directors, officers, agents, insurers,

attorneys, representatives, employees, and, for purposes of this Settlement Agreement only, BMW NA's franchised dealerships.

   D.   **Claim Form**.  "Claim Form" means a form in substantially the same form as that attached hereto as Exhibit "A."

   E.   **Claims Period**.  "Claims Period" means the time period through which Claim Forms may be submitted by Class Members and will conclude ninety (90) days following entry of the Preliminary Approval Order.

   F.   **Claims Confirmation Process**.  "Claims Confirmation Process" means the process by which properly submitted claims are reviewed and validated by Defendants. Within forty-five (45) days of Defendants' receipt from the Settlement Administrator of properly submitted claims, Defendants may object to the approval of the claim based on evidence that: (1) the vehicle's warranty was voided because (a) the VIN has been altered or cannot be read, (b) the odometer has been replaced or altered and the true mileage cannot be determined, (c) the vehicle has been declared a total loss or sold for salvage purposes (for reasons unrelated to timing-chain tensioner or timing-chain failure), or (d) if the vehicle has been used in any competitive event; (2) the VIN number associated with the claim does not match the Settlement Class Member's VIN number; (3) the claim has previously been paid by BMW NA, a MINI Dealer, or any other entity through "goodwill" or other pricing adjustment, coupon, reimbursement, or refund equal to the amount of the claim submitted; and/or (4) the claim for reimbursement is for an item or service that is not covered under this Settlement Agreement.

   G.   **Class Counsel**.  "Class Counsel" means Boucher LLP; Kiesel Law LLP; Markun Zusman Compton LLP; Cafferty Clobes Meriwether & Sprengel LLP; Pinilis

Halpern LLP; Ahdoot & Wolfson PC; and Morgan & Morgan Complex Litigation Group.

      H.    **Class Counsel Fees and Expenses**.  "Class Counsel Fees and Expenses" means the reasonable attorneys' fees and expenses approved by the Court, to be paid by Defendants.  As part of the resolution of the Actions, Class Counsel and Defendants have agreed Class Counsel may apply to the Court for an award of Class Counsel Fees and Expenses and that Defendants may object to or oppose that application. While not agreeing to the total amount of such an award, the Parties have agreed that Defendants will not object to Class Counsel's application for an award of fees and expenses up to $1,820,000, and that Class Counsel may apply for an award of fees and expenses not to exceed $2,320,000. The Parties have further agreed that Class Counsel shall not seek payment of any amount in excess of $2,320,000 if awarded by the Court. The Class Counsel Fees and Expenses will be paid separate and apart from any relief provided to the Class.

      I.    **Class Members**.  "Class Members" means all persons or entities in the United States, the District of Columbia, and Puerto Rico who currently own or lease, or previously owned or leased, a model-year 2007 through 2009 MINI  Cooper 'S' Hardtop (R56), a model-year 2008 through 2009 MINI Cooper 'S' Clubman (R55), or a model-year 2009 through 2010 MINI Cooper 'S' Convertible (R57) vehicle.

      J.    **Class Representatives**. "Class Representatives" means Joshua Skeen, Laurie Freeman, Scott Lamb, Gina Romaggi, Emmanuel Nomikos, Gregory Abbott, Vicki Blasucci, Scott Bookhout, Michelle Colberg, Kevin Kebabjian, Marta Motel, Ginger Roach, James Stoecker, Heather Swango, Patricia Curran, Maryanne Howland, Candi Sossa, and Richard Kahn.

/ / /

K.     **Class Notice**.  "Class Notice" means the Court-approved form of notice to current and former owners and lessees of Class Vehicles, in substantially the same form as that attached hereto as Exhibit "B," informing them of, *inter alia*, the (i) preliminary approval of the Settlement; (ii) scheduling of the Final Approval Hearing; (iii) opportunity to submit a claim; (iv) opportunity to submit an objection; and (v) opportunity to request exclusion.

L.     **Class Vehicles**.  "Class Vehicles" means all model-year 2007 through 2009 MINI Cooper 'S' Hardtop (R56), model-year 2008 through 2009 MINI Cooper 'S' Clubman (R55), or model-year 2009 through 2010 MINI Cooper 'S' Convertible (R57) vehicles equipped with an N14 engine, from start of production in November 2006 through July 2010.

M.     **Covered Parts.**  "Covered Parts" means timing-chain tensioner; sealing ring; timing chain; guide rail; tensioner rail; sliding rail; sprocket on the crankshaft; bearing bolts for the tensioner and guide rails.  Where a timing chain has been repaired or replaced, "Covered Parts" includes oil change, oil filter, and cleaning of oil pan.

N.     **Court**.  "Court" means the United States District Court for the District of New Jersey, the Honorable William H. Walls presiding, or his duly appointed successor.

O.     **Defendants**.  "Defendants" means BMW AG and BMW NA, as well as its and their predecessors, successors, assigns, parents, affiliates, directors, officers, agents, attorneys, representatives, and employees.

P.     **Defendants' Counsel**.  "Defendants' Counsel" means Buchanan Ingersoll & Rooney PC.

Q.     **Effective Date**.  "Effective Date" means the date following the entry of the

Final Approval Order on which the time for any appeal expires or the date upon which any

appeal is finally terminated, whichever date is later.

      R.     **Final Approval Hearing**.  "Final Approval Hearing" means the hearing at

which the Court will consider and finally decide whether to enter the Final Approval Order.

      S.     **Final Approval Order**.  "Final Approval Order" means the Court order

that approves this Settlement Agreement and makes such other final rulings as are

contemplated by this Settlement Agreement.

      T.     **In-Service Date**.  "In-Service Date" means the date on which a Class

Vehicle is first placed in service, as reflected in BMW NA's warranty records.

      U.     **Lead Class Counsel**.  "Lead Class Counsel" means Boucher LLP,Cafferty

Clobes Meriwether & Sprengel LLP, and Markun Zusman Compton LLP.

      V.     **N12 Plaintiffs.**  "N12 Plaintiffs" means Julian Mercado, Karla

Moreno-Vanni, Lauren Sanders, Teresa Welch, Jessica Brown, Wayne Brown, and Judy

Quinlan.

      W.     **Objection Date**.  "Objection Date" means the date agreed upon by the

Parties or otherwise ordered by the Court in the Preliminary Approval Order by which any

Class Members who wish to do so must object to the Settlement Agreement's terms or

provisions and submit any required statements, proof, or other materials and/or argument.

      X.     **Opt-Out Deadline**.  "Opt-Out Deadline" means the date agreed upon by

the Parties or otherwise ordered by the Court in the Preliminary Approval Order, by which

any Class Members who do not wish to be included in the Settlement Class and participate

in the Settlement Agreement must complete the acts necessary to properly effect such

election.

Y.     **Opt-Out List**.  "Opt-Out List" means a written list prepared by Class Counsel of all Class Members who submit timely Requests for Exclusion.

Z.     **Parties**.  "Parties" means the Plaintiffs and Defendants.

AA.     **Plaintiffs**.  "Plaintiffs" means the Class Representatives, Joshua Skeen, Laurie Freeman, Scott Lamb, Gina Romaggi, Emmanuel Nomikos, Gregory Abbott, Vicki Blasucci, Scott Bookhout, Michelle Colberg, Kevin Kebabjian, Marta Motel, Ginger Roach, James Stoecker, Heather Swango, Patricia Curran, Maryanne Howland, Candi Sossa, Richard Kahn, Jessica Brown, and Wayne Brown.

BB.     **Preliminary Approval Order**.  "Preliminary Approval Order" means the order of the Court preliminarily approving this Settlement Agreement, in substantially the same form as that attached hereto as Exhibit "C."

CC.     **Release.** "Release" means the release and waiver set forth in Section VII of this Settlement Agreement and in the Final Approval Order.

DD.     **Request for Exclusion**.  "Request for Exclusion" means any request by any Class Member for exclusion from the Settlement.

EE.     **Service Award**.  "Service Award" means any sum of money paid to the Class Representatives for their participation in the Actions.

FF.     **Settlement**.  "Settlement" means the agreement by the Parties to resolve the Actions, the terms of which have been memorialized and provided for in this Settlement Agreement.

GG.     **Settlement Administrator**.  "Settlement Administrator" means Class Action Administrators.

/ / /

HH.    **Settlement Agreement**.  "Settlement Agreement" means this Settlement Agreement and all the exhibits attached hereto.

II.    **Settlement Class.**  "Settlement Class" means all Class Members who do not affirmatively exclude themselves (*i.e.,* "opt out") from the Settlement as approved by the Court.

JJ.    **Settlement Class Members**.  "Settlement Class Members" means all Class Members who do not affirmatively exclude themselves  (*i.e.,* "opt out") from the Settlement as approved by the Court.

KK.    **Special Maste**r.  "Special Master" means Joel A. Pisano, U.S.D.J. (ret.).  If the designated Special Master is unable or unwilling to serve in this capacity in the future for any reason, the Parties will jointly agree upon a replacement Special Master.  The costs associated with the use of the Special Master in this regard will be borne equally (50/50) by the Plaintiffs and Defendants (unless otherwise ordered by the Special Master).

LL.    **Warranty Period**.  "Warranty Period" means four years or 50,000 miles from the date the vehicle is first placed into service, whichever comes first, as provided in MINI's New Vehicle Limited Warranty.

MM.    **Warranty Extension**.  "Warranty Extension" means the extended warranty provided for Covered Parts as set forth in this Agreement.

NN.    **VIN**.  "VIN" means Vehicle Identification Number.

## II.    <u>REQUIRED EVENTS</u>

A.    Promptly after execution of this Settlement Agreement by all Parties:

1.    Class Counsel and Defendants' Counsel will take all reasonable and necessary steps, subject to the Court's availability, to obtain entry of the Preliminary

Approval Order and the Final Approval Order as expeditiously as possible.

        2.      The Parties will seek entry of a Preliminary Approval Order in substantially the same form as that attached hereto as Exhibit "C."  The Preliminary Approval Order will, among other things:

        a.      Certify a nationwide (United States, District of Columbia, and Puerto Rico) settlement-only class; approve Joshua Skeen, Laurie Freeman, Scott Lamb, Gina Romaggi, Emmanuel Nomikos, Gregory Abbott, Vicki Blasucci, Scott Bookhout, Michelle Colberg, Kevin Kebabjian, Marta Motel, Ginger Roach, James Stoecker, Heather Swango, Patricia Curran, Maryanne Howland, Candi Sossa, and Richard Kahn as Class Representatives; and appoint their counsel as Class Counsel, pursuant to Fed. R. Civ. P. 23;

        b.      Preliminarily approve the Settlement;

        c.      Require the dissemination of Class Notice within forty-five (45) days of the date of the Preliminary Approval Order and the taking of all necessary and appropriate steps to accomplish this task;

        d.      Determine that the Class Notice complies with all legal requirements, including, but not limited to, the Due Process Clause of the United States Constitution;

        e.      Schedule a date and time for a Final Approval Hearing, not less than 210 days after the date of the Preliminary Approval Order, to determine whether the Preliminary Approval Order should be finally approved by the Court;

        f.      Require Class Members who wish to exclude themselves to submit an appropriate and timely written request for exclusion within ninety (90) days after

the date of the Preliminary Approval Order as directed in the Settlement Agreement and Class Notice and advise that a failure to do so will bind those Class Members who remain in the Class;

        g.      Require Class Members who wish to object to the Settlement Agreement to submit an appropriate and timely written statement within ninety (90)  days after the date of the Preliminary Approval Order as directed in the Agreement and Class Notice;

        h.      Require Class Members who wish to appear to object to the Settlement Agreement to submit an appropriate and timely written statement within ninety (90) days after the date of the Preliminary Approval Order as directed in the Settlement Agreement and Class Notice;

        i.      Require attorneys representing objecting Class Members, at the Class Members' expense, to file a notice of appearance as within ninety (90) days after the date of the Preliminary Approval Order directed in the Settlement Agreement and Class Notice;

        j.      Appoint the Settlement Administrator; and

        k.      Issue other related orders to effectuate the preliminary approval of the Settlement Agreement.

        3.      After the Preliminary Approval Hearing, the Parties will seek to obtain from the Court a Final Approval Order in a form to be agreed upon by the Parties. The Final Approval Order will, among other things:

/ / /

/ / /

        a.      Find that the Court has personal jurisdiction over all Class Members, subject-matter jurisdiction over the claims asserted in the Actions, and that venue is proper;

        b.      Finally approve the Settlement Agreement, pursuant to Fed. R. Civ. P. 23;

        c.      Finally certify the Class for settlement purposes only;

        d.      Find that the Class Notice complied with all laws, including, but not limited to, the Due Process Clause of the United States Constitution;

        e.      Dismiss the *Skeen* Action with prejudice;

        f.      Incorporate the Release set forth in the Settlement Agreement and make the Release effective as of the date of the Final Approval Order;

        g.      Authorize the Parties to implement the terms of the Settlement Agreement;

        h.      Retain jurisdiction relating to the administration, consummation, enforcement, and interpretation of the Settlement Agreement, the Final Approval Order, and for any other necessary purpose; and

        i.      Issue any related orders necessary to effectuate the final approval of the Settlement Agreement and its implementation.

        4.      The Parties will use their best efforts, consistent with the terms of this Settlement Agreement, to promptly obtain a Final Approval Order.

        5.      If the Court fails to issue the Preliminary Approval Order, or fails to issue the Final Approval Order, this Settlement Agreement is voidable by either Party.

However, the Parties agree to use their best efforts, consistent with this Settlement Agreement, to cure any defect(s) identified by the Court.

6.     The Parties acknowledge that prompt approval, consummation, and implementation of the Settlement set forth in this Settlement Agreement are essential. The Parties will cooperate with each other in good faith to carry out the purposes of and to effectuate this Settlement Agreement, will promptly perform their respective obligations hereunder, and will promptly take any and all actions and execute and deliver any and all additional documents and all other materials and/or information reasonably necessary or appropriate to carry out the terms of this Settlement Agreement and the transactions contemplated hereby.

7.     Upon Entry of the Final Approval Order, the *Skeen* Action will be dismissed, on its merits and with prejudice, subject to the continuing jurisdiction of this Court, and Settlement Class Members will be forever barred and enjoined from pursuing any claims which have been resolved by this Settlement.

## III.     SETTLEMENT TERMS

### A.     Warranty Extension.

1.     All Class Vehicles will receive a warranty extension for the timing-chain tensioner and timing chain.

2.     The Warranty Extension for the timing-chain tensioner and timing chain is seven (7) years or 100,000 miles from the date the Class Vehicle was first placed into service, whichever comes first, will be subject to the terms and conditions of such Class Vehicle's MINI New Vehicle Limited Warranty, and will include the timing-chain tensioner, timing chain, and any Covered Parts necessary to effectuate repair.

**B.      Reimbursement for Out-of-Pocket Expenses for Repair and/or**

**Replacement of Timing Chain/Timing-Chain Tensioner Prior to Effective Date of**

**Settlement**.  Settlement Class Members will be entitled to reimbursement for

out-of-pocket expenses as follows:

      1.      <u>Timing-Chain Tensioner Repair/Replacement.</u>

          a.      If the timing-chain tensioner was repaired or replaced at an

authorized MINI Dealer, the Settlement Class Member will receive a one-hundred percent

(100%) refund of the Dealer invoice amount for the Covered Part(s) and labor limited to

one repair per Class Member/VIN.

          b.      If the timing-chain tensioner was repaired or replaced at an

independent service center, the Settlement Class Member will receive a refund of the

invoice for Covered Part(s) and labor, but no more than $120.

      2.      <u>Timing Chain Repair/Replacement.</u>

          a.      If the timing chain was repaired or replaced at an authorized

MINI Dealer, the Settlement Class Member will receive a one-hundred percent (100%)

refund of the Dealer invoice amount for the Covered Part(s) and labor limited to one repair

per Class Member/VIN.

          b.      If the timing chain was repaired or replaced at an

independent service center, the Settlement Class Member will receive a refund of the

invoice for Covered Part(s) and labor, but no more than $850.

          c.      Where the timing chain is replaced, "Covered Parts"

includes oil change, oil filter, and cleaning of oil pan.

/ / /

3. <u>Limitations</u>.

 a. Any reimbursement will be reduced by goodwill or other concession paid by MINI or any other entity (including insurers and providers of extended warranties), up to no reimbursement if customer received free replacement or repair.

 b. Defendants will only pay for labor and parts for one initial repair per Class Member/VIN by an independent service center; Defendants will not be responsible for, and will not warrant, repair/replacement work performed at an independent service center.  If the replacement Covered Part(s), purchased by the customer or the independent service center from a Dealer fails within two years of installation, Defendants will provide a free replacement of the Covered Part(s) only.

4. <u>Required Proof</u>.  In order to obtain the benefits provided for in this section, the Settlement Class Member must provide the following:

 a. Repair invoice containing claimant's name, VIN, name and address of Dealer or servicing center, date of repair, description of repair, mileage at repair, part(s) replaced, and cost of repair/replacement and proof of payment of same.  The claim will not be approved without this documentation.

 b. Documents evidencing claimant's adherence to vehicle maintenance schedule, in particular, scheduled oil changes (+2,000 miles), up to date/mileage of replacement/repair. However, the claimant may submit a declaration under penalty of perjury detailing why the records are not available and a declaration under penalty of perjury by the respective customer's mechanic(s) attesting to adherence to vehicle maintenance schedule and, in particular, scheduled oil changes, up to date/mileage of replacement.

C.      **Reimbursement for Out-of-Pocket Expenses to Repair or Replace Damaged or Failed Engine Due to Timing-Chain Tensioner and/or Timing Chain Failure Prior to Effective Date of Settlement.**  Settlement Class Members will be entitled to reimbursement for out-of-pocket expenses incurred to replace a failed or damaged engine due to timing-chain tensioner and/or timing chain failure as follows:

1.      If the engine was repaired or replaced at a MINI Dealer, a refund of the invoice amount subject to the time/mileage parameters in Table One, below.

2.      If the engine was repaired or replaced at an independent service center, the maximum reimbursement amount is $5,400.00, subject to the time/mileage parameters in Table One, below.

### TABLE 1: REIMBURSEMENT FOR OUT-OF-POCKET EXPENSES FOR DAMAGED OR FAILED ENGINE DUE TO TIMING CHAIN TENSIONER/TIMING CHAIN FAILURE

| Time from in-service date | Less than 50,000 Miles | 50,001 to 62,500 Miles | 62,501 to 75,000 Miles | 75,001 to 87,500 Miles | 87,501 to 100,000 Miles | 100,001 to 112,500 Miles |
|---|---|---|---|---|---|---|
| 4 years | 100% (under original warranty) | 85% | 70% | 60% | 40% | 25% |
| 4-5 years | 85% | 75% | 60% | 40% | 30% | 15% |
| 5-6 years | 75% | 60% | 50% | 30% | 20% | 10% |
| 6-7 years | 50% | 30% | 30% | 15% | 10% | 0% |
| 7-10 years | 25% | 10% | 10% | 5% | 0% | 0% |
| 10+ years | 0% | 0% | 0% | 0% | 0% | 0% |

        3.     <u>Limitations</u>.

        a.     Any reimbursement will be reduced by goodwill or other concession paid by MINI or any other entity (including insurers and providers of extended warranties), up to no reimbursement if customer received free replacement or repair.

        b.     Defendants will only pay for labor and parts for one initial repair or replacement by an independent service center; Defendants will not be responsible for, and will not warrant, repair or replacement work performed at an independent service center.

        c.     Any replacement engine will be subject to the warranty terms and conditions accompanying that replacement engine.  Nothing in this Settlement Agreement modifies that warranty.

        4.     <u>Required Proof</u>.  In order to obtain the benefits provided for in this section, the Settlement Class Member must provide the following:

        a.     Repair invoice containing claimant's name, VIN, name and address of Dealer or servicing center, date of repair, description of repair, mileage at repair, part(s) replaced, cost of repair/replacement, and indicating that engine damage or failure was due to timing-chain tensioner and/or timing chain failure, and proof of payment of same.  The claim will not be approved without this documentation.

        b.     Documents evidencing claimant's adherence to vehicle maintenance schedule, in particular, scheduled oil changes (+2,000 miles), up to date/mileage of replacement/repair. However, the claimant may submit a declaration under penalty of perjury detailing why the records are not available and a declaration under penalty of perjury by the respective customer's mechanic attesting to adherence to vehicle

maintenance schedule and, in particular, scheduled oil changes, up to date/mileage of replacement.

**D.**     **Compensation for Sale of Class Vehicle at Loss Due to Unrepaired Damaged or Failed Engine as a Result of Failed Timing-Chain Tensioner/Timing Chain Prior to Effective Date of Settlement.**   Settlement Class Members will be entitled to compensation for sale of a vehicle due to an unrepaired damaged or failed engine caused by timing-chain tensioner and/or timing chain failure prior to effective date of settlement as set forth in Table Two, below.

**TABLE 2: COMPENSATION FOR SALE OF CLASS VEHICLE AT LOSS DUE TO UNREPAIRED DAMAGED OR FAILED ENGINE AS A RESULT OF FAILED TIMING CHAIN/TIMING-CHAIN TENSIONER**

| Time from in-service date | Less than 50,000 Miles | 50,001 to 62,500 Miles | 62,501 to 75,000 Miles | 75,001 to 87,500 Miles | 87,501 to 100,000 Miles | 100,001 to 112,500 Miles |
|---|---|---|---|---|---|---|
| 4 years | $0 because 100% covered under original warranty | $2,250 | $1,500 | $1,300 | $1,000 | $500 |
| 4-5 years | $2,250 | $1,500 | $1,200 | $1,000 | $600 | $0 |
| 5-6 years | $1,500 | $1,200 | $900 | $600 | $450 | $0 |
| 6-7 years | $1,000 | $750 | $600 | $450 | $300 | $0 |
| 7-10 years | $750 | $500 | $0 | $0 | $0 | $0 |
| 10+ years | $0 | $0 | $0 | $0 | $0 | $0 |

       1.    <u>Limitation</u>:  Persons who purchase a vehicle with an unrepaired damaged or failed engine due to timing-chain tensioner and/or timing-chain failure are not entitled to make a claim for reimbursement under any provisions in this Agreement.

       2.    <u>Required Proof</u>.  In order to obtain the benefits provided for in this section, the Settlement Class Member must provide the following:

       a.    Repair estimate containing claimant's name, VIN, name and address of Dealer or servicing center, description of repair, mileage at engine damage/failure, and cost of repair/replacement, and indicating that engine damage/failure was due to timing-chain tensioner and/or timing chain failure.  The claim will not be approved without this documentation.

       b.    Sales invoice containing claimant's name, VIN, name and address of purchaser, date of sale, mileage at sale, and sales price.  The claim will not be approved without this documentation.  If the mileage at sale is not consistent with the mileage on the repair estimate, the claim will not be processed.

       c.    Documents evidencing claimant's adherence to vehicle maintenance schedule, in particular, scheduled oil changes (+2,000 miles), up to date/mileage of replacement/repair. However, the claimant may submit a declaration under penalty of perjury detailing why the records are not available and a declaration under penalty of perjury by the respective customer's mechanic attesting to adherence to vehicle maintenance schedule and, in particular, scheduled oil changes, up to date/mileage of replacement.

/ / /

/ / /

**E.**      **Claim Review, Claim Processing, Claim Confirmation, and Appeal from Denial**.

1.      <u>Claim Review</u>:  All claims submitted for reimbursement or compensation will be reviewed and accepted within ten (10) days of receipt by the Settlement Administrator, which will be responsible for ensuring that all information required under this Settlement Agreement has been submitted. Any Claimant whose claim is deemed incomplete, or whose claim is denied in whole or in part, will receive from the Settlement Administrator by first-class mail a written explanation stating the reasons for denial, including steps the Claimant can take to cure the deficiencies. The Claimant receiving such notice will be allowed forty-five (45) days to submit materials to cure the deficiencies.

2.      <u>Claim Processing and Confirmation</u>:  Commencing immediately after the Effective Date, the Settlement Administrator will calculate the amount due to each Claimant for all claims accepted by the Settlement Administrator as complying with the requirements of this Settlement Agreement.  The Settlement Administrator will, on  a rolling basis, submit those claims to Defendants to determine if there is any reason to believe that an accepted claim is fraudulent or otherwise invalid.  Within forty-five (45) days of Defendants' receipt from the Settlement Administrator of properly submitted claims, Defendants may object to the approval of the claim based on evidence that: (1) the vehicle's warranty was voided because (a) the VIN has been altered or cannot be read, (b) the odometer has been replaced or altered and the true mileage cannot be determined, (c) the vehicle has been declared a total loss or sold for salvage purposes (for reasons unrelated to timing-chain tensioner or timing-chain failure), or (d) if the vehicle has been used in any

competitive event; (2) the VIN number associated with the claim does not match the Settlement Class Member's VIN number; (3) the Settlement Class Member has received "goodwill" or other pricing adjustment, coupon, reimbursement, or refund from BMW NA, a MINI Dealer, or any person or entity equal to the amount of the claim submitted; and/or (4) the claim for reimbursement is for an item or service that is not covered under this Settlement Agreement. If within the forty-five (45) day period referenced above Defendants fail to notify the Settlement Administrator and Lead Class Counsel of their objection, or if Defendants fail to provide the grounds for their objection, then the Settlement Administrator's approval of the claim shall become final.

　　　　　　3.　　<u>Appeal from Denial</u>:  If the Settlement Administrator rejects a claim and the Settlement Class Member is unable to cure the reason for rejection, or if Defendants determine that any such claim should be rejected, and the Settlement Class Member disagrees with the rejection, the Settlement Class Member may appeal the denial by notifiying Lead Class Counsel within fifteen (15) days of the date notice of such denial was mailed to the Settlement Class Member.  If Lead Class Counsel receives such notice, or if Lead Class Counsel disagrees with a rejection, Lead Class Counsel will notify Defense Counsel that the Settlement Class Member wishes to appeal the denial. In such cases, the Parties will meet and confer in an effort to resolve the dispute.  If the Parties are unable to resolve any dispute by meeting and conferring, the claim will be submitted to the Special Master, whose determination will be final and binding.  Any other dispute regarding relief under the terms of the Settlement, including the validity of any Claim Form submitted, will also be submitted to the Special Master under the terms set forth in this paragraph.

IV.     **NOTIFICATION TO CLASS MEMBERS**

A.     Unless otherwise specified, Defendants will pay all costs for the following notice program, subject to the Court approving the same, which will be effectuated within forty-five (45) days of the entry of the Preliminary Approval Order by:

1.     Individual direct mail (first class) notice regarding the Settlement ("Class Notice") will be sent to all current and former owners and lessees of Class Vehicles using BMW NA's database and RL Polk data; and

2.     Individual email notice regarding the Settlement ("Class Notice") will be sent, at Class Counsel's expense, to all current and former owners and lessees of Class Vehicles using BMW NA's database and RL Polk data, except to those owners and lessees whose email address is not in BMW NA's database or whose email address is no longer valid; and

3.     Publication on a website maintained by the Settlement Administrator.

B.     Within forty-five (45) days after the Court's preliminary approval of this Settlement Agreement, the Settlement Administrator will disseminate Class Notice to the Class as specified in the Preliminary Approval Order and herein, and in compliance with all applicable laws, including, but not limited to, the Due Process Clause of the Constitution.

The Settlement Administrator will be responsible for, without limitation: (a) printing, formatting, emailing, mailing, or arranging for the emailing or mailing of the Class Notice (including all notices and materials required by the Class Action Fairness Act to be transmitted to state Attorneys General); (b) handling return email and mail not

delivered to Class Members; (c) attempting to obtain updated address information for any Class Notice returned without a forwarding address; (d) making any additional emailings and mailings required under the terms of this Settlement Agreement; (e) responding to requests for Class Notice; (f) forwarding written inquiries to Class Counsel or its designee for a response, if warranted; (g) establishing an email mailbox and a post office box for the receipt of any correspondence; (h) responding to requests from Class Counsel and/or Defendants' Counsel; (i) establishing a web site and toll-free voice response unit with message capabilities to which Class Members may refer for information about the Action and the Settlement, and with access to live agents to answer Class Members' inquiries; (j) determining whether claims submitted for reimbursement or compensation contain the required appropriate proofs; (k) transmitting properly-submitted claims to BMW of North America, LLC for Claims Review; (l) administering payment to Class Members whose claims are approved; (m) notifying class members whose claims have been rejected how to cure the reason for rejection or to appeal a rejection; and (n) otherwise implementing and/or assisting with the dissemination of the notice and/or administration of the Settlement.

C.      The Parties will agree on language for any statements about the Settlement in connection with responding to any inquiries from the press or third parties and no additional or different statements will be allowed by Plaintiffs or Plaintiffs' representatives.  Nothing in this paragraph will be deemed to prevent Class Counsel from communicating with Plaintiffs and Class Members and discussing with them the nature, benefits, and reasons for this Settlement.

/ / /

D.     All costs of the Class Notice program will be paid by Defendants except the cost of individual email notice, which will be paid by Class Counsel.  There will be no charge to Defendants for the posting of the Class Notice on Class Counsel's websites or for posting any other information on such websites or any other websites.

E.     Contents of the Class Notice:  The Class Notice, in a form substantially similar to the one attached to the Settlement Agreement as Exhibit B, will advise Class Members of the following:

1.     General Terms:  The Class Notice will contain a plain and concise description of the nature of the Actions, the history of the Actions, the preliminary certification of the Class, and the proposed Settlement, including information on the identity of Class Members, how the proposed Settlement would provide relief to the Class and Class Members, what claims are released under the proposed Settlement, and other relevant terms and conditions.

2.     Exclusion/Opt-Out Rights:  The Class Notice will inform Class Members that they have the right to request exclusion from (opt out of) the Settlement.  The Class Notice will provide the deadlines and procedures for exercising this right.

3.     Objection to Settlement:  The Class Notice will inform Class Members of their right to object to the proposed Settlement and appear at the Final Approval Hearing.  The Class Notice will provide the deadlines and procedures for exercising these rights.

4.     Attorneys' Fees, Expenses, and Incentive Awards:  The Class Notice will inform Class Members about the amounts being sought by Class Counsel as Attorneys' Fees and Expenses and by Plaintiffs as Incentive Awards, will explain that

27

Defendants will pay the attorneys' fees and expenses awarded to Class Counsel, and any incentive awards granted to Plaintiffs, in addition to and without reducing the relief being made available to Class Members.

        5.     <u>Claim Form:</u> The Class Notice will include the Claim Form, which will inform the Class Member that he/she/it must fully complete and timely return the Claim Form within the Claim Period to be eligible to obtain a recovery.

        F.     No less than ten (10) days prior to the Final Approval Hearing, Defendants will provide to the Court, with a copy to Class Counsel, an affidavit from the Settlement Administrator attesting that Class Notice was disseminated in a manner consistent with the terms of this Settlement Agreement, or those otherwise required by the Court.

## V.      **REQUESTS FOR EXCLUSION BY CLASS MEMBERS**

        A.     The provisions of this paragraph will apply to any Request for Exclusion. Any Class Member may make a Request for Exclusion by mailing or delivering such request in writing to Lead Class Counsel and Defendants' Counsel at the addresses set forth in the Class Notice.  Any Request for Exclusion must be postmarked or delivered not later than the Opt-Out Deadline specified in the Court's Preliminary Approval Order.  Any Request for Exclusion must (1) state the Class Member's full name and current address; (2) identify the model year and Vehicle Identification Number ("VIN") of his/her/its Vehicle(s) and the date(s) of purchase or lease; and (3) specifically and clearly state his/her/its desire to be excluded from the Settlement and from the Settlement Class.

        B.     Any Class Member who submits a timely Request for Exclusion may not file an objection to the Settlement and will be deemed to have waived any rights or benefits under this Settlement Agreement.

C.      No less than ten (10) days prior to the Final Approval Hearing, Lead Class

Counsel will report to the Court the names of all individuals who have submitted a Request

for Exclusion.

## VI.    OBJECTIONS BY SETTLEMENT CLASS MEMBERS

A.      Any Class Member who has not filed a timely written Request for

Exclusion and who wishes to object to the fairness, reasonableness, or adequacy of this

Settlement Agreement or the Settlement, or to the requested award of Attorneys' Fees and

Expenses and/or Incentive Awards, must file a written notice of objection by the Objection

Date, as well as a notice of intention to appear at the Final Approval Hearing ("Notice of

Intention to Appear") if he/she/it wishes to appear and be heard at the Final Approval

Hearing.  To state a valid objection to the Settlement, an objecting Settlement Class

Member must provide the following information in the Settlement Class Member's written

objection: (1) his/her/its full name, current address, and current telephone number; (2) the

model year of his/her/its Vehicle(s), as well as the VIN of his/her/its Vehicle(s) and the

date(s) of purchase or lease; (3) a statement of the position(s) the objector wishes to assert,

including the factual and legal grounds for the position; and (4) provide copies of any other

documents that the objector wishes to submit in support of his/her/its position. To be valid,

an objection also must include a detailed statement of each objection asserted, including

the grounds for objection.  In addition, any Class Member objecting to the Settlement must

provide a detailed list of any other objections to any class action settlements submitted in

any court, whether state, federal, or otherwise, in the United States in the previous five (5)

years.  If the Class Member has not objected to any other class action settlement in any

court in the United States in the previous five (5) years, he/she/it must affirmatively so state

in the written materials provided in connection with the objection to this Settlement. Finally, subject to approval of the Court, any objecting Class Member may appear, in person or by counsel, at the Final Approval Hearing held by the Court, to show cause why the proposed Settlement should not be approved as fair, adequate, and reasonable, or object to any petitions for attorneys' fees and reimbursement of reasonable litigation costs and expenses. The objecting Class Member must file with the Clerk of the Court and serve upon all counsel designated in the Class Notice a Notice of Intention to Appear by the Objection Deadline or on such other date that may be set forth in the Class Notice. The Notice of Intention to Appear must include copies of any papers, exhibits, or other evidence that the objecting Class Member (or his/her/its counsel) will present to the Court in connection with the Final Approval Hearing. Any Class Member who does not provide a Notice of Intention to Appear in complete accordance with the deadlines and other specifications set forth in the Class Notice, and who has not filed an objection in complete accordance with the deadlines and other specifications set forth in this Settlement and the Class Notice, will be deemed to have waived any objections to the Settlement and will be barred from speaking or otherwise presenting any views at the Final Approval Hearing.

B.     The agreed-upon procedures and requirements for filing objections in connection with the Final Approval Hearing are intended to ensure the efficient administration of justice and the orderly presentation of any Class Member's objection to the Settlement, in accordance with such Class Member's due-process rights. The Preliminary Approval Order and Class Notice will require all Class Members who have any objections to file such notice of objection or request to be heard with the Court, and serve by mail or hand delivery such notice of objection or request to be heard upon Lead

Class Counsel and Defendants' Lead Counsel at the addresses set forth in the Class Notice, by no later than the Objection Date. The Preliminary Approval Order will further provide that objectors who fail properly or timely to file their objections with the Court, along with the required information and documentation set forth above, or to serve them as provided above, will not be heard during the Final Approval Hearing, and their objections will be waived and will not be considered by the Court.

C.      Any Class Member who objects to the Settlement will be entitled to all of the benefits of the Settlement if this Settlement Agreement and the terms contained herein are approved, as long as the objecting Class Member complies with all the requirements of this Settlement Agreement applicable to Class Members.

**VII.    RELEASE, DISMISSAL OF ACTION, AND JURISDICTION OF COURT**

The Parties agree to the following release and waiver, which will take effect upon entry of the Final Approval Order:

A.      By this Settlement Agreement and the following Release, Defendants are released from any and all claims or causes of action that were or could have been asserted against them by the Plaintiffs or any Class Members regarding the Class Vehicles' timing chains or timing-chain tensioners, except for claims for personal injury or subrogation, but including claims for consequential damages resulting from failure of the timing chain or timing-chain tensioner. Plaintiffs and Class Members recognize that, even if they later discover facts in addition to or different from those which they now know or believe to be true, they nevertheless agree that, upon entry of the Final Approval Order and accompanying Judgment, Plaintiffs and Class Members, on behalf of themselves and their heirs, successors, or assigns, fully, finally, and forever settle and release any and all claims

and causes of action (except claims for personal injury or subrogation) relating to Class Vehicles' timing chain or timing chain tensioner, including claims for consequential damages resulting from failure of the timing chian or timing-chain tensioner, which were, could have been, or ever could be asserted against Defendants. The Parties acknowledge that the foregoing waiver and release was bargained for and is a material element of the Settlement Agreement.

B.      Plaintiffs and Class Representatives represent and warrant that they are the sole and exclusive owners of all claims that they are releasing under this Settlement Agreement.  Plaintiffs and Class Representatives further acknowledge that they have not assigned, pledged, or in any manner whatsoever sold, transferred, assigned, or encumbered any right, title, interest, or claim arising out of or in any way whatsoever pertaining to the Action, including, without limitation, any claim for benefits, proceeds, or value under the Action, and that Plaintiffs and Class Representatives are not aware of anyone other than themselves claiming any interest, in whole or in part, in the Action or in any benefits, proceeds, or values under the Action.

C.      Plaintiffs and Class Representatives further represent that they are not aware of any Class Members who have filed claims or actions for the relief sought in this Action.

D.      Without in any way limiting its scope, this Release covers by example and without limitation, any and all claims for attorneys' fees, costs, expert fees, consultant fees, interest, litigation fees, costs, or any other fees, costs, and/or disbursements incurred by Class Counsel or by Plaintiffs, except to the extent otherwise specified in the Settlement Agreement.

E.      Plaintiffs and Class Representatives expressly agree that this Release will be and may be raised as a complete defense to and will preclude any action or proceeding encompassed by this Release, or arising out of or relating to the allegations in the Action, except claims for personal injury or subrogation.

F.      This Settlement Agreement and Release does not affect the rights of Class Members who timely and properly request exclusion from (opt-out of) the Settlement.

G.      The administration and consummation of the Settlement as embodied in this Settlement Agreement will be under the authority of the Court.  The Court will retain jurisdiction to protect, preserve, and implement the Settlement Agreement including, but not limited to, the Release.  The Court expressly retains jurisdiction to enter such further orders as may be necessary or appropriate in administering and implementing the terms and provisions of the Settlement Agreement.

H.      Upon issuance of the Final Approval Order: (1) the Settlement Agreement will be the exclusive remedy for any and all Settlement Class Members, except those who have properly requested exclusion (opted out) in accordance with the terms and provisions hereof; (2) the Defendants will not be subject to liability or expense of any kind to any Settlement Class Member(s) for reasons related to the Action except as set forth herein; and (3) Settlement Class Members will be permanently barred from initiating, asserting, or prosecuting any and all released claims against Defendants in any federal or state court in the United States or any other tribunal.

I.      Nothing in this Release will preclude any action to enforce the terms of the Settlement Agreement, including participation in any of the processes detailed therein.

/ / /

00027785.27                                          33

Case 2:13-cv-01531-WHW-CLW   Document 69-3   Filed 11/23/15   Page 47 of 162 PageID: 1083

## VIII.   ATTORNEYS' FEES AND EXPENSES, SERVICE AWARDS

A.      All expenses incurred in administering this Settlement Agreement,
including, without limitation, all attorneys' fees and costs, the cost of the Class Notice, and
the cost of distributing and administering the benefits of the Settlement Agreement, will be
paid by Defendants, subject to the limitations contained herein. The Class Counsel Fees
and Expenses, and Service Awards to Class Representatives, will be paid separate and
apart from any relief provided to the Class.

B.      As part of the resolution of the Actions, Class Counsel and Defendants have
agreed Class Counsel may apply to the Court for an award of Class Counsel Fees and
Expenses and that Defendants may object to or oppose that application, although
Defendants will not object to Class Counsel's application for an award of fees and
expenses up to $1,820,000. While not agreeing to the total amount of such an award, the
Parties have agreed Class Counsel may apply for an award of fees and expenses not to
exceed $2,320,000. The Parties have further agreed that Class Counsel shall not seek
payment of any amount in excess of $2,320,000 if awarded by the Court.  The Class
Counsel Fees and Expenses will be paid separate and apart from any relief provided to the
Class.

C.      The Parties agree that Class Counsel will move the Court for an order to pay
Service Awards of $4,000 each to the Class Representatives in recognition of their work in
furtherance of the Litigation. If Plaintiffs, Class Members, Lead Class Counsel, Class
Counsel, or other counsel seek any amount in excess of this amount, Defendants reserve
the right to oppose any greater award.  The amount awarded by the Court will be paid by

00027785.27                                              34

wire transfer and will be delivered to an account to be designated and agreed upon by the Parties within five (5) days after the date all appeals and avenues of appeal are exhausted.

D.      The total amount of Class Representative Service Awards and Class Counsel Fees and Expenses awarded by the Court, subject to Class Counsel's and Defendants' agreed-upon range, will be paid by wire transfer, within five (5) days after the date all appeals and avenues of appeal are exhausted, to an account to be designated and agreed upon by the Parties.

E.      Defendants will not be liable for or obligated to pay any fees, expenses, costs, incentive awards, or disbursements to, or incur any expense on behalf of, any person or entity, either directly or indirectly, in connection with this Action, this Settlement Agreement, or the proposed Settlement, other than the amount or amounts expressly provided for in this Settlement Agreement.

## IX.     REPRESENTATIONS, WARRANTIES, AND COVENANTS

A.      Lead Class Counsel, who are signatories hereof, represent and warrant that they have the authority, on behalf of Plaintiffs and Class Counsel, to execute, deliver, and perform this Settlement Agreement and to consummate all of the transactions contemplated hereby.  This Settlement Agreement has been duly and validly executed and delivered by Lead Class Counsel and Plaintiffs and constitutes their legal, valid, and binding obligation.

B.      Defendants, through their undersigned attorneys, represent and warrant that they have the authority to execute, deliver, and perform this Settlement Agreement and to consummate the transactions contemplated hereby.  The execution, delivery, and performance by Defendants of this Settlement Agreement and the consummation by it of

the actions contemplated hereby have been duly authorized by all necessary corporate action on the part of Defendants.  This Settlement Agreement has been duly and validly executed and delivered by Defendants and constitutes their legal, valid, and binding obligation.

## X.   **MISCELLANEOUS PROVISIONS**

A.     The Parties expressly acknowledge and agree that this Settlement Agreement and the exhibits and related documents thereto along with all related drafts, motions, pleadings, conversations, negotiations, and correspondence, constitute an offer of compromise and a compromise within the meaning of Federal Rule of Evidence 408 and any equivalent rule of evidence in any state.  In no event will this Settlement Agreement, any of its provisions or any negotiations, statements, or court proceedings relating to its provisions in any way be construed as, offered as, received as, used as, or deemed to be evidence of any kind in the Action, any other action, or in any judicial, administrative, regulatory, or other proceedings, except in a proceeding to enforce this Settlement Agreement or the rights of the Parties or their counsel.

Without limiting the foregoing, this Settlement Agreement, the exhibits thereto, any related documents, any related negotiations, statements, or court proceedings will not be construed as, offered as, received as, used as, or deemed to be evidence or an admission or concession of any liability, wrongdoing, fault, or omission of any kind whatsoever by Defendants with respect to any alleged wrongdoing, fault, or omission of any kind whatsoever, regardless of whether or not this Settlement Agreement results in entry of a Final Approval Order as contemplated herein.  Defendants specifically deny all of the allegations made in connection with the Actions.  Neither this Settlement Agreement nor

any class certification pursuant to it will constitute, in this or in any other proceeding, an admission by the Defendants, or evidence or a finding of any kind, that any requirement for class certification is satisfied with respect to the Actions, or any other litigation, except for the limited purpose of settlement pursuant to this Settlement Agreement. This Settlement Agreement also is made with the Parties' understanding and agreement that (1) under applicable laws, it is appropriate that a class be certified for settlement purposes only (i.e., without needing to satisfy fully the standard required for certification of the matter for litigation purposes); (2) Defendants contest and deny that any class, including the proposed Settlement Class, is suitable for certification as a class under the law of any jurisdiction, other than for the purposes of this Settlement Agreement; and (3) notwithstanding any other provisions of this Settlement Agreement, all actions and proceedings pursuant to it will be consistent with the foregoing. This provision will survive the expiration or voiding of the Settlement Agreement.

B.      This Settlement Agreement is entered into only for purposes of settlement. If the Final Approval Order is not entered, then this Settlement Agreement, including any releases or dismissals hereunder, is canceled, and no term or condition of this Settlement Agreement, or any draft thereof, or of the discussion, negotiation, documentation or other part or aspect of the Parties' settlement discussions, will have any effect, nor will any such matter be admissible in evidence for any purpose, or used for any purposes whatsoever in the Actions, and all Parties will be restored to their prior rights and positions as if the Settlement Agreement had not been entered into.

C.      Simultaneously herewith, Lead Class Counsel and Defendants' Counsel are executing a "Supplemental Agreement" setting forth, among other things, certain

conditions under which this Settlement Agreement may be withdrawn or terminated by the Defendants including if, prior to the Settlement Hearing, more than the agreed-upon number of Class Members have submitted valid and timely Requests for Exclusion.  For the purposes of determining whether the conditions set forth in the Supplemental Agreement have occurred, copies of all Requests for Exclusion timely received, together with copies of all written revocations of Requests for Exclusion, must be delivered to the Defendants' Counsel within three (3) days of receipt by Lead Class Counsel, but, in all events, not less than ten (10) Court days before the Final Approval Hearing.  The Supplemental Agreement will not be filed unless (1) required by the Court, (2) a dispute arises regarding its terms, or (3) the Defendants exercise their rights thereunder.  If Defendants withdraw from this Settlement Agreement in accordance with the terms of the Supplemental Agreement, this Settlement Agreement will become null and void and of no further force and effect.  Notwithstanding the foregoing, the Settlement Agreement will not become null and void as a result of the election by the Defendants to exercise their option to withdraw from the Settlement Agreement, pursuant to the Supplemental Agreement, until the conditions set forth in the Supplemental Agreement have been satisfied.

In addition to the terms set forth in the Supplemental Agreement, this Settlement Agreement will terminate by decision of either the Defendants or the Plaintiffs, through Lead Class Counsel, if: (1) the Court, or any appellate court(s), rejects, modifies, or denies approval of any portion of this Settlement Agreement or the proposed Settlement that the terminating Party reasonably determines(s) is material, including without limitation, the terms of relief, the findings, or conclusions of the Court, the provisions relating to notice, the definition of the Class, and/or the terms of the Release; or (2) the Court, or any

00027785.27                                    38

appellate court(s), does not enter or completely affirm, or alters or expands, any portion of the Final Approval Order, or any of the Court's findings of fact or conclusions of law, that the terminating Party reasonably determine(s) is material.  The terminating Party must exercise the option to withdraw from and terminate this Settlement Agreement, as provided in this paragraph, no later than 20 days after receiving notice of the event prompting the termination.  In such event, the Parties will be returned to the positions that they occupied as of October 13, 2014.

Further, Defendants may unilaterally withdraw from and terminate this Settlement Agreement within 20 days after receiving notice of either of the following events:

1.      any state attorney general, federal agency, or regulatory or administrative authority, institutes a proceeding against the Defendants arising out of or otherwise related to the Release and any of the terms or conditions of this Settlement Agreement; or

2.      any federal or state regulator or agency: (a) objects either to any aspect or term of the Settlement Agreement; or (b) requires any modification to the Settlement Agreement, including, without limitation, a constriction or expansion of the scope of the contemplated relief that Defendants in their sole discretion deem reasonably material.

D.      If this Settlement Agreement is terminated pursuant to Section X then:

1.      This Settlement Agreement will be null and void and will have no force or effect and no Party to this Settlement Agreement will be bound by any of its terms, except for the terms set forth in the Supplemental Agreement and in this paragraph D;

/ / /

2.      The Parties will petition to have lifted any stay orders entered

pursuant to this Agreement;

3.      All of the provisions, and all negotiations, statements, and

proceedings relating to it, will be without prejudice to the rights of Defendants, Plaintiffs,

or any Class Member, all of whom will be restored to their respective positions occupied as

of October 13, 2014, except that the Parties will cooperate in requesting that the Court set a

new scheduling order such that no Parties' substantive or procedural rights are prejudiced

by the attempted settlement;

4.      Defendants expressly and affirmatively reserve all defenses,

arguments, and motions as to all claims that have been or might later be asserted in the

Action, including, without limitation, the argument that this Action may not be litigated as

a Class Action;

5.      Neither this Settlement Agreement, nor the fact of its having been

made, nor the negotiations leading to it, nor any discovery or action taken by a Party or

Class Member pursuant to this Settlement Agreement, will be admissible or entered into

evidence for any purpose whatsoever;

6.      Any Settlement-related order(s) or judgment(s) entered in this

Action after the date of execution of this Agreement will be deemed vacated and will be

without any force or effect; and

7.      Defendants are not responsible for any of Class Counsel's

attorneys' fees and/or internal costs for the settlement, including, but not limited to, any

investigative, expert, and/or actuarial costs, or any other claims for fees or expenses, other

than the attorneys' fees and expenses described above in this Agreement.

E.      The attorneys' fees, expenses, and costs, including the fees and expenses of experts and consultants, as awarded by the Court, will be paid in accordance with the terms set forth in Paragraphs VIII A and B of the Settlement Agreement within five (5) days of the Effective Date.  Lead Class Counsel will, at their discretion, allocate the award of attorneys' fees, costs, and expenses among Class Counsel in any manner in which they in good faith believe reflects the contributions of such counsel to the prosecution and settlement of the Actions.

F.      The headings of the sections and paragraphs of this Settlement Agreement are included for convenience only and will not be deemed to constitute part of this Settlement Agreement or to affect its construction.

G.      This Settlement Agreement, including all exhibits attached hereto, may not be modified or amended except in writing and signed by all of the Parties and with approval of the Court.

H.      This Settlement Agreement may be executed in one or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.

I.      This Settlement Agreement and any amendments thereto will be governed by and construed in accordance with the substantive laws of the State of New Jersey without giving effect to any choice-of-law or conflict-of-law provision or rule that would cause the application of the laws of any other jurisdiction.

J.      Any disagreement and/or action to enforce this Settlement Agreement will be commenced and maintained only in the Court in which this Action is pending.

/ / /

K.     Except as otherwise provided in this Settlement Agreement, each Party to this Settlement Agreement will bear his, her, or its own costs of the Action.

L.     The Parties to this Settlement Agreement reserve the right, by agreement and subject to the Court's approval, to grant any reasonable extensions of time that might be necessary to carry out any of the provisions of this Settlement Agreement, as well as to correct any inadvertent, non-substantive mistakes or typographical errors contained in any of the Settlement papers.

M.     Proper notice will be given to Plaintiffs and Defendants of all applications for Court approval or Court orders required under this Settlement Agreement.

N.     The determination of the terms of, and the drafting of, this Settlement Agreement, including its exhibits, has been by mutual agreement after negotiation, with consideration by and participation of all Parties and their counsel.  Since this Settlement Agreement was drafted with the participation of all Parties and their counsel, the presumption that ambiguities will be construed against the drafter does not apply.  Each of the Parties was represented by competent and effective counsel throughout the course of settlement negotiations and in the drafting and execution of this Settlement Agreement, and there was no disparity in bargaining power among the Parties to this Settlement Agreement.  No parol or other evidence may be offered to explain, modify, construe, contradict, or clarify its terms, the intent of the Parties or their counsel, or the circumstances under which this Settlement Agreement was made or executed.

O.     All of the exhibits of this Settlement Agreement are material and integral parts hereof, and are fully incorporated herein by reference.  This Settlement Agreement and the exhibits hereto constitute the entire, fully integrated agreement among the Parties

and cancel and supersede all prior written and unwritten agreements and understandings pertaining to the Settlement of the Actions.

P.      The Parties agree that any disputes regarding the meaning of the terms and conditions of this Settlement Agreement, the Parties' rights and obligations under this Settlement Agreement, and/or the manner in which any issue or dispute arising under this Settlement Agreement should be resolved, will be submitted to the Court for resolution.

Q.      The Parties agree and acknowledge that this Settlement Agreement includes a covenant of good faith and fair dealing.

R.      The waiver by one Party of any breach of this Settlement Agreement by another Party will not be deemed a waiver of any prior or subsequent breach of this Settlement Agreement.

S.      If one Party to this Settlement Agreement considers another Party to be in breach of its obligations under this Settlement Agreement, that Party must provide the breaching Party with written notice of the alleged breach and provide a reasonable opportunity to cure the breach before taking any action to enforce any rights under this Settlement Agreement.

T.      All time periods set forth herein will be computed in calendar days unless otherwise expressly provided.  In computing any period of time prescribed or allowed by this Settlement Agreement or by order of the Court, the day of the act, event, or default from which the designated period of time begins to run will not be included.  The last day of the period so computed will be included, unless it is a Saturday, Sunday, or legal holiday, or, when the action to be done is the filing of a paper in court, a day on which conditions or events have made the office of the clerk of the court inaccessible, in which

event the period will run until the end of the next day that is not one of the aforementioned

days.  As used in this section "legal holiday" includes New Year's Day, Birthday of Martin

Luther King, Jr., Presidents' Day, Memorial Day, Independence Day, Labor Day,

Columbus Day, Veterans' Day, Thanksgiving Day, Christmas Day, and any other day

appointed as a holiday by the President or the Congress of the United States.

      U.    **Notices**.  All notices to the Parties or counsel required by this Settlement

Agreement will be made in writing and communicated by electronic and regular mail to the

following addresses (unless one of the Parties subsequently designates one or more other

designees):

    If to Plaintiff, Lead Class Counsel, or Class Counsel:

       Raymond P. Boucher, Esq.
       BOUCHER LLP
       21600 Oxnard Street, Suite 600
       Woodland Hills, California 91367
       (818) 340-5400 (t)
       (818) 340-5401 (f)
       minisettlement@boucher.la

    If to BMW NA or BMW NA's Counsel:

       Rosemary J. Bruno, Esq.
       Christopher J. Dalton, Esq.
       Buchanan Ingersoll & Rooney PC
       550 Broad Street, Suite 810
       Newark, New Jersey 07102
       (973) 273-9800 (t)
       (973) 273-9430 (f)
       rosemary.bruno@bipc.com
       christopher.dalton@bicp.com

/ / /

/ / /

/ / /

**IN WITNESS WHEREOF**, Defendants, by and through their counsel, and

Plaintiffs have executed this Settlement Agreement as of the date(s) indicated on the lines

below.

Dated: _____, 2015           _____

                                   Rosemary J. Bruno, Esq.
                                   Christopher J. Dalton, Esq.
                                   Buchanan Ingersoll & Rooney PC
                                   550 Broad Street, Suite 810
                                   Newark, New Jersey 07102
                                   (973) 273-9800 (t)
                                   (973) 273-9430 (f)
                                   Email:  rosemary.bruno@bipc.com
                                            christopher.dalton@bipc.com

                                   Attorneys for Defendants,
                                    BMW of North America, LLC and
                                    Bayerische Motoren Werke
                                    Aktiengesellschaft

Dated: *October 29*, 2015          _____

                                   Raymond P. Boucher, Esq.
                                   BOUCHER LLP
                                   21600 Oxnard Street, Suite 600
                                   Woodland Hills, California 91367
                                   (818) 340-5400 (t)
                                   (818) 340-5401 (f)
                                   Email: ray@boucher.la

                                   On Behalf of Lead Class Counsel

Dated: _____, 2015           _____

                                   Joshua Skeen, Class Representative

Dated: _____, 2015           _____

                                   Laurie Freeman, Class Representative

00027785.27                        45

**IN WITNESS WHEREOF**, Defendants, by and through their counsel, and

Plaintiffs have executed this Settlement Agreement as of the date(s) indicated on the lines

below.

Dated: _November 2_, 2015

Rosemary J. Bruno, Esq.
Christopher J. Dalton, Esq.
Buchanan Ingersoll & Rooney PC
550 Broad Street, Suite 810
Newark, New Jersey 07102
(973) 273-9800 (t)
(973) 273-9430 (f)
Email: rosemary.bruno@bipc.com
        christopher.dalton@bipc.com

Attorneys for Defendants,
  BMW of North America, LLC and
  Bayerische Motoren Werke
  Aktiengesellschaft

Dated: _October 29_, 2015

Raymond P. Boucher, Esq.
BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367
(818) 340-5400 (t)
(818) 340-5401 (f)
Email: ray@boucher.la

On Behalf of Lead Class Counsel

Dated: _____, 2015

Joshua Skeen, Class Representative

Dated: _____, 2015

Laurie Freeman, Class Representative

00027785.27

45

**IN WITNESS WHEREOF**, Defendants, by and through their counsel, and

Plaintiffs have executed this Settlement Agreement as of the date(s) indicated on the lines

below.

Dated: _____, 2015

      _____
Rosemary J. Bruno, Esq.
Christopher J. Dalton, Esq.
Buchanan Ingersoll & Rooney PC
550 Broad Street, Suite 810
Newark, New Jersey 07102
(973) 273-9800 (t)
(973) 273-9430 (f)
Email:  rosemary.bruno@bipc.com
           christopher.dalton@bipc.com

Attorneys for Defendants,
  BMW of North America, LLC and
  Bayerische Motoren Werke
  Aktiengesellschaft

Dated: _____, 2015

      _____
Raymond P. Boucher, Esq.
BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367
(818) 340-5400 (t)
(818) 340-5401 (f)
Email: ray@boucher.la

On Behalf of Lead Class Counsel

Dated: 10/31, 2015

      _____
Joshua Skeen, Class Representative

Dated: _____, 2015

      _____
Laurie Freeman, Class Representative

**IN WITNESS WHEREOF**, Defendants, by and through their counsel, and

Plaintiffs have executed this Settlement Agreement as of the date(s) indicated on the lines

below.

Dated: _____, 2015

                              _____
Rosemary J. Bruno, Esq.
Christopher J. Dalton, Esq.
Buchanan Ingersoll & Rooney PC
550 Broad Street, Suite 810
Newark, New Jersey 07102
(973) 273-9800 (t)
(973) 273-9430 (f)
Email: rosemary.bruno@bipc.com
        christopher.dalton@bipc.com

Attorneys for Defendants,
  BMW of North America, LLC and
  Bayerische Motoren Werke
  Aktiengesellschaft

Dated: _____, 2015

                              _____
Raymond P. Boucher, Esq.
BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367
(818) 340-5400 (t)
(818) 340-5401 (f)
Email: ray@boucher.la

On Behalf of Lead Class Counsel

Dated: _____, 2015

                              _____
Joshua Skeen, Class Representative

Dated: 11/2 , 2015

                              _____
Laurie Freeman, Class Representative

Dated: _11/03_, 2015                    _____
                                        Scott Lamb, Class Representative

Dated: _____, 2015                _____
                                        Gina Romaggi, Class Representative

Dated: _____, 2015                _____
                                        Emmanuel Nomikos, Class Representative

Dated: _____, 2015                _____
                                        Gregory Abbott, Class Representative

Dated: _____, 2015                _____
                                        Vicki Blasucci, Class Representative

Dated: _____, 2015                _____
                                        Scott Bookhout, Class Representative

Dated: _____, 2015                _____
                                        Michelle Colberg, Class Representative

Dated: _____, 2015                _____
                                        Kevin Kebabjian, Class Representative

Dated: _____, 2015                _____
                                        Marta Motel, Class Representative

Dated: _____, 2015                _____
                                        Ginger Roach, Class Representative

Dated: _____, 2015                _____
                                        James Stoecker, Class Representative

Dated: _____, 2015

_____
Scott Lamb, Class Representative

Dated: _October 31_, 2015

_____
Gina Romaggi, Class Representative

Dated: _____, 2015

_____
Emmanuel Nomikos, Class Representative

Dated: _____, 2015

_____
Gregory Abbott, Class Representative

Dated: _____, 2015

_____
Vicki Blasucci, Class Representative

Dated: _____, 2015

_____
Scott Bookhout, Class Representative

Dated: _____, 2015

_____
Michelle Colberg, Class Representative

Dated: _____, 2015

_____
Kevin Kebabjian, Class Representative

Dated: _____, 2015

_____
Marta Motel, Class Representative

Dated: _____, 2015

_____
Ginger Roach, Class Representative

Dated: _____, 2015

_____
James Stoecker, Class Representative

Dated: _____, 2015

Scott Lamb, Class Representative

Dated: _____, 2015

Gina Romaggi, Class Representative

Dated: 11/4/2015

Emmanuel Nomikos, Class Representative

Dated: _____, 2015

Gregory Abbott, Class Representative

Dated: _____, 2015

Vicki Blasucci, Class Representative

Dated: _____, 2015

Scott Bookhout, Class Representative

Dated: _____, 2015

Michelle Colberg, Class Representative

Dated: _____, 2015

Kevin Kebabjian, Class Representative

Dated: _____, 2015

Marta Motel, Class Representative

Dated: _____, 2015

Ginger Roach, Class Representative

Dated: _____, 2015

James Stoecker, Class Representative

46

Dated: _____, 2015

_____
Scott Lamb, Class Representative

Dated: _____, 2015

_____
Gina Romaggi, Class Representative

Dated: _____, 2015

_____
Emmanuel Nomikos, Class Representative

Dated: 11/3, 2015

_____
Gregory Abbott, Class Representative

Dated: _____, 2015

_____
Vicki Blasucci, Class Representative

Dated: _____, 2015

_____
Scott Bookhout, Class Representative

Dated: _____, 2015

_____
Michelle Colberg, Class Representative

Dated: _____, 2015

_____
Kevin Kebabjian, Class Representative

Dated: _____, 2015

_____
Marta Motel, Class Representative

Dated: _____, 2015

_____
Ginger Roach, Class Representative

Dated: _____, 2015

_____
James Stoecker, Class Representative

00027785.27                          46

Dated: _____, 2015

_____
Scott Lamb, Class Representative

Dated: _____, 2015

_____
Gina Romaggi, Class Representative

Dated: _____, 2015

_____
Emmanuel Nomikos, Class Representative

Dated: _____, 2015

_____
Gregory Abbott, Class Representative

Dated: *Nov. 4,* 2015

*Vicki Blasucci*
_____
Vicki Blasucci, Class Representative

Dated: _____, 2015

_____
Scott Bookhout, Class Representative

Dated: _____, 2015

_____
Michelle Colberg, Class Representative

Dated: _____, 2015

_____
Kevin Kebabjian, Class Representative

Dated: _____, 2015

_____
Marta Motel, Class Representative

Dated: _____, 2015

_____
Ginger Roach, Class Representative

Dated: _____, 2015

_____
James Stoecker, Class Representative

Dated: _____, 2015

_____
Scott Lamb, Class Representative

Dated: _____, 2015

_____
Gina Romaggi, Class Representative

Dated: _____, 2015

_____
Emmanuel Nomikos, Class Representative

Dated: _____, 2015

_____
Gregory Abbott, Class Representative

Dated: _____, 2015

_____
Vicki Blasucci, Class Representative

Dated: _Oct 30_, 2015

_____
Scott Bookhout, Class Representative

Dated: _____, 2015

_____
Michelle Colberg, Class Representative

Dated: _____, 2015

_____
Kevin Kebabjian, Class Representative

Dated: _____, 2015

_____
Marta Motel, Class Representative

Dated: _____, 2015

_____
Ginger Roach, Class Representative

Dated: _____, 2015

_____
James Stoecker, Class Representative

Dated: _____, 2015

_____
Scott Lamb, Class Representative

Dated: _____, 2015

_____
Gina Romaggi, Class Representative

Dated: _____, 2015

_____
Emmanuel Nomikos, Class Representative

Dated: _____, 2015

_____
Gregory Abbott, Class Representative

Dated: _____, 2015

_____
Vicki Blasucci, Class Representative

Dated: _____, 2015

_____
Scott Bookhout, Class Representative

Dated: 4 Nov _____, 2015

_____
Michelle Colberg, Class Representative

Dated: _____, 2015

_____
Kevin Kebabjian, Class Representative

Dated: _____, 2015

_____
Marta Motel, Class Representative

Dated: _____, 2015

_____
Ginger Roach, Class Representative

Dated: _____, 2015

_____
James Stoecker, Class Representative

Dated: _____, 2015

_____
Scott Lamb, Class Representative

Dated: _____, 2015

_____
Gina Romaggi, Class Representative

Dated: _____, 2015

_____
Emmanuel Nomikos, Class Representative

Dated: _____, 2015

_____
Gregory Abbott, Class Representative

Dated: _____, 2015

_____
Vicki Blasucci, Class Representative

Dated: _____, 2015

_____
Scott Bookhout, Class Representative

Dated: _____, 2015

_____
Michelle Colberg, Class Representative

Dated: 10/29 _____, 2015

_____ (KEVORK KEBABJIAN)
Kevin Kebabjian, Class Representative

Dated: _____, 2015

_____
Marta Motel, Class Representative

Dated: _____, 2015

_____
Ginger Roach, Class Representative

Dated: _____, 2015

_____
James Stoecker, Class Representative

Dated: _____, 2015

_____
Scott Lamb, Class Representative

Dated: _____, 2015

_____
Gina Romaggi, Class Representative

Dated: _____, 2015

_____
Emmanuel Nomikos, Class Representative

Dated: _____, 2015

_____
Gregory Abbott, Class Representative

Dated: _____, 2015

_____
Vicki Blasucci, Class Representative

Dated: _____, 2015

_____
Scott Bookhout, Class Representative

Dated: _____, 2015

_____
Michelle Colberg, Class Representative

Dated: _____, 2015

_____
Kevin Kebabjian, Class Representative

Dated: _10/31_, 2015

*Marta Motel*
Marta Motel, Class Representative

Dated: _____, 2015

_____
Ginger Roach, Class Representative

Dated: _____, 2015

_____
James Stoecker, Class Representative

00027785.27                                        46

Dated: _____, 2015

_____
Scott Lamb, Class Representative

Dated: _____, 2015

_____
Gina Romaggi, Class Representative

Dated: _____, 2015

_____
Emmanuel Nomikos, Class Representative

Dated: _____, 2015

_____
Gregory Abbott, Class Representative

Dated: _____, 2015

_____
Vicki Blasucci, Class Representative

Dated: _____, 2015

_____
Scott Bookhout, Class Representative

Dated: _____, 2015

_____
Michelle Colberg, Class Representative

Dated: _____, 2015

_____
Kevin Kebabjian, Class Representative

Dated: _____, 2015

_____
Marta Motel, Class Representative

Dated: 10 - 27 , 2015

_____
Ginger Roach, Class Representative

Dated: _____, 2015

_____
James Stoecker, Class Representative

Dated: _____, 2015        _____
                                 Scott Lamb, Class Representative

Dated: _____, 2015        _____
                                 Gina Romaggi, Class Representative

Dated: _____, 2015        _____
                                 Emmanuel Nomikos, Class Representative

Dated: _____, 2015        _____
                                 Gregory Abbott, Class Representative

Dated: _____, 2015        _____
                                 Vicki Blasucci, Class Representative

Dated: _____, 2015        _____
                                 Scott Bookhout, Class Representative

Dated: _____, 2015        _____
                                 Michelle Colberg, Class Representative

Dated: _____, 2015        _____
                                 Kevin Kebabjian, Class Representative

Dated: _____, 2015        _____
                                 Marta Motel, Class Representative

Dated: _____, 2015        _____
                                 Ginger Roach, Class Representative

Dated: 11-02, 2015               _____
                                 James Stoecker, Class Representative

Dated: 11/2 , 2015

_H. Swango_____
Heather Swango, Class Representative

Dated: _____, 2015

_____
Patricia Curran, Class Representative

Dated: _____, 2015

_____
Maryanne Howland, Class Representative

Dated: _____, 2015

_____
Candi Sossa, Class Representative

Dated: _____, 2015

_____
Richard Kahn, Class Representative

Dated: _____, 2015

_____
Heather Swango, Class Representative

Dated: Oct 28, 2015

_____
Patricia Curran, Class Representative

Dated: _____, 2015

_____
Maryanne Howland, Class Representative

Dated: _____, 2015

_____
Candi Sossa, Class Representative

Dated: _____, 2015

_____
Richard Kahn, Class Representative

Dated: _____, 2015

_____
Heather Swango, Class Representative

Dated: _____, 2015

_____
Patricia Curran, Class Representative

Dated: _10/27_, 2015

_____
Maryanne Howland, Class Representative

Dated: _____, 2015

_____
Candi Sossa, Class Representative

Dated: _____, 2015

_____
Richard Kahn, Class Representative

Dated: _____, 2015

_____
Heather Swango, Class Representative

Dated: _____, 2015

_____
Patricia Curran, Class Representative

Dated: _____, 2015

_____
Maryanne Howland, Class Representative

Dated: _11._ _10_ ·, 2015

_____
Candi Sossa, Class Representative

Dated: _____, 2015

_____
Richard Kahn, Class Representative

Dated: _____, 2015

_____
Heather Swango, Class Representative

Dated: _____, 2015

_____
Patricia Curran, Class Representative

Dated: _____, 2015

_____
Maryanne Howland, Class Representative

Dated: _____, 2015

_____
Candi Sossa, Class Representative

Dated: __11/3/__, 2015

_____
Richard Kahn, Class Representative

EXHIBIT A

```
┌─────────────────────┐
│   MUST BE           │
│   POSTMARKED        │
│   NO LATER THAN     │
│   _____     │
└─────────────────────┘
```

*Skeen v. BMW of North America, LLC (Case No. 2:13-cv-01531-WHW-CLW)*

## Timing Chain Tensioner Class Action Settlement Claim Form

To make a claim in the class action settlement in the above case, please complete and mail this form, signed under penalty of perjury, with the required documentation, postmarked no later than _____, to:

Claims Administrator
xxxxx
xxxxxxx
xxxxxxx

You may also submit your claim online at www._____.com by 12:00 a.m. Eastern on _____.

| CLAIM TYPE |
|---|
| I am making a claim for: |
| ☐      Reimbursement for Timing Chain Tensioner/Timing Chain repair/replacement at a MINI Dealership (please complete sections *A*, *B*, *C*, *H*, and *L*, below). |
| ☐      Reimbursement for Timing Chain Tensioner/Timing Chain repair/replacement at a third party repair facility (please complete sections *A*, *B*, *D*, *H*, and *L*, below). |
| ☐      Reimbursement for engine repair/replacement at a MINI Dealership due to a failed Timing Chain Tensioner/Timing Chain (please complete sections *A*, *B*, *E*, *I*, and *L*, below). |
| ☐      Reimbursement for engine repair/replacement at a third party repair facility due to a failed Timing Chain Tensioner/Timing Chain (please complete sections *A*, *B*, *F*, *I*, and *L*, below). |
| ☐      Payment for a MINI vehicle sold with an unrepaired damaged/failed engine due to Timing Chain Tensioner/Timing Chain Failure (please complete sections *A*, *B*, *G*, *J*, and *L*, below). |

| A.    CLAIMANT INFORMATION | |
|---|---|
| Name: | |
| Address: | |
| City, State, Zip Code: | |
| Telephone Number: | |
| E-Mail: | |

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

NOTICE OF PROPOSED SETTLEMENT OF CLASS ACTION

## If you have ever owned or leased any of the following MINI Cooper Models, you could get a payment from this class action settlement and will receive a warranty extension:
### 2008-2009 MINI Cooper S Clubman (R55)
### 2007-2009 MINI Cooper S Hardtop (R56)
### 2009-2010 MINI Cooper S Convertible (R57)

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

The settlement will:

- provide cash reimbursement for certain expenses as a result of a timing chain tensioner or timing chain failure in the MINI Coopers listed above; and

- extend the warranty on the timing chain tensioner and its components.

Your legal rights are affected whether you act or don't act. Read this notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT: | |
|---|---|
| SUBMIT A CLAIM FORM | The only way to get a payment. |
| EXCLUDE YOURSELF | Get no payment. This is the only option that allows you to ever be part of any other lawsuit against BMW, which makes MINIs, about the legal claims in this case. |
| OBJECT | Write to the Court about why you don't like the settlement. |
| GO TO A HEARING | Ask to speak in Court about the fairness of the settlement. |
| DO NOTHING | Get no payment. Give up rights. |

- These rights and options—**and the deadlines to exercise them**—are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the settlement. Payments will be made if the Court approves the settlement and after appeals are resolved. Please be patient.

### 1. Why did I get this notice package?

You or someone in your family may have owned or leased a MINI Cooper.

The Court sent you this notice because you have a right to know about a proposed settlement of a class action lawsuit, and about your options, before the Court decides whether to approve the settlement. If the Court approves it and after objections and appeals are resolved, an administrator appointed by the Court will make the payments that the settlement allows. This package explains the lawsuit, the settlement, your legal rights, what benefits are available, who is eligible for them, and how to get them.

The Court in charge of the case is the United States District Court for the District of New Jersey, and the case is *Skeen v. BMW of North America, LLC*, case no. 2:13-cv-01531-WHW-CLW. The people who sued are called Plaintiffs, and the companies they sued, BMW of North America, LLC and Bayerische Motoren Werke Aktiengesellschaft, are called the Defendants.

## 2. What is this lawsuit about?

The lawsuit claimed that BMW made and sold certain MINI Coopers knowing that the cars had defective timing chain components, which are parts inside the engine. Defendants deny they did anything wrong and stand behind and support their products.

## 3. Why is this a class action?

In a class action, one or more people, called Class Representatives (in this case Joshua Skeen, Laurie Freeman, Scott Lamb, Gina Romaggi, Emmanuel Nomikos, Gregory Abbott, Vicki Blasucci, Scott Bookhout, Michelle Colberg, Kevin Kebabjian, Marta Motel, Ginger Roach, James Stoecker, Heather Swango, Patricia Curran, Maryanne Howland, Candi Sossa, and Richard Kahn), sue on behalf of people who have similar claims. All these people are a Class or Class Members. One court resolves the issues for all Class Members, except for those who exclude themselves from the Class. U.S. District Judge William H. Walls is in charge of this class action.

## 4. Why is there a settlement?

The Court did not decide in favor of Plaintiffs or Defendants. Instead, both sides agreed to a settlement. That way, they avoid the cost and risk of a trial, so that the people affected will get benefits. The Class Representatives and the attorneys think the settlement is best for everyone.

# WHO IS IN THE SETTLEMENT

To see if you will get benefits and a warranty extension from this settlement, you first have to decide if you are a Class Member.

## 5. How do I know if I am part of the settlement?

Judge William H. Walls decided that everyone who fits this description is a Class Member:

All current and former owners and lessees within the United States of the following vehicles, manufactured at any time from start of production in November 2006 through July 2010 ("Class Vehicle"):

- 2008 through 2009 model year MINI Cooper S Clubman (R55)
- 2007 through 2009 model year MINI Cooper S Hardtop (R56)
- 2009 through 2010 model year MINI Cooper S Convertible (R57)

# THE SETTLEMENT BENEFITS—WHAT YOU GET

## 6. What benefits does the Settlement provide?

If the proposed settlement is approved by the Court, it will provide a warranty extension on all Class Vehicles and cash payments to eligible Class Members. In return for the benefits described below, Class Members release their rights to pursue any claims individually against Defendants and related entities relating to the facts and claims at issue in this case.

## 7. What can I get from the settlement?

The following description of the settlement benefits is set out in its entirety in the Settlement Agreement, a copy of which is on file with the Court and available at www._____.com. Any capitalized or defined terms have the meaning provided in the Settlement Agreement.

## A.    WARRANTY EXTENSION FOR COVERED PARTS

All Class Vehicles will receive an automatic warranty extension for original Covered Parts, which will run for 7 years/100,000 miles from the Class Vehicle's in-service date, whichever comes first, and will be subject to the terms and conditions of the MINI Warranty.

## B.    REIMBURSEMENT FOR OUT OF POCKET EXPENSES FOR REPAIRS/REPLACEMENTS OF TIMING CHAIN TENSIONER/TIMING CHAIN BEFORE EFFECTIVE DATE OF SETTLEMENT

All Class Members who repaired or replaced a Timing Chain Tensioner or Timing Chain before the Effective Date of the Settlement who submit a valid Claim are entitled to be reimbursed as follows:

1.    Timing Chain Tensioner Repair/Replacement:

    (a)    If replaced at an Authorized MINI Dealer: 100% of full Dealer invoice amount for the Covered Part(s) and labor.

    (b)    If replaced at a third-party service center other than an Authorized MINI Dealer: 100% of invoice for Covered Part(s) and labor, but no more than the equivalent cost as if performed at an Authorized MINI Dealer (up to $120).

2.    Timing Chain Repair/Replacement:

    (a)    If replaced at an Authorized MINI Dealer: 100% of full Dealer invoice amount for the Covered Part(s) and labor.

    (b)    If replaced at a third-party service center other than an Authorized MINI Dealer: 100% of invoice for Covered Part(s) and labor, but no more than the equivalent cost as if performed at an Authorized MINI Dealer (up to $850).

3.    Limitations on Reimbursement:

    (a)    Any reimbursement will be reduced by the amount of any goodwill payments/credits or other concession paid by BMW or any other entity (including insurers and providers of extended warranties), up to the full amount of any reimbursement if you received free replacement or repair.

    (b)    BMW will only pay for labor and parts for one initial repair by a third-party service center; BMW will not be responsible for, and will not warrant, repair/replacement work performed at a third-party service center. *Subsequent Failure*: If any replacement Covered Part(s), purchased by the customer or a third-party service center from an Authorized MINI Dealer fails within two (2) years of installation in a Class Vehicle, BMW will provide a free replacement of Covered Part(s) only.

## C.    REIMBURSEMENT FOR OUT-OF-POCKET EXPENSES FOR DAMAGED OR FAILED ENGINE DUE TO TIMING CHAIN TENSIONER/TIMING CHAIN FAILURE BEFORE EFFECTIVE DATE OF SETTLEMENT:

All Class Members whose Class Vehicle suffered a damaged or failed engine due to failure of the Class Vehicle's Timing Chain Tensioner or Timing Chain and who submit a valid Claim are entitled to be reimbursed as follows:

1.    Reimbursement Parameters

    (a)    If repaired or replaced at an Authorized MINI Dealer, the maximum recovery is the full invoice amount subject to the time/mileage parameters set out in Table 1, below.

    (b)    If repaired or replaced at a third-party service center other than an Authorized MINI Dealer, the maximum recovery is $5,400.00, subject to the time/mileage parameters set out in Table 1, below.

| Time from in-service date | Less than 50,000 Miles | 50,001 to 62,500 Miles | 62,501 to 75,000 Miles | 75,001 to 87,500 Miles | 87,501 to 100,000 Miles | 100,001 to 112,500 Miles |
|---|---|---|---|---|---|---|
| 4 years | 100% (warranty) | 85% | 70% | 60% | 40% | 25% |
| 4-5 years | 85% | 75% | 60% | 40% | 30% | 15% |
| 5-6 years | 75% | 60% | 50% | 30% | 20% | 10% |
| 6-7 years | 50% | 30% | 30% | 15% | 10% | 0% |
| 7-10 years | 25% | 10% | 10% | 5% | 0 | 0% |

For illustration purposes, if you had your engine replaced at an Authorized MINI Dealer when your Class Vehicle was 4 ½ years old and had been driven for 70,000 miles, you would be entitled to a 60% return of your documented Out-Of-Pocket Expenses if you submit a valid Claim. If you instead had your engine replaced at a third-party service center, you would be entitled to a 60% return, up to a maximum of $5,400, of your documented Out-Of-Pocket Expenses if you submit a valid Claim.

2.  Limitations on Reimbursement:

    (a) Any reimbursement will be reduced by the amount of any goodwill payments/credits or other concession paid by BMW or any other entity (including insurers and providers of extended warranties), up to the full amount of any reimbursement if Claimant received free replacement or repair.

    (b) BMW will only pay for labor and parts for one (1) initial repair by a third-party service center; BMW will not be responsible for, and will not warrant, repair/replacement work performed at a third-party service center. *Subsequent Failure*: If the replacement Covered Part(s), purchased by the customer or a third-party service center from an Authorized MINI Dealer, fails within two years of installation in a Class Vehicle, BMW will provide a free replacement of Covered Part(s) only.

    (c) Any replacement engine will be subject to the parts warranty terms and conditions accompanying that replacement engine.  Nothing in this settlement modifies that warranty.

**D.  COMPENSATION FOR SALE OF VEHICLE DUE TO UNREPAIRED FAILED ENGINE AS A RESULT OF FAILED TIMING CHAIN TENSIONER/TIMING CHAIN BEFORE EFFECTIVE DATE OF SETTLEMENT**

All Class Members whose Class Vehicles were sold due to an unrepaired failed engine resulting from a failed Timing Chain Tensioner or Timing Chain, and who submit a valid Claim, are entitled to compensation as follows:

| Time from in-service date | Less than 50,000 Miles | 50,001 to 62,500 Miles | 62,501 to 75,000 Miles | 75,001 to 87,500 Miles | 87,501 to 100,000 Miles | 100,001 to 112,500 Miles |
|---|---|---|---|---|---|---|
| 4 years | $0 because 100% covered under warranty | $2,250 | $1,500 | $1,300 | $1,000 | $500 |
| 4-5 years | $2,250 | $1,500 | $1,200 | $1,000 | $600 | $0 |
| 5-6 years | $1,500 | $1,200 | $900 | $600 | $450 | $0 |
| 6-7 years | $1,000 | $750 | $600 | $450 | $300 | $0 |
| 7-10 years | $750 | $500 | $0 | $0 | $0 | $0 |

# HOW YOU GET A PAYMENT—SUBMITTING A CLAIM FORM

## 8. How do I file a claim?

To receive reimbursement, Class Members must submit a Claim Form **ON OR BEFORE** _____.  A Claim Form is attached to this Notice. The Claim Form must be completed in its entirety and should be signed under penalty of perjury. You must also include all Required Documentation, which are described in detail in the Claim Form. Read the Claim Form instructions carefully.

You may visit www._____.com to file your claim online or obtain replacement Claim Forms.

*Please note that Claim Forms will not be processed, and payments will not be issued, until after the Effective Date of this Settlement, which is thirty (30) days after the Court grants final approval of the Settlement.  Please be patient, and feel free to check the website or call the phone number listed below for current status.*

# THE LAWYERS REPRESENTING YOU

## 9. Do I have a lawyer in the case?

The Court asked the law firms of Boucher LLP, Markun Zusman Compton LLP, Cafferty Clobes Meriwether & Sprengel LLP, Kiesel Law LLP, Pinilis Halpern LLP, Ahdoot & Wolfson PC, and Morgan & Morgan Complex Litigation Group, to represent you and other Class Members. Together, the lawyers are called Class Counsel. You will not be charged for these lawyers. If you want to be represented by your own lawyer, you may hire one at your own expense.

## 10. How will the lawyers be paid?

If the Court approves the Settlement, the Court also will determine what amount of attorneys' fees, costs and all other expenses should be paid to Class Counsel. Payment of attorneys' fees and expenses to Class Counsel will not reduce any benefit available to you as part of the Settlement, and will be paid separately by BMW. While not agreeing to the total amount of such an award, the parties have agreed that Defendants will not object to Class Counsel's application for an award of fees and expenses up to $1,820,000, and that Class Counsel may apply for an award of fees and expenses not to exceed $2,320,000. The Parties have further agreed that Class Counsel shall not seek payment of any amount in excess of $2,320,000 if awarded by the Court. Class Counsel also will apply for Service Awards in the amount of $4,000 for each Class Representative for their work on behalf of the class. These amounts, if approved by the Court, will be paid separately by BMW and will not affect the benefits you may receive under this settlement.

Copies of Class Counsel's motion for an award of Class Counsel's Fees and Expenses will be posted on the settlement website www._____.com on or before _____.

BMW will also separately pay the costs to administer the settlement.

## 11. What am I giving up to get a payment or stay in the Class?

Unless you exclude yourself, you are staying in the Class, and that means that you can't sue, continue to sue, or be part of any other lawsuit against BMW about the legal issues in this case. It also means that all of the Court's orders will apply to you and legally bind you.

/ / /

# EXCLUDING YOURSELF FROM THE SETTLEMENT

If you don't want a payment from this settlement, but you want keep the right to sue or continue to sue BMW on your own about the legal issues in this case, then you must take steps to get out. This is called excluding yourself—sometimes referred to as "opting out" of the Settlement Class.

## 12. How do I get out of the settlement?

To exclude yourself from the settlement, you must send a letter by mail saying that you want to be excluded from **Skeen v. BMW**. Be sure to include (a) the name of the case, (b) your name, current address, telephone number, and signature, (c) the approximate date(s) of purchase or lease and VIN for your Settlement Class Vehicle(s), and (d) a clear statement communicating that you elect to be excluded from the Settlement. You must mail your exclusion request postmarked no later than _____, to:

*Skeen v. BMW of North America, LLC* Claims Administrator
P.O. Box 0000
City, ST 00000-0000

You can't exclude yourself on the phone or by e-mail. If you ask to be excluded, you will not get any settlement payment, and you cannot object to the settlement. You will not be legally bound by anything that happens in this lawsuit. You may be able to sue (or continue to sue) BMW in the future.

## 13. If I don't exclude myself, can I sue BMW for the same thing later?

No. Unless you exclude yourself, you give up the right to sue BMW for the claims that this settlement resolves. If you have a pending lawsuit, speak to your lawyer in that lawsuit immediately. You must exclude yourself from this Class to continue your own lawsuit. Remember, the exclusion deadline is _____.

## 14. If I exclude myself, can I get money from this settlement?

No. If you exclude yourself, do not send in a claim form to ask for any money. But you may sue, continue to sue, or be part of a different lawsuit against BMW.

# OBJECTING TO THE SETTLEMENT

You can tell the Court that you don't agree with the settlement or some part of it.

## 15. How do I tell the Court that I don't like the settlement?

If you're a Class Member, you can object to the settlement if you don't like any part of it. You can give reasons why you think the Court should not approve it. The Court will consider your views. To object, you must send a letter saying that you object to *Skeen v. BMW of North America, LLC*. Be sure to include (1) your full name and current address; (2) the model year and Vehicle Identification Number ("VIN") of your Vehicle(s) and the date(s) of purchase or lease; (3) the factual and legal reasons for your objection (including all documents you wish to submit in support of you objection); (4) a detailed list of any other objections to any class action settlements you submitted to any court, whether State, Federal, or otherwise, in the United States in the previous five (5) years; (5) a Notice of Intention to Appear at the Final Approval Hearing if you intend to appear in person at the hearing; and (6) your signature. Mail the objection to these three different places postmarked no later than _____:

| COURT | CLASS COUNSEL | DEFENSE COUNSEL |
|---|---|---|
| Clerk of the Court United States District Court for the District of New Jersey | Raymond P. Boucher BOUCHER LLP 21600 Oxnard Street, Suite 600 | Rosemary J. Bruno Christopher J. Dalton BUCHANAN INGERSOLL & |

CLASS NOTICE 00378538-1 **QUESTIONS? CALL 1-800-000-0000 TOLL FREE, OR VISIT WWW._____.COM**

50 Walnut Street                          Woodland Hills, California 91367          ROONEY PC
Newark, New Jersey 07101                                                           550 Broad Street, Suite 810
                                                                                  Newark, New Jersey 07102

### 16. What's the difference between objecting and excluding?

Objecting is simply telling the Court that you don't like something about the settlement. You can object only if you stay in the Class. Excluding yourself is telling the Court that you don't want to be part of the Settlement Class. If you exclude yourself, you have no basis to object because the case no longer affects you.

## THE COURT'S FINAL APPROVAL HEARING

The Court will hold a hearing to decide whether to approve the settlement, sometimes called the "Fairness Hearing." You may attend and you may ask to speak, but you don't have to.

### 17. When and where will the Court decide whether to approve the settlement?

The Court will hold a Final Approval ("Fairness") Hearing at __:00 a.m. on _____, _____, at the United States District Court for the District of New Jersey, Martin Luther King Building & US Courthouse, 50 Walnut Street, Newark, NJ 07101, in Courtroom 4D. At this hearing the Court will consider whether the Settlement is fair, reasonable, and adequate. The Court will consider any objections, and will listen to people who have asked to speak at the hearing. The Court may also decide how much to pay Class Counsel. After the hearing, the Court will decide whether to approve the settlement. We do not know how long these decisions will take.

### 18. Do I have to come to the hearing?

No. Class Counsel will answer questions the Court may have. But you are welcome to come at your own expense. If you send an objection, you don't have to come to Court to talk about it. As long as you mailed your written objection on time, the Court will consider it. You may also pay your own lawyer to attend, but it's not required.

### 19. May I speak at the hearing?

You may ask the Court for permission to speak at the Fairness Hearing. To do so, you must send a letter saying that it is your "Notice of Intention to Appear in *Skeen v. BMW of North America, LLC*." Be sure to include the information set forth in Question 15. Your Notice of Intention to Appear must be postmarked no later than _____, and be sent to the Clerk of the Court, Class Counsel, and Defense Counsel, at the three addresses on Page 7, in Question 15. You cannot speak at the hearing if you excluded yourself.

## IF YOU DO NOTHING

### 20. What happens if I do nothing at all?

If you do nothing, you'll get no money from this settlement although you will still receive a warranty extension. But, unless you exclude yourself, you won't be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against BMW about the legal issues in this case, ever again.

## GETTING MORE INFORMATION

### 21. Are there more details about the settlement?

This notice summarizes the proposed settlement. More details are in the Settlement Agreement. You can get a copy of the Settlement Agreement by writing to Claims Administrator, P.O Box

CLASS NOTICE 00378538-1 QUESTIONS? CALL 1-800-000-0000 TOLL FREE, OR VISIT WWW._____.COM

_____, or by visiting www._____.com.

## 22. How do I get more information?

You can call 1-800-___-____ toll free; write to BMW Settlement, P.O. Box __, City, ST 00000-0000; or visit the website at www._____.com, where you will find answers to common questions about the settlement, a claim form, plus other information to help you determine whether you are a Class Member and whether you are eligible for a payment.

EXHIBIT B

MUST BE
POSTMARKED
NO LATER THAN
_____

| B. | INFORMATION ON CLASS VEHICLE AND SERVICING |
|---|---|
| Model: | |
| Model Year: | |
| Vehicle Identification Number (VIN): | |
| Please list all dealerships or repair facilities where your vehicle was serviced: | Name: _____<br>Address: _____<br>City, State: _____<br>Phone: _____ |
| | Name: _____<br>Address: _____<br>City, State: _____<br>Phone: _____ |
| | Name: _____<br>Address: _____<br>City, State: _____<br>Phone: _____ |
| | ☐ _Check here if your vehicle was serviced at more than three (3) facilities. If so, list name, address, city, state, and phone number of all other facilities on a separate attachment. |

| C. | INFORMATION ON TIMING CHAIN TENSIONER/TIMING CHAIN REPAIR/REPLACEMENT AT MINI DEALERSHIP |
|---|---|
| Dealership where Timing Chain Tensioner/Timing Chain repair/replacement was performed: | Name: _____<br>Address: _____<br>City, State: _____<br>Phone: _____ |
| Date of repair/replacement: | |
| Mileage at time of repair/replacement: | |
| Total out-of-pocket costs paid for the repair/replacement: | |

MUST BE
POSTMARKED
NO LATER THAN
_____

| Have you received any compensation or reimbursement for your Timing Chain Tensioner/ Timing Chain repair/replacement from MINI/BMW (warranty or goodwill), insurance, or any other source? | ☐ Yes*          ☐ No<br><br>*Please state amount and source of payment: _____<br>_____<br><br><br>***If you are not making any other claims, skip to Section H, below.*** |
|---|---|

| **D.** | **INFORMATION ON TIMING CHAIN TENSIONER/TIMING CHAIN REPAIR/REPLACEMENT OUTSIDE MINI DEALERSHIP NETWORK** |
|---|---|
| Third party repair facility where Timing Chain Tensioner/Timing Chain repair/replacement was performed: | Name:      _____<br>Address:   _____<br>City, State: _____<br>Phone:     _____ |
| Date of repair/replacement: | |
| Mileage at time of repair/replacement: | |
| Total out-of-pocket costs paid for the repair/replacement: | |
| Have you received any compensation or reimbursement for your Timing Chain Tensioner/ Timing Chain repair/replacement from MINI/BMW (warranty or goodwill), insurance, or any other source? | ☐ Yes*          ☐ No<br><br>*Please state amount and source of payment: _____<br>_____<br><br><br>***If you are not making any other claims, skip to Section H, below.*** |

| **E.** | **INFORMATION ON ENGINE REPAIR/REPLACEMENT DUE TO FAILED TIMING CHAIN TENSIONER/TIMING CHAIN AT MINI DEALERSHIP** |
|---|---|
| Dealership where engine repair/replacement was performed: | Name:      _____<br>Address:   _____<br>City, State: _____<br>Phone:     _____ |

| MUST BE POSTMARKED NO LATER THAN _____ |
|---|

| | |
|---|---|
| Date of repair/replacement: | |
| Mileage at time of repair/replacement: | |
| Total out-of-pocket costs paid for the repair/replacement: | |
| Have you received any compensation or reimbursement for your engine repair/replacement from MINI/BMW (warranty or goodwill), insurance, or any other source? | ☐ Yes*        ☐ No<br><br>*Please state amount and source of payment: _____<br><br>_____<br><br>***If you are not making any other claims, skip to Section I, below.*** |
| **F.     INFORMATION ON ENGINE REPAIR/REPLACEMENT DUE TO FAILED TIMING CHAIN TENSIONER/TIMING CHAIN OUTSIDE MINI DEALERSHIP NETWORK** | |
| Third party repair facility where engine repair/replacement was performed: | Name:        _____<br>Address:     _____<br>City, State:  _____<br>Phone:       _____ |
| Date of repair/replacement: | |
| Mileage at time of repair/replacement: | |
| Total out-of-pocket costs paid for the repair/replacement: | |
| Have you received any compensation or reimbursement for your engine repair/replacement from MINI/BMW (warranty or goodwill), insurance, or any other source? | ☐ Yes*        ☐ No<br><br>*Please state amount and source of payment: _____<br><br>_____<br><br>***If you are not making any other claims, skip to Section I, below.*** |

MUST BE
POSTMARKED
NO LATER THAN
_____

| G. | **INFORMATION ABOUT THE SALE OF YOUR MINI VEHICLE** |
|---|---|
| Date of Timing Chain Tensioner/Timing Chain failure: | |
| Date vehicle was sold: | |
| Mileage at time of vehicle sale: | |
| Vehicle sales price: | |
| | *If you are not making any other claims, skip to Section J, below.* |

| H. | **REQUIRED DOCUMENTATION FOR TIMING CHAIN TENSIONER/TIMING CHAIN REPAIR/REPLACEMENT CLAIMS** |
|---|---|

*If you are making a claim for out-of-pocket costs incurred to repair or replace your Timing Chain Tensioner and/or Timing Chain either at a MINI dealership or third party repair facility, you must (1) provide the* <u>*Required Documentation*</u> *described below; and (2)* <u>*sign the Attestation and Consent*</u> *in Section L under penalty of perjury.*

**Required Documentation.**   To make a claim for reimbursement for out-of-pocket costs, you must submit the following documentation:

    (1) A repair order/invoice for the Timing Chain Tensioner/Timing Chain repair/replacement showing your name, Vehicle Identification Number (VIN), name and address of the MINI dealership or third party repair facility, date of repair/replacement, description of repair/replacement, mileage at repair/replacement, part(s) repaired/replaced, and cost of repair/replacement; *and*

    (2) Acceptable proof showing payment of out-of-pocket costs such as receipts, cancelled checks or credit card statement; *and*

    (3) Documents evidencing your adherence to vehicle maintenance schedule, in particular, regular oil changes (within 2,000 miles of recommended schedule), up to the date/mileage of repair /replacement. **If you do not have these maintenance documents, check here ☐ and submit a "Mechanic's Attestation" in Section K**, below, from the mechanic(s) who regularly maintained your vehicle.

| I. | **REQUIRED DOCUMENTATION FOR ENGINE REPAIR/REPLACEMENT DUE TO FAILED TIMING CHAIN TENSIONER/TIMING CHAIN** |
|---|---|

*If you are making a claim for out-of-pocket costs incurred to repair or replace your engine due to Timing Chain Tensioner and/or Timing Chain failure either at a MINI dealership or third party repair facility, you must (1) provide the* <u>*Required Documentation*</u> *described below; and (2)* <u>*sign the Attestation and Consent*</u> *in Section L under penalty of perjury.*

MUST BE
POSTMARKED
NO LATER THAN
_____

**Required Documentation.**  To make a claim for reimbursement for out-of-pocket costs, you must submit the following documentation:

(1) A repair order/invoice for the engine repair/replacement showing your name, Vehicle Identification Number (VIN), name and address of the MINI dealership or third party repair facility, date of repair/replacement, description of repair/replacement, mileage at repair/replacement, part(s) repaired/replaced, cost of repair/replacement, and indicating that engine damage/failure was due to timing-chain tensioner/timing chain failure; ***and***

(2) Acceptable proof showing payment of out-of-pocket costs such as receipts, cancelled checks or credit card statement; ***and***

(3) Documents evidencing your adherence to vehicle maintenance schedule, in particular, regular oil changes (within 2,000 miles of recommended schedule), up to the date/mileage of repair /replacement. **If you do not have these maintenance documents, check here ☐ and submit a "Mechanic's Attestation" in Section K**, below, from the mechanic(s) who regularly maintained your vehicle.

| **J.** | **REQUIRED DOCUMENTATION FOR VEHICLES SOLD WITH UNREPAIRED DAMAGED OR FAILED ENGINE DUE TO TIMING CHAIN TENSIONER/ TIMING CHAIN FAILURE** |
|---|---|

*If you are making a claim for a cash payment for a MINI vehicle you sold with a damaged or failed engine due to a Timing Chain Tensioner/Timing Chain failure, without repair, you must (1) provide the **Required Documentation** described below; and (2) sign the Attestation and Consent in Section L under penalty of perjury.*

**Required Documentation.**  To make a claim for a MINI vehicle you sold with a damaged or failed engine due to a Timing Chain Tensioner/Timing Chain failure, without repair, you must submit the following documentation:

(1) A repair estimate containing your name, VIN, name and address of MINI dealership or third party repair facility, description of repair, estimated cost of repair, mileage at engine failure, and indicating that engine failure was due to timing-chain tensioner or timing chain failure; ***and***

(2) A sales invoice or similar document containing your name, VIN, name and address of purchaser, date of sale, mileage at sale, and sales price. *Note*: mileage at time of sale must be consistent with the repair estimate; ***and***

(3) Documents evidencing your adherence to vehicle maintenance schedule, in particular, regular oil changes (within 2,000 miles of recommended schedule), up to the date/mileage of repair /replacement. **If you do not have these maintenance documents, check here ☐ and submit a "Mechanic's Attestation" in Section K**, below, from the mechanic(s) who regularly maintained your vehicle.

The documentation you provide must be sufficient to establish that the sale of the MINI was due to a

MUST BE
POSTMARKED
NO LATER THAN
_____

failure that occurred during the first 10 years or 112,500 miles (whichever occurs first) from the date the vehicle was first put into service as a new vehicle.

| K. | **MECHANIC'S ATTESTATION** |
| --- | --- |
| | *If you do not have required maintenance documents evidencing your adherence to vehicle maintenance schedule, in particular, scheduled oil changes (+2,000 miles) up to the date/mileage of claimed event, you may submit the below Mechanic's Attestation from the mechanic(s) who regularly maintained your vehicle. Attach additional pages if necessary.* |

☐   I _____ (name), am the mechanic/repair shop that regularly maintained the MINI vehicle belonging to _____ [claimant], VIN _____. The claimant adhered to the MINI maintenance schedule, in particular, regular oil changes ( within 2,000 miles of recommended schedule), up to [provide date or mileage]:_____. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Signature of Mechanic:      _____
Print Name of Mechanic:    _____
Name of Repair Shop:        _____
Address:                            _____
City, State:                        _____

| L. | **ATTESTATION AND CONSENT** |
| --- | --- |

**I, _____ (name) hereby attest that I at all times had my MINI vehicle maintained and serviced in accordance with the vehicle's service and warranty manual requirements either at a MINI dealership, a BMW Center, or a third party repair facility within 2,000 miles of the recommended vehicle maintenance schedule.**

**I understand that BMW may, at its discretion, verify that the representations in this Claim Form are true and correct. Through my signature below, I consent to the release of repair records related to my MINI vehicle by the repair facilities listed in section (B) of this Claim Form if BMW requests them.**

**I DECLARE UNDER PENALTY OF PERJURY THAT THE INFORMATION CONTAINED IN THIS CLAIM FORM IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.**

_____          _____
Signature                                                        Date

**NOTE: PLEASE BE SURE TO KEEP COPIES OF THIS CLAIM FORM AND ALL DOCUMENTS SUBMITTED WITH YOUR CLAIM.**

EXHIBIT C

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSHUA SKEEN and LAURIE FREEMAN, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>BMW OF NORTH AMERICA, LLC, a Delaware limited liability company; BMW (U.S.) HOLDING CORP., a Delaware corporation; and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, a foreign corporation,<br><br>    Defendants. | Case No. 2:13-cv-01531-WHW-CLW<br><br>**[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND NOTICE PROGRAM** |

The Court, having considered the arguments and evidence submitted by the parties in connection with Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Notice Program, hereby GRANTS the Motion and enters the following orders:

1.      This Order hereby incorporates by reference the definitions of the Settlement Agreement as though fully set forth herein, and all terms used herein shall have the same meaning as set forth in the Settlement Agreement.

2.      The Court conditionally certifies and approves, for settlement purposes only, the following Class:

> All persons or entities in the United States, the District of Columbia, and Puerto Rico who currently own or lease, or previously owned or leased, a model-year 2007 through 2009 MINI Cooper 'S' Hardtop (R56), a model-year 2008 through 2009 MINI Cooper 'S' Clubman (R55), or a model-year 2009 through 2010 MINI Cooper 'S' Convertible (R57) vehicle, which was manufactured at any time from start of production in November 2006 through July 2010.

3.      The Court preliminarily appoints Plaintiffs Joshua Skeen, Laurie Freeman, Scott Lamb, Gina Romaggi, Emmanuel Nomikos, Gregory Abbott, Vicki Blasucci, Scott Bookhout, Michelle Colberg, Kevin Kebabjian, Marta Motel, Ginger Roach, James Stoecker, Heather Swango, Patricia Curran, Maryanne Howland, Candi Sossa, and Richard Kahn as Class Representatives

4.      The Court preliminarily appoints the law firms of Boucher LLP; Kiesel Law LLP; Markun Zusman Compton LLP; Cafferty Clobes Meriwether & Sprengel LLP; Pinilis Halpern LLP; Ahdoot & Wolfson PC; and Morgan & Morgan Complex Litigation Group, as Class Counsel, with the law firms of Boucher LLP, Cafferty Clobes Meriwether & Sprengel LLP, and Markun Zusman Compton LLP, acting as Lead Class Counsel. Any Class Member may enter an appearance in the action, at their own expense, either individually or through counsel of their own choice. However, if they do not enter an appearance, they will be represented by Class Counsel.

5.      The Court hereby preliminarily approves the proposed Settlement upon the terms and conditions set forth in the Settlement Agreement and Release attached to the Declaration of Raymond P. Boucher as Exhibit 1 ("Settlement Agreement"). The Court preliminarily finds that the Settlement is within the range of reasonableness necessary for preliminary approval by the Court. The Court finds that the requirements of Federal Rule of Civil Procedure, Rules 23(a) and 23(b)(3) are met and that the Settlement terms are fair, adequate, and reasonable as to all potential Class Members when balanced against the probable outcome of further litigation, given the risks relating to liability and damages. It further appears that extensive and costly investigation and research has been conducted such that counsel for the Parties at this time are reasonably able to evaluate their respective positions. It further appears to the Court that

settlement at this time will avoid substantial additional costs by all parties, as well as the delay and risks that would be presented by the further prosecution of the above-titled action. It appears that the Settlement has been reached as a result of intensive, arms-length negotiations utilizing an experienced third party neutral.

6.      The Court hereby approves, as to form and content, the Timing Chain Tensioner Class Action Settlement Claim Form ("Claim Form") attached as Exhibit A to the Settlement Agreement, and the Notice of Proposed Settlement of Class Action ("Notice") attached as Exhibit B to the Settlement Agreement.  The Court finds that the Notice and procedures for mailing and distributing the Notice set forth in the Settlement Agreement meet the requirements of the Federal Rules of Civil Procedure, Rule 23, due process, are the best notice practicable under the circumstances, and shall constitute due and sufficient notice to all persons entitled thereto. Accordingly, the Court directs the following notice procedures be effected within forty-five (45) days of entry of this Order:

        a.      Individual direct mail (first class) notice regarding the Settlement will be sent to all current and former owners and lessees of Class Vehicles using BMW NA's database and RL Polk data; and

        b.      Individual email notice regarding the Settlement will be sent, at Class Counsel's expense, to all current and former owners and lessees of Class Vehicles using BMW NA's database and RL Polk data, except to those owners and lessees whose email address is not in BMW NA's database or whose email address is no longer valid; and

        c.      Publication on a website maintained by the Settlement Administrator.

7.      The Court approves Class Action Administrators as the Settlement Administrator. Class Action Administrators is directed to perform all other Settlement Administration

responsibilities set forth in the Settlement Agreement.

8.      To be eligible for reimbursement under the Settlement, a Class Member must complete a Timing Chain Tensioner Class Action Settlement Claim Form ("Claim Form"), attached as Exhibit A to the Settlement Agreement, and submit all required documentation in accordance with the procedures set forth in the Notice, no later than ninety (90) days following the date of entry of this Order.

9.      Any Class Member may make a Request for Exclusion by mailing or delivering such request in writing to Lead Class Counsel and Defendants' Counsel at the addresses set forth in the Class Notice. Any Request for Exclusion must be postmarked or delivered not later than ninety (90) days from the date of entry of this Order (the "Opt-Out Deadline").  Any Request for Exclusion must (1) state the Class Member's full name and current address; (2) identify the model year and Vehicle Identification Number ("VIN") of his/her/its Vehicle(s) and the date(s) of purchase or lease; and (3) specifically and clearly state his/her/its desire to be excluded from the Settlement and from the Settlement Class. Class Members who submit valid and timely requests for exclusion will not be entitled to any recovery under the Settlement and will not be bound by the Settlement or have any right to object, appeal, or comment thereon. Class Members who do not to submit valid and timely requests for exclusion are "Settlement Class Members" and shall be bound by all terms of the Settlement Agreement and any Final Judgment.

10.     Any Class Member who has not filed a timely written Request for Exclusion and who wishes to object to the fairness, reasonableness, or adequacy of this Settlement Agreement or the Settlement, or to the requested award of Attorneys' Fees and Expenses and/or Service Awards, must file a written notice of objection not later than ninety (90) days from the date of entry of this Order (the "Objection Date"), as well as a notice of intention to appear at the Final

Approval Hearing ("Notice of Intention to Appear") if he/she/it wishes to appear and be heard at the Final Approval Hearing.  To state a valid objection to the Settlement, an objecting Settlement Class Member must provide the following information in the Settlement Class Member's written objection: (1) his/her/its full name, current address, and current telephone number; (2) the model year of his/her/its Vehicle(s), as well as the VIN of his/her/its Vehicle(s) and the date(s) of purchase or lease; (3) a statement of the position(s) the objector wishes to assert, including the factual and legal grounds for the position; and (4) provide copies of any other documents that the objector wishes to submit in support of his/her/its position. To be valid, an objection also must include a detailed statement of each objection asserted, including the grounds for objection.  In addition, any Class Member objecting to the Settlement must provide a detailed list of any other objections to any class action settlements submitted in any court, whether state, federal, or otherwise, in the United States in the previous five (5) years.  If the Class Member has not objected to any other class action settlement in any court in the United States in the previous five (5) years, he/she/it must affirmatively so state in the written materials provided in connection with the objection to this Settlement.  Finally, subject to approval of the Court, any objecting Class Member may appear, in person or by counsel, at the Final Approval Hearing held by the Court, to show cause why the proposed Settlement should not be approved as fair, adequate, and reasonable, or object to any petitions for attorneys' fees and reimbursement of reasonable litigation costs and expenses.  The objecting Class Member must file with the Clerk of the Court, and serve upon all counsel designated in the Class Notice, a Notice of Intention to Appear by the Objection Deadline. The Notice of Intention to Appear must include copies of any papers, exhibits, or other evidence that the objecting Class Member (or his/her/its counsel) will present to the Court in connection with the Final Approval Hearing.

11.     Any Class Member who does not provide a Notice of Intention to Appear in complete accordance with the deadlines and other specifications set forth in this Order and the Settlement Agreement and Class Notice, and who has not filed an objection in complete accordance with the deadlines and other specifications set forth in this Order and the Settlement Agreement and Class Notice, will be deemed to have waived any objections to the Settlement and will be barred from speaking or otherwise presenting any views at the Final Approval Hearing.

12.     Upon entry of Judgment by the Court in accordance with the Settlement Agreement, all Settlement Class Members shall fully and finally release and discharge Defendants from any and all claims or causes of action that were or could have been asserted against them by the Plaintiffs or any Class Members regarding the Class Vehicles' timing chains or timing-chain tensioners, except for claims for personal injury or subrogation, but including claims for consequential damages resulting from failure of the timing chain or timing-chain tensioner. Plaintiffs and Class Members recognize that, even if they later discover facts in addition to or different from those which they now know or believe to be true, they nevertheless agree that, upon entry of the Final Approval Order and accompanying Judgment, Plaintiffs and Class Members, on behalf of themselves and their heirs, successors, or assigns, fully, finally, and forever settle and release any and all claims and causes of action (except claims for personal injury or subrogation) relating to Class Vehicles' timing chain or timing chain tensioner, including claims for consequential damages resulting from failure of the timing chain or timing-chain tensioner, which were, could have been, or ever could be asserted against Defendants.

13.     A Final Approval Hearing shall be held on _____, 2016 at ___ a.m. The purpose of such hearing will be to: (a) determine whether the proposed Settlement should be

approved by the Court as fair, reasonable and adequate; (b) determine the reasonableness of Class Counsels' request for attorneys' fees and costs; (c) determine the reasonableness of the Service Award requested for Plaintiffs; and (d) Order entry of Judgment in the Action, which shall constitute a complete release and bar with respect to the Released Claims.

14.     No less than ten (10) days prior to the Final Approval Hearing, Lead Class Counsel will report to the Court the names of all individuals who have submitted a Request for Exclusion.

15.     No less than ten (10) days prior to the Final Approval Hearing, Defendants will provide to the Court, with a copy to Class Counsel, an affidavit from the Settlement Administrator attesting that Class Notice was disseminated in a manner consistent with the terms of this Settlement Agreement.

16.     All other papers in support of the Final Approval of this Settlement and any application for reimbursement of attorneys' fees and expenses or service award, shall be filed by _____, 2016.

17.     All further proceedings in this Action shall be stayed except such proceedings necessary to review, approve, and implement this Settlement.

        IT IS SO ORDERED.

DATED: _____

                            _____
                            HON. WILLIAM H. WALLS
                            UNITED STATES DISTRICT COURT JUDGE

EXHIBIT 2

# BOUCHER LLP

Boucher LLP is a new firm, steeped in the tradition of obtaining justice for the people who need it most.

Founded by Raymond P. Boucher—Los Angeles Daily Journal's Trial Lawyer of the Decade (2001-2010)—Boucher LLP focuses on the prosecution of high-impact, complex litigation, including class actions, mass actions, and representative actions on behalf of consumers and employees harmed by major corporations and insurance companies; civil rights and police misconduct cases; cases involving the sexual abuse of minors and disabled; and significant personal injury and wrongful death cases. Boucher and his colleagues are frequently appointed class counsel in major class actions and often serve among plaintiffs' leadership in state and federal coordinated proceedings.

Boucher's successes include a groundbreaking $1 billion settlement on behalf of the victims of childhood sexual abuse by Catholic priests. He has long been a trusted resource for referring attorneys. His skill and tenacity also make him sought after as co-counsel.

Boucher built the firm from the ground up, handpicking dynamic, talented, and experienced attorneys who share his vision and values. Clients can expect meticulous preparation and tenacious, relentless representation, as well as highly individualized and compassionate service.

The firm is new. The founding principles of Boucher LLP are timeless.

## EXPERTISE AND RESOURCES

Boucher LLP has the expertise and resources to handle cases against major corporations from intake through trial. The firm is presently comprised of three partners, three associates, two of counsel attorneys, and several paralegals and staff members. The firm is well-equipped to conduct discovery in a variety of cases, including large complex cases. The firm uses sophisticated technology and protocol to capture, evaluate, and present information gleaned from documents numbering in the multi-millions. In coordinated proceedings, the firm has the experience and leadership qualities needed to effectively manage resources to ensure efficiency of litigation.

Boucher LLP has expertise in the following practice areas:

## Consumer Class Actions

The firm has extensive experience with consumer class action litigation and the relevant issues in evaluating and settling class action claims. Boucher LLP's attorneys have litigated and certified consumer class actions in a range of areas—from automotive and other product defects, to privacy and data breach, to antitrust, breach of contract, and other business disputes.

Boucher LLP's attorneys have served as lead class counsel and/or on the plaintiffs' steering committee in numerous consumer class action cases including, *In Re Aetna UCR Litigation*, Dist. N.J., MDL No. 2020 (Class Counsel), *American Medical Association et al. v. Wellpoint, Inc.*, C.D. Cal, MDL No. 2074 (Interim Co-Lead Class Counsel), *Black v. Blue Cross of California*, Super. Ct. Los Angeles County, No. BC250339 (Class Counsel), *Chavez v. Nestlé USA, Inc.* C.D. Cal., No. CV09-9192 GW (CWx) (Lead Counsel), *In Re: Facebook, Inc. Internet Tracking Litig.*, N.D. Cal., MDL No. 2314 (Interim Liaison Counsel), *In Re Galvanized Steel Pipe Litigation*, Super. Ct.

Los Angeles County, No. BC174649 (Lead Class Counsel), *In re: Pellicano Cases*, Super. Ct. Los Angeles County No. BC316318 (Co-Lead Class Counsel), *Sister Sledge et al. v. Warner Music Group Corp*., N.D. Cal., No. 12-CV-0559-RS (Interim Co-Lead Class Counsel), and *Skeen, et al. v. BMW of North America LLC, et al.*, Dist. N.J., No. 2:13-cv-1531-WHW-CLW (Interim Co-Lead Class Counsel).

## Employment Class and Representative Actions

Boucher LLP is currently prosecuting numerous class and representative cases against corporations on behalf of thousands of workers alleging wage-and-hour violations, including claims for violations of meal and rest break laws, illegal rounding of time, and failure to pay all wages. The firm is committed to ensuring employees are properly compensated under state and federal laws, and to holding corporations accountable for failing to abide by the law.

## Mass Tort Litigation

Boucher LLP's attorneys have obtained favorable recoveries for thousands of clients harmed by major pharmaceutical companies. Boucher presently serves in leadership for numerous coordinated proceedings in state and federal court, including *In Re Crestor Products Liability Cases*, Super. Ct. Los Angeles County, JCCP No. 4713 (Plaintiffs' Co-Liaison Counsel), *In Re Diet Drug Litigation*, Super. Ct. Los Angeles County, JCCP 4032 (Plaintiffs' Co-Liaison Counsel), *In re Wright Medical* Technology, *Inc., Conserve Hip Implant Products Liability Litigation,* MDL No. 2329 (Co-Lead Counsel for Plaintiffs and state Liaison Counsel), and *Zoloft Birth Defects Cases*, JCCP No. 4771 (Plaintiffs' Co-Lead Counsel).

Boucher LLP's attorneys have also successfully resolved mass tort cases involving toxic exposure, including, among others, *Bunker Hill Twrs Condo Ass'n, et al. v. W.R. Grace & Co*., Super. Ct. Los Angeles County, No. B072642, and *Zachary et al. v. ARCO et al.*, Super. Ct. Los Angeles County, No. BC209944.

## Complex, High-Impact Litigation

Boucher LLP is committed to advancing the rights of the people and to holding corporations accountable. Throughout his career, Mr. Boucher has brought worthy cases in furtherance of these goals. For example, in the *California Gubernatorial Recall Election Litigation*, Boucher represented former Governor Gray Davis in a challenge to the qualification of the 2003 California gubernatorial recall election. In *Madrid v. Perot Systems Corporation et al*., Super. Ct. Sacramento County, No. 03AS04763, Boucher resolved an antitrust and unfair competition action to recover from Perot Systems Corporation for aiding and abetting the manipulation, distortion, and corruption of California's electricity market. More recently, in *Centinela Freeman Emergency Medical Associates, et al. v. Maxwell-Jolly, et al.*, Super. Ct. Los Angeles County, Pending, No. BC406372, Boucher and his partners obtained an order compelling California's Department of Health Care Services to comply—for the first time ever—with their obligation to annually review of Medi-Cal physician reimbursement rates to ensure access to quality healthcare in California.

These are but a few of the many "impact" cases Boucher and his colleagues have pursued in the interest of positive social change.

## Civil Rights and Police Misconduct Cases

Boucher LLP prosecutes individual, mass, and class actions against public entities for civil rights violations and police misconduct. The firm is committed to helping people obtain justice and to motivating significant policy changes.

Boucher is particularly proud of the published result in *Wallace v. City of Los Angeles* (1993) 12 Cal. App. 4th 1385, a case of first impression he brought against the City on behalf of Demetria Wallace, a teenaged honors student who was shot and killed while waiting for a bus, just five days before she was to testify against a man accused of fatally shooting a taxi driver. After non-suit was granted at trial, the appeals court held the police had a duty to warn the victim. The case affirmed the government's responsibility to protect citizens who place their lives in jeopardy by stepping forward as witnesses to crimes, and prompted changes in police procedures that have saved countless other witnesses' lives since.

## Sexual Abuse Cases

Boucher LLP prosecutes individual and mass action cases against public and private entities that fail to protect minors and the disabled from sexual abuse. The firm's attorneys have extensive experience representing survivors of sexual abuse in such cases.

For example, in *The Clergy Cases,* Super. Ct. California*,* JCCP Nos. 4286, 4297, 4359, Boucher served as Plaintiffs' Liaison Counsel on behalf of almost 1,000 individuals and their families in significant personal injury claims involving molestation at the hands of Catholic priests. In *Jane Doe v. Garden Grove Unified School District,* Boucher prosecuted claims on behalf of a child victim of sexual abuse at school against a public school district. *Elena A. et al. v. Casa de Angeles Cal. Corp., d/b/a Healthy Start, et al*., Super. Ct. Los Angeles County, No. BC457840, was brought on behalf of developmentally disabled adults who were subjected to serious verbal, physical, and sexual abuse and neglect while attending an adult day care center. And Boucher was a leader in *Los Angeles Unified School District Sexual Molestation Cases*, which were brought on behalf of the many children who were molested by a teacher at Miramonte Elementary School.

## Significant Personal Injury and Wrongful Death

Boucher LLP represents individuals who have suffered serious personal injury or the death of loved ones.

The firm is committed to obtaining the justice that its clients deserve. For example, in *Young v. Johnny's Hot Dog Stand, et al*., Super. Ct. Los Angeles County, No. BC102837, Boucher obtained a jury verdict in excess of $1 million in compensatory damages on behalf of 57-year-old indigent person who was shot by a waitress outside of a hot dog stand. The firm is also passionate about seeking justice on behalf of children and adults who have suffered serious injuries from in apparel fires.

3

# BOUCHER LLP

## RAYMOND P. BOUCHER

Raymond P. Boucher, a veteran trial lawyer specializing in complex consumer litigation, class actions, product liability, toxic tort litigation, employment discrimination and bad faith, is the Founder and Senior Partner of Boucher LLP.

During his professional career, which spans three decades, Boucher has tried more than 50 cases, and has helped obtain verdicts and settlements on behalf of clients in excess of $3 billion.  In two of his more notable cases, he served as lead attorney in the landmark $660 million sexual abuse settlement with the Catholic Archdiocese of Los Angeles in which he represented over 250 abuse victims in the July 2007 settlement as well as obtaining nearly $200 million for 144 survivors in a lawsuit against the Roman Catholic Diocese of San Diego.  Boucher has briefed and argued more than 20 appeals before the Ninth Circuit Court of Appeals and California Courts of Appeal.

For his professional achievements, Boucher has received a diverse array of honors and awards, to include recognition as: "Top 100 Attorneys in California" (2002) by the Daily Journal; "Trial Lawyers of the Decade, " (2001-2010) by the Daily Journal;  "California Lawyer Attorney of the Year" (2008) by California Lawyer; "Consumer Attorney of the Year" (2007) by the Consumer Attorneys of California; and "Trial Lawyer of the Year" by the Consumer Attorneys Association of Los Angeles (additional awards listed below).

A noted author and lecturer, Boucher has lectured at numerous law schools (e.g. Stanford, Pepperdine, Loyola) and has delivered hundreds of presentations to bar associations and other legal organizations as well as legal media sponsored events and educational and government forums.

Prior to founding Boucher, LLP, Boucher served several other Los Angeles area law firms, including:  Kiesel, Boucher & Larson LLP (Partner), Law Offices of Raymond P. Boucher (Founder/Senior Partner), Nordstrom, Steele, Nicolette & Jefferson (Of Counsel), Sayre, Moreno, Purcell & Boucher (Managing Partner), and Gould & Sayre.

A native of Massachusetts, Boucher received his undergraduate education at Fort Lewis College in Durango, CO where he received his Bachelor of Arts degree with a double major in Business Administration and Political Science.

He was Student Body President, on the Dean's List and later was honored as its "Alumnus of the Year" (2007). He matriculated to Colorado State University where he received a Master of Science degree in Management. Boucher obtained his Juris Doctor degree from Pepperdine University School of Law While in law school, Boucher ranked in the top 15% of his class, was a member of the Phi Delta Phi honor society and later honored in 2002 with its Distinguished Alumnus Award.  He received an Honorary Doctor of Law by Whittier College School of Law in 2005.

Boucher is admitted to the State Bar of California as well as the United States District Court for the Central, Northern, Southern and Eastern Districts of California.  He is a member of, and has held leadership positions in, numerous legal professional entities, including:

- American Association for Justice, Member

- American Bar Association, Admitted as a Fellow of the American Bar

- Association of Trial Lawyers of America, State of California Delegate Member

- Beverly Hills Bar Association, Member
- California Courts, Administrative Office of the Courts (2002 to 2007), Committees: Court Funding, Complex Courts System, Court Integration
- California State Bar Association, Member
- Civil Justice Foundation, Member
- Consumer Attorneys Association of Los Angeles (Formerly the Los Angeles Trial Lawyers Association) President (2005), Board of Governors, Emeritus Member (2005 to present), Board of Governors, Member (1996 to 2006)
- Consumer Attorneys of California (Formerly the California Trial Lawyers Association, President (2007), Board of Governors (1997 to present)
- Consumer Attorneys of San Diego (2001 to present), Consumer Advocate of the Year (2007)
- Diversity in Law Foundation, Board of Directors
- Los Angeles County Bar Association, Board of Trustees (2000 to 2002)
- Los Angeles Superior Court Bench and Bar Committee (2001 to 2008)
- National College of Advocacy, Fellow
- Orange County Trial Lawyers Association, Member
- Pepperdine School of Law, Board of Visitors (1997 to present)
- Public Citizen, Member
- Public Justice (Formerly Trial Lawyers for Public Justice), Board of Directors (1996 to present), Member (1984 to present)
- The Roscoe Pound Foundation, Member

Among the other honors, awards and other forms of recognition Boucher has received for his professional achievements and accomplishments from legal, community, educational, nonprofit and media entities, include:

- American Association for Justice Steven J. Sharp Public Service Award (2008)
- Consumer Attorneys Association of Los Angeles Ted Horn Memorial Award in recognition of service to the California State Bar (2002), Finalist, Trial Lawyer of the Year (1996) , Several Presidential Awards for Outstanding Contribution to the Trial Bar
- Consumer Attorneys of California Legislative Champion Award (2002), Several Presidential Awards of Merit
- Consumer Attorneys of San Diego David S. Casey, Jr. Consumer Advocate Award (2006)
- California League of Conservation Voters Environmental Leadership Award (2005) for dedication to the environment and for fostering the public health rights of individuals
- Fort Lewis College, Durango, Colorado Alumnus of the Year (2007)

- Lawdragon Named one of 500 Leading Lawyers in America (2009-2014)
- Los Angeles Daily Journal Law Business Named one of the 100 Most Influential Attorneys in California several times
- Los Angeles Magazine Super Lawyer (2001 to present); named one of the Top 100 Super Lawyers in Southern California (2010 to present)
- Loyola Law School Champion of Justice Award (2008)
- Martindale-Hubbell, Peer Reviewed AV (highest rating)
- Orange County Trial Lawyers Association Top Gun Award (2008)
- Pepperdine University School of Law Distinguished Alumnus Award (2002)
- Project Sister Family Services Justice Armand Arabian Award (2006) for outstanding efforts to secure justice for victims of clergy abuse
- Trial Lawyers for Public Justice Trial Lawyer of the Year (1994)

Additionally, Boucher has been the recipient of presidential awards, awards of merit, recognition and commendation from federal, state and local government entities as well as a variety of bar associations.

Boucher, who resides in Tarzana, CA, is active in numerous business, civic, community and charitable organizations (e.g. Ambassador, Make a Wish Foundation).  He is also active in fund raising for various local, state and national organizations for whom he has raised millions of dollars.  He spends significant time doing pro bono work and frequently advises California Senate, Assembly and constitutional offices about legal and political issues.

# BOUCHER LLP

### SHEHNAZ M. BHUJWALA

Shehnaz M. Bhujwala, a strong advocate of consumer rights in civil courts and the California Legislature, is a partner of Boucher LLP.

Bhujwala helps consumers harmed by defective products or business practices of corporations and insurance companies obtain justice through the courts. She exclusively prosecutes class actions, mass torts, and other complex civil cases on behalf of consumers in federal and California state courts. In recent years, she has developed expertise with class actions involving data breaches and corporate privacy violations.

Bhujwala, who has been recognized for her work as a consumer attorney as a "Southern California Rising Star" by both Los Angeles Magazine and Southern California Rising Stars Magazine (2009-2011), and was bestowed with a Martindale-Hubbell "AV Preeminent" rating for her professionalism and ethics in 2015, has helped bring resolution to numerous cases through settlement and trials over the course of her legal career, including:

- A $58 million jury verdict for a construction worker who suffered severe burn injuries from a defective O-ring part on his construction vehicle
- A historic settlement on behalf of hundreds of survivors of childhood sexual abuse against the Los Angeles and San Diego Catholic Archdioceses
- A favorable settlement on behalf of a news reporter who suffered severe electrical burns and related injuries when her transmission truck hit overhead power lines
- A class action settlement with the Writers Guild of America on behalf of writers to ensure the Guild's payment of collected, foreign levy funds to them.

Prior to joining Boucher LLP, Bhujwala worked for top plaintiffs' firms in the Los Angeles area, including Khorrami Boucher, LLP, Kiesel Boucher & Larson, LLP, and Greene, Broillet, Panish & Wheeler, LLP.

An active author and speaker on consumer law subjects, Bhujwala is a member of, and has held leadership positions in, numerous professional organizations, including:

- Consumer Attorneys of California - (Board of Governors – 2011-2015; Chair-Elect, Women's Caucus – 2014, Chair, Woman's Caucus – 2015)
- Consumer Attorneys Association of Los Angeles - (Board of Governors, 2013-2014)
- Los Angeles County Bar Association - (Litigation Section, Legislative Chair – 2014, member of Judicial Appointments Committee)
- American Association for Justice
- Public Justice

Through her work with the Consumer Attorneys of California, Bhujwala also regularly speaks with California legislators regarding the need for sufficient court funding and other issues affecting consumers.

A California native and current resident of Los Angeles, Bhujwala received her undergraduate education at the University of California, Los Angeles where she obtained her Bachelor of Arts degree in Psychology. Thereafter, she attended the University of Southern California's Gould School of Law, where she obtained her Juris Doctor degree.  During law school, she externed for the Honorable U.S. District Court Judge Robert Takasugi of the Central District of California and counseled victims of domestic violence through the Los Angeles County Bar Association's Barrister's Project.

# BOUCHER LLP

### BRANDON BROUILLETTE

Brandon Brouillette, a consumer fraud and wage-and-hour class action lawyer, is an associate of Boucher LLP.

During his legal career, Brouillette has consistently fought for the interests of both consumers and employees against corporate fraud and wrongdoing through his representation of plaintiffs in class actions against corporate defendants such as national retail chains, drug manufacturers, insurance companies, banks and financial service companies, and through his involvement as an active member with Consumer Attorneys of California.

Brouillette obtained his Juris Doctor degree from Loyola Law School in Los Angeles. While in law school, he was involved in numerous activities, including: interning in the Corporate Legal and Theatrical Clearance departments of Warner Brothers Entertainment; actively participating in the Sports and Entertainment Law Society; and, serving as a volunteer providing tax assistance to individuals in lower income surrounding communities.

Brouillette is admitted to practice before the California Supreme Court.

A native of Minneapolis, MN, Brouillette received his undergraduate education at the University of Southern California from which he obtained his Bachelor of Science degree in Business Administration.  As part of his undergraduate studies, he took courses at Corvinus University in Budapest, Hungary.

# BOUCHER LLP

### BRIAN BUSH

Brian Bush, a trial lawyer who concentrates his legal practice in the areas of civil rights, personal injury and mass tort litigation, is an Associate of Boucher LLP.

Bush is admitted to the State Bar of California as well as the United States District Courts for the Central, Eastern and Northern Districts of California. Among his professional affiliations, he is a member of the American Association for Justice, Los Angeles County Bar Association and the Consumer Attorneys Association of Los Angeles (CAALA).

Bush received his Juris Doctor degree from Loyola Law School in Los Angeles. Throughout law school, Bush volunteered at the Los Angeles County District Attorney's Office. In his capacity as a certified law student, he presided over numerous felony preliminary hearings, evidence suppression hearings and also served as second chair for the prosecution in a child molestation trial.

While in law school, Bush competed in trial advocacy tournaments in California and New York as a member of Loyola's nationally-ranked Byrne Trial Advocacy Team and served as speaker, co-chair and vice president of Loyola's student chapter of CAALA. Additionally, at Loyola, he earned First Honors awards in White Collar Crimes, Cross Examination and Advanced Trial Advocacy.

A native of Seattle, WA, Bush attended Washington State University where he obtained a Bachelor of Arts degree in Communications with an Advertising Emphasis. At the university, he was on the Dean's Honor Roll (2001-2004), was a graduate of the WSU Honors College, served as President and Vice President of the Ad Club and was a member of the student chapter of the American Advertising Federation.

# BOUCHER LLP

## MILIN CHUN

Milin Chun, an attorney with experience in both criminal and civil law, is a Senior Associate of Boucher LLP. Throughout her career, Chun has focused her practice on federal white-collar criminal defense and appellate matters. She has represented clients in criminal investigations, including cases arising out of the Hobbs Act, Contraband Cigarette Trafficking Act, False Claims Act, securities fraud, money laundering, wire fraud, and tax evasion. Chun has previously represented a CEO of a major defense firm and executive director of a large non-profit organization in Washington, D.C.

Chun has been named to the Maryland Rising Stars list by Maryland Super Lawyers for three consecutive years (2013-2015), and in 2015 was named "Top 40 Under 40" by the National Trial Lawyers.

Chun currently serves on the Diversity Task Force for the National Association of Criminal Defense Lawyers, the nation's leading organization devoted to ensuring a just legal process for all criminal cases, and previously served on the Editorial Advisory Board of the Daily Record, a legal and business newspaper in Maryland.

Chun is admitted to practice in California, Maryland, and the District of Columbia. She is also admitted to practice in the United States District Courts for the Central District of California, District of Maryland, and the District of Nebraska, and the United States Court of Appeals for the Fourth Circuit.

Raised in Southern California, Chun attended the University of California, San Diego, where she received a Bachelor of Arts degree in Political Science. She then obtained her Juris Doctor degree from the University of Maryland, Baltimore, where she served as the Managing Editor of the University of Maryland Law Journal of Race, Religion, Gender, and Class. Following law school, Chun clerked for the Honorable Gale E. Rasin in the Circuit Court for Baltimore City.

# BOUCHER LLP

### CATHY KIM

Cathy Kim is an Associate of Boucher LLP. During her legal career, Cathy has focused her practice on representing individuals in mass tort litigation (e.g. products liability) against major pharmaceutical companies and medical device manufacturers in state and federal proceedings.

Cathy is admitted to the State Bar of California and the United States District Court, Central District of California. Among her professional affiliations, she is a member of Consumer Attorneys of California and the Korean American Bar Association.

Raised in Torrance, CA, Cathy attended the University of California, Los Angeles where she received a Bachelor of Arts degree in Business Economics with a minor in East Asian Languages and Cultures. Cathy graduated magna cum laude, was a member of Phi Beta Kappa Honor Society and the Golden Key International Honour Society, as well as being on the Provost's Honors List for six quarters.

Cathy matriculated to Loyola Law School in Los Angeles where she obtained her Juris Doctor degree while receiving numerous academic honors and recognition, including the First Honors Award in Advanced Legal Research. During law school, she served as a judicial extern to the Honorable Samuel L. Bufford in the United States Bankruptcy Court. Cathy also served as the Internal and External Vice President of the Asian Pacific American Law Students Association.

An accomplished musician (e.g. piano, violin) who has won many awards in competitions and performed in various orchestras, Cathy is active in community and cultural organizations. Among her involvements, she has served as a Korean-English translator for the Asian Pacific American Legal Center's Citizenship Workshops and Volunteer Income Tax Assistance.

# BOUCHER LLP

## HERMEZ MORENO

Hermez Moreno, a veteran trial lawyer who specializes in complex police misconduct litigation and catastrophic person injury and trial work, serves as Of Counsel to Boucher LLP.

During his professional career, which spans nearly four decades, Moreno has a diverse array of litigation experience and has attained verdicts and settlements for his clients up to eight figures.  Some of the legal areas he has litigated include:

- Civil Rights
- Medical/Legal Malpractice
- Mass Torts
- Insurance Bad Faith
- Police Misconduct
- Excessive Use of Force
- False Arrest/Imprisonment
- Asbestos Personal Injury
- Mishandling of Human Remains
- Traumatic Brain Injury
- Asbestos Commercial Property   Damage
- Asbestos Personal Injury
- Jail Abuse

Moreno also has extensive experience in transactional work and has been involved in the negotiating and drafting of contracts and other documents for entertainers in the fields of film, music recordings and film and recording financing.  He has also negotiated and drafted contracts for the sale and purchase of businesses and landmark real estate in the Los Angeles area.

Moreno, who began his career handling civil rights cases throughout California, served as Special Counsel to Cesar Chavez (1984-1993) and as Trial Counsel for the United Farm Workers Union (1984-1990) in areas involving labor disputes and cases brought by growers' efforts to break the union.  He also represented indigent clients in pro bono cases and continues to do so.

In addition to his legal practice, Moreno is actively serving as a professor of trial advocacy.  He has served as a Clinical Professor at the UCLA School of Law in its Trial Advocacy Program and has been both a Visiting Associate Professor of Law, Clinical Instructor in the Trial Advocacy Program of Southwestern Law School and currently serves as an Adjunct Professor of Law in the school's Trial Advocacy and Civil Rights Program.

Moreno is admitted to the State Bar of California as well as the United States Supreme Court, United States Court of Appeal Ninth Circuit, United States Court of Appeal, Federal Circuit and the United States District Court for the Central, Northern, and Eastern

Districts of California.  Among his professional affiliations, he is or has been a member of:

- Consumer Attorneys of California

- Consumer Attorneys Association of Los Angeles

- Trial Lawyers for Public Justice

- Mexican American Bar Association (Board of Trustees)

- Mexican American Bar Foundation (Board of Directors)

- Santa Monica Third Street Development Corporation (Board of Directors)

A native of Mexico, Moreno attended the University of California, Santa Barbara where he received a Bachelor of Arts degree in Political Science.  He obtained his Juris Doctor degree from the UCLA School of Law.  While in law school, he co-founded Centro Legal de Santa Monica, Inc., a non-profit legal aid office operated by UCLA Chicano law students.  The organization, which subsequently merged with Westside Legal Services, provided legal services to underprivileged residents in Santa Monica and Moreno served as a Board of Trustees member and supervising attorney.

Moreno lives with his wife in Moorpark, CA on a 15-acre horse ranch.  Among his personal interests, he is an art collector, an artist, and has written his first novel.

# BOUCHER LLP

## MARIA L. WEITZ

Maria L. Weitz, an attorney with broad experience in numerous areas of consumer law, is a partner of Boucher LLP.

Throughout her legal career, Weitz has focused her practice on unfair, deceptive, and fraudulent business practices, and seeking legal accountability on behalf of injured plaintiffs. As a result, her diverse range of litigation experience spans a wide array of legal issues, including complex class actions, product liability and other personal injury cases, employment litigation, and appellate practice.

Weitz's interest in civil justice developed while attending the University of California, Davis School of Law, where she earned her Juris Doctor degree. She received a Public Service Law Certificate recognizing her legal work in public interest organizations and government agencies. This work included serving as co-counsel in a federal jury trial on behalf of an inmate alleging civil rights violations, and working within the California Attorney General's Office to prosecute civil cases for violations of California's Air Pollution Control Laws. She also received a Witkin Award for Academic Excellence in Legal Writing and the Sacramento County Bar Association Diversity Fellowship.

Weitz is admitted to the State Bar of California and the United States District Courts in the Northern, Southern, Central, and Eastern Districts of California. Among her professional affiliations, she is a member of the Consumer Attorneys Association of Los Angeles.

In recognition of her career accomplishments, Weitz has twice been selected as a Southern California Rising Star by Super Lawyers Magazine and was listed among Top Women Attorneys by Los Angeles Magazine.

Weitz received her undergraduate education at the University of California, Los Angeles, where she earned a Bachelor of Arts degree in Sociology and Communications.



Chicago ● Philadelphia ● Ann Arbor
www.caffertyclobes.com

## I.    Overview

Cafferty Clobes Meriwether & Sprengel LLP, which has offices in Chicago, Philadelphia, and Ann Arbor, combines the talents of attorneys with a wide range of experience in complex civil litigation. The skill and experience of CCMS attorneys has been recognized on repeated occasions by courts that have appointed these attorneys to major positions in complex multidistrict or consolidated litigation. As the cases listed below demonstrate, these attorneys have taken a leading role in numerous important actions on behalf of investors, employees, consumers, businesses, and others. In addition, CCMS attorneys are currently involved in a number of pending class actions, as described on the Firm's web page.

## II.    Consumer and Other Class Actions

*Apple iPhone Warranty Litigation* (N.D. Cal.) On January 29, 2010, CCMS first of its kind class action against Apple in the Superior Court of Santa Clara County, with the goal of achieving a nationwide recovery for all similarly situated Apple consumers. The suit challenged Apple's policy of denying warranty claims based on liquid contact indicators located in headphone jacks and dock connector ports of iPhones and iPod touches. Similar class actions were subsequently filed in federal courts on behalf of Apple consumers.  Our firm, together with other counsel representing the state and federal plaintiffs, achieved a $53 million global settlement of the state and federal cases. On May 8, 2014, the Honorable Judge Richard Seeborg granted final approval to the settlement.

*Bergman v. DAP Products, Inc.*, (D. Md.) No. 1:14-cv-03205. Cafferty Clobes is co-lead counsel in a consumer class action brought on behalf of purchasers of X-Hose products. The case is stayed pending settlement discussions and an ongoing mediation.

*Traxler v. PPG Industries, Inc.*, (N.D. Ohio) No. 1:15-cv-00912-DAP. Cafferty Clobes is co-lead counsel in a consumer class action brought on behalf of purchasers of defective deck stain.

*Darisse v. Nest Labs, Inc.*, (N.D. Cal.) No. 5:14-cv-01363-BLF. Cafferty Clobes is leading an action alleging consumer fraud in connection with sale of "smart" thermostats.

*Klug v. Watts Regulator Co.*, (D. Neb.) No. 8:15-cv-00061-JFB-TDT.  Cafferty Clobes is leading an action on behalf of consumers that alleges consumer fraud and breach of warranty against the manufacturer of water heaters sold with defective

*Sharp v. Watts Regulator Co.*, (D. Mass.) No. 1:14-cv-14080-ADB.  Cafferty Clobes is leading an action on behalf of consumers that alleges consumer fraud and breach of warranty against the manufacturer of water heaters sold with defective flexible braided stainless steel water heater supply lines.



**Sabol v. Ford Motor Co.**, (E.D. Pa.), No. 2:14-cv-06654-HB.  Cafferty Clobes is sole counsel in a nationwide consumer class action alleging breach of express and implied warranty, violation of the Magnuson-Moss Warranty Act, and violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law on behalf of owners of certain vehicles containing 2.0- and 1.6-L EcoBoost branded engines.  Most recently, Cafferty Clobes successfully opposed Ford's motion for summary judgment and the litigation is ongoing.

**Meyers v. Garmin Int'l, Inc.**, (D. Kan.), No. 13-cv-2416. Cafferty Clobes serves as lead counsel in nationwide class action under Kansas law alleging that defendant's products use defective batteries prone to early failure.

**Hadley v. Chrysler Group, LLC**, (E.D. Mich.), No. 13-cv-13665. Cafferty Clobes is lead counsel in a consumer class case asserting breach of warranty and consumer fraud claims brought on behalf of Jeep Cherokee owners whose vehicles contain defective airbags.

**In re Midway Moving & Storage, Inc.'s Charges to Residential Customers,** No. 03 CH 16091 (Cir. Ct. Cook Cty., Il.). A class action on behalf of customers of Illinois' largest moving company whose final moving charges exceeded their pre-move written estimates. Plaintiffs alleged violation of the Illinois Consumer Fraud Act, breach of contract and breach of the covenant of good faith and fair dealing. A litigation class was certified and upheld on appeal. *See Ramirez v. Midway Moving and Storage, Inc.*, 880 N.E.2d 653 (Ill. App. 2007). On the eve of trial, the case settled on a class-wide basis. On October 12, 2012, the Court (Judge Richard J. Elrod) granted final approval and stated that CCMS is "highly experienced in complex and class action litigation, vigorously prosecuted the Class' claims, and achieved an excellent Settlement for the Class under which Class members will receive 100% of their alleged damages."

**Grider v. Keystone Health Plan Central Inc. et al.**, Civ. No. 01-5641 (E.D. Pa.).  A class action filed on behalf of  medical service providers who rendered services to patients insured by the defendants.  Plaintiffs alleged that the defendants improperly denied, delayed or reduced payments to medical providers for the services they rendered to class members.  On June 13, 2008, Judge Gardner, of the Eastern District of Pennsylvania, granted final approval to two settlements that fully resolved the case.  Under the terms of the settlement agreement, the defendants were required to pay class members almost $7.5 million and make substantial changes to their business practices.  The estimated value of the business practice changes was $48 million.

**Supnick v. Amazon.Com, Inc., and Alexa Internet**, No. 00-CV-221 (W.D. Wash.).  Class action against internet browsing service provider and its parent for violating user privacy by secretly collecting personally identifying information of users without informed consent.  On July 27, 2001, the court granted final approval to a settlement that included programmatic and monetary relief.  The FTC endorsed the settlement and elected to not prosecute defendants based, in part, on the relief achieved in the settlement with plaintiffs.



***PrimeCo Personal Communications, L.P. v. Illinois Commerce Commission***, No. 98 CH 5500 (Circuit Court of Cook County, Ill.).  This class action sought recovery of an unconstitutional infrastructure maintenance fee imposed by municipalities on telephone and other telecommunications customers in the State of Illinois.  On August 1, 2002, the court granted final approval to a settlement of wireless telephone and pager customers' claims against the City of Chicago worth over $31 million.

***Walter Cwietniewicz d/b/a Ellis Pharmacy, et al. v. Aetna U.S. Healthcare***, June Term, 1998, No. 423 (Pa. Common Pleas).  On May 25, 2006, Judge Stephen E. Levin of the Court of Common Pleas of Philadelphia County, First Judicial District of Pennsylvania, Civil Trial Division, granted final approval to a settlement of a class action brought for the benefit of Pennsylvania pharmacies that participated in U.S. Healthcare's capitation program and had money withheld from capitation payments during the second half of 1996 and the first half of 1997.  The lawsuit alleged that participating pharmacies should have received certain semi-annual payments for these two six-month periods in order to be properly compensated for dispensing prescriptions to plan members.  At the final approval hearing, Judge Levin noted that "this particular case was as hard-fought as any that I have participated in" and with respect to the Class's reaction to the settlement achieved as a result of our firm's work: ". . . a good job, and the reason there should be no objection, they should be very very happy with what you have done."

***Gersenson v. Pennsylvania Life and Health Insurance Guaranty Assoc.***, No. 3468 (Pa. Common Pleas).  Class action against state insurance guaranty association brought on behalf of Pennsylvania resident insureds of Executive Life Insurance Co. for violating due process, and failing to pay required benefits and other monies.  Plaintiff's motion for summary judgment was granted and the court awarded plaintiff and the Class more than $18 million.  The judgment was upheld on appeal.

***Supnick v. Amazon.Com, Inc., and Alexa Internet***, No. 00-CV-221 (W.D. Wash.).  Class action against internet browsing service provider and its parent for violating user privacy by secretly collecting personally identifying information of users without informed consent.  On July 27, 2001, the court granted final approval to a settlement that included programmatic and monetary relief.  The FTC endorsed the settlement and elected to not prosecute defendants based, in part, on the relief achieved in the settlement with plaintiffs.

***Curley v. Cumberland Farms Dairy, Inc.***, No. 86-5057 (D.N.J.).  Class action arising out of convenience store chain's treatment of employees to prevent losses.  In September 1993, the court approved a settlement in the amount of $5.5 million.  In a November 12, 1993 opinion awarding attorneys fees, Judge Stanley S. Brotman noted that "petitioners [including Mr. Faucher and Ms. Meriwether] demonstrated in this case great skill and determination in representing their clients through the many stages of this lengthy and complex litigation."

## III.   Antitrust Class Actions and Litigation

***In re Insurance Brokerage Antitrust Litig.***, MDL No. 1663 (D.N.J.).  CCMS was appointed Co-Lead Counsel for plaintiffs who alleged that insurance brokers and insurers conspired to allocate customers in a complicated scheme to maximize their own revenues at the expense of class members.



Chicago ● Philadelphia ● Ann Arbor
www.caffertyclobes.com

The litigation concluded in August 2013 with final approval of last of five separate settlements that, in aggregate, exceeded $270 million. *See*: (1) *In re Insurance Brokerage Antitrust Litig.,* MDL No. 1663, 2007 WL 542227, (D.N.J. Feb. 16, 2007) (approving $121.8 million settlement with the Zurich Defendants), *aff'd,* 579 F.3d 241(3d Cir. 2009); (2) *In re Insurance Brokerage Antitrust Litig.,* MDL No. 1663, 2007 WL 2589950 (D.N.J. Sept. 4, 2007) (approving $28 million settlement with the Gallagher Defendants), *aff'd,* 579 F.3d 241(3d Cir. 2009); (3) *In re Insurance Brokerage Antitrust Litig.,* MDL No. 1663, 2009 WL 411877 (D.N.J. Feb. 17, 2009) (approving $69 million settlement with Marsh & McLennan Cos. Inc.); (4) *In re Insurance Brokerage Antitrust Litig.,* MDL No. 1663, 2012 WL 1071240 (D.N.J. Mar. 30, 2012) (approving $41 million settlement with several defendants, including AIG, Hartford, Fireman's Fund and Travelers); and (5) *In re Insurance Brokerage Antitrust Litig.,* MDL No. 1663, 297 F.R.D. 136 (D.N.J. 2013) (approving $10.5 million settlement with ACE defendants, Chubb defendants and Munich Re defendants). Judge Claire C. Cecchi recently observed that "Class counsel include notably skilled attorneys with experience in antitrust, class actions and RICO litigation." *Id.* at *17; *see also In re Insurance Brokerage Antitrust Litig.,* MDL No. 1663, 2007 WL 1652303, at *6 (D.N.J. June 5, 2007).

***State of Indiana v. McWane***, Civ. No. 12-6667 (D.N.J.). CCMS serves as counsel for the State of Indiana Attorney General, Greg Zoeller, in a case alleging that certain ductile iron pipe fittings ("DIPF") manufacturers conspired to fix prices and monopolize the market for DIPF through a series of agreements spanning several years. The action further alleges that Indiana municipalities and political subdivisions overpaid for DIPF during that period as a result of the manufacturers' anticompetitive conduct. The Honorable Anne E. Thompson denied the Defendants' motions to dismiss the State of Indiana's complaint as to all claims for damages as a result of those alleged overcharges. *In re Ductile Iron Pipe Fittings ("DIPF") Indirect Purchaser Litig.,* Civ. No. 12-169, 2013 WL 5503308 (D.N.J. Oct. 2, 2013).

***In re New Motor Vehicles Canadian Export Antitrust Litig.***, MDL No. 1532 (D. Me.). CCMS was appointed Class Counsel, together with other firms, in multidistrict litigation alleging that automobile manufacturers and other parties conspired to prevent lower priced new motor vehicles from entering the American market during certain periods, thereby artificially inflating prices. *In re New Motor Vehicles Canadian Export Antitrust Litig.,* 270 F.R.D. 30, 35 (D. Me. 2010). On February 3, 2012, the court approved a $37 million settlement with Toyota and the Canadian Automobile Dealers' Association. *In re New Motor Vehicles Canadian Export Antitrust Litig.,* MDL 1532, 2012 WL 379947 (D. Me. Feb. 3, 2012).

***In re TriCor Indirect Purchaser Antitrust Litig.***, No. 05-360 (D. Del). CCMS was appointed Co-Lead Counsel for consumer and third-party payor plaintiffs who alleged that defendants engaged in unlawful monopolization in the market for fenofibrate products, which are used to treat high cholesterol and high triglyceride levels. *See Abbott Laboratories v. Teva Pharmaceuticals, Inc.,* 432 F. Supp. 2d 408 (D. Del. 2006) (denying defendants' motions to dismiss). On October 28, 2009, the court granted final approval to a $65.7 million settlement (an amount that excludes an initial payment to opt-out insurance companies).



Chicago ● Philadelphia ● Ann Arbor
www.caffertyclobes.com

***Nichols v. SmithKline Beecham Corp.***, No. Civ.A.00-6222 (E.D. Pa.). CCMS served as Co-Lead Counsel for consumers and third-party payors who alleged that the manufacturer of the brand-name antidepressant Paxil misled the U.S. Patent Office into issuing patents that protected Paxil from competition from generic substitutes. On April 22, 2005, Judge John R. Padova granted final approval to a $65 million class action settlement for the benefit of consumers and third-party payors who paid for Paxil. *Nichols v. SmithKline Beecham Corp.*, No. Civ.A.00-6222, 2005 WL 950616, 2005-1 Trade Cas. (CCH) ¶74,762 (E.D. Pa. April 22, 2005). *See also Nichols v. SmithKline Beecham Corp.*, No. Civ.A.00-6222, 2003 WL 302352, 2003-1 Trade Cas. (CCH) ¶ 73,974 (E.D. Pa. Jan. 29, 2003) (denying defendant's motion to strike expert testimony).

***In re Relafen Antitrust Litig.*** No. 01-12239 (D. Mass.). On September 28, 2005, Judge William G. Young of the United States District Court for the District of Massachusetts granted final approval to a $75 million class action settlement for the benefit of consumers and third-party payors who paid for branded and generic versions of the arthritis medication Relafen. In certifying an exemplar class of end-payors, the court singled out our Firm as experienced and vigorous advocates. *See In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 273 (D. Mass. 2004). In the opinion granting final approval to the settlement, the court commented that "Class counsel here exceeded my expectations in these respects [*i.e.*, experience, competence, and vigor] in every way." *In re Relafen Antitrust Litig.,* 231 F.R.D. 52, 85 (D. Mass. 2005); *see also id.* at 80 ("The Court has consistently noted the exceptional efforts of class counsel."). The litigation resulted in many significant decisions including: 286 F Supp. 2d 56 (D. Mass. 2003) (denying motion to dismiss); 346 F. Supp. 2d 349 (D. Mass. 2004) (denying defendant's motion for summary judgment).

***VisaCheck/MasterMoney Antitrust Litig.,*** Master File No. 96-5238 (E.D.N.Y.). CCMS's client, Burlington Coat Factory Warehouse, and the other plaintiffs alleged that Visa and MasterCard violated the antitrust laws by forcing retailers to accept all of their branded cards as a condition of acceptance of their credit cards. On June 4, 2003, the parties entered into settlement agreements that collectively provided for the payment of over $3.3 billion, plus widespread reforms and injunctive relief. On December 19, 2003, the Settlement was finally approved by Judge John Gleeson. On January 4, 2005, the Second Circuit Court of Appeals affirmed Judge Gleeson's decision.

***In re Warfarin Sodium Antitrust Litig.***, MDL 98-1232 (D. Del.). Multidistrict class action on behalf of purchasers of Coumadin, the brand-name warfarin sodium manufactured and marketed by DuPont Pharmaceutical Company. Plaintiffs alleged that the defendant engaged in anticompetitive conduct that wrongfully suppressed competition from generic warfarin sodium. On August 30, 2002, the Court granted final approval to a $44.5 million settlement. *See In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002). On December 8, 2004, the Third Circuit upheld approval of the settlement. 391 F.3d 516 (3d Cir. 2004).

***In re Cardizem CD Antitrust Litig.,*** MDL No. 1278 (E.D. Mich.). Multidistrict class action on behalf of purchasers of Cardizem CD, a brand-name heart medication manufactured and marketed by Hoechst Marion Roussel, Inc. Plaintiffs alleged that an agreement between HMR and generic manufacturer Andrx Corp. unlawfully stalled generic competition. On October 1, 2003, Judge Nancy

5



Chicago ● Philadelphia ● Ann Arbor
www.caffertyclobes.com

Edmunds granted final approval to an $80 million settlement for the benefit of consumers, third-party payors and state attorneys general. *In re Cardizem CD Antitrust Litig.,* 218 F.R.D. 508 (E.D. Mich. 2003), *app. dismissed*, 391 F.3d 812 (6th Cir. 2004). The litigation resulted in several significant decisions, including: 105 F. Supp. 618 (E.D. Mich. 2000) (denying motions to dismiss); 105 F. Supp. 2d 682 (E.D. Mich. 2000) (granting plaintiffs' motions for partial summary judgment and holding agreement *per se* illegal under federal and state antitrust law); 200 F.R.D. 326 (E.D. Mich. 2001) (certifying exemplar end-payor class); 332 F.3d 896 (6th Cir. 2003) (upholding denial of motion to dismiss and grant of partial summary judgment).

*Blevins v. Wyeth-Ayerst Labs.,* No. 324380 (Sup. Ct. San Francisco Cty. CA). Plaintiff alleged that Wyeth-Ayerst unlawfully monopolized the market for conjugated estrogen drug products through exclusive contracts with health benefit providers and pharmacy benefit managers. On October 30, 2007, the court approved a $5.2 million settlement for a class of California purchasers of Wyeth-Ayerst's conjugated estrogen drug product.

*In re DDAVP Indirect Purchaser Antitrust Litig.,* No. 05-2237 (S.D.N.Y.). CCMS was appointed Co-Lead Counsel for consumer and third-party payor plaintiffs who alleged that defendants the defendant pharmaceutical manufacturers relied upon sham patents and sham patent litigation to preclude generic competition. On December 18, 2013, the court entered an order approving a $4.75 million settlement.

*House v. GlaxoSmithKline PLC*, No. 2:02-cv-442 (E.D. Va.). Plaintiffs alleged that GSK, which makes Augmentin, misled the United States Patent Office into issuing patents to protect Augmentin from competition from generic substitutes. On January 10, 2005, the court entered and order approving a $29 million settlement for the benefit of consumers and third-party payors.

*In re Synthroid Marketing Litig.,* MDL No. 1182 (N.D. Ill). This multidistrict action arises out of alleged unlawful activities with respect to the marketing of Synthroid, a levothyroxine product used to treat thyroid disorders. On August 4, 2000, the court granted final approval of a consumer settlement in the amount of $87.4 million. *See* 188 F.R.D. 295 (N.D. Ill. 1999). On August 31, 2001, approval of the settlement was upheld on appeal. *See* 264 F.3d 712 (7th Cir. 2001).

*In re Lorazepam & Clorazepate Antitrust Litig.,* MDL 1290 (D.D.C.). This multidistrict class action arose out of an alleged scheme to corner the market on the active pharmaceutical ingredients necessary to manufacture generic clorazepate and lorazepam tablets. After cornering the market on the supply, defendants raised prices for generic clorazepate and lorazepam tablets by staggering amounts (*i.e.*, 1,900% to over 6,500%) despite no significant increase in costs. On February 1, 2002, Judge Thomas F. Hogan approved class action settlements on behalf of consumers, state attorneys general and third party payors in the aggregate amount of $135 million. *See* 205 F.R.D. 369 (D.D.C. 2002).

*In re Lithotripsy Antitrust Litig.,* No. 98 C 8394 (N.D. Ill.). Antitrust class action arising out of alleged stabilization of urologist fees in the Chicago metropolitan area. In granting class certification,



Chicago • Philadelphia • Ann Arbor
www.caffertyclobes.com

Judge George Lindberg stated that "Miller Faucher [as CCMS was then known] is experienced in antitrust class action litigation and defendants do not dispute that they are competent, qualified, experienced and able to vigorously conduct the litigation." *Sebo v. Rubenstien*, 188 F.R.D. 310, 317 (N.D. Ill. 1999). On June 12, 2000, the court approved a $1.4 million settlement. *In re Lithotripsy Antitrust Litig.*, 2000 WL 765086 (N.D. Ill. June 12, 2000).

**Brand-Name Prescription Drug Indirect Purchaser Actions**. Coordinated antitrust actions against the major pharmaceutical manufacturers in ten states and the District of Columbia. The actions were brought under state law on behalf of indirect purchaser consumers who obtained brand name prescription drugs from retail pharmacies. In 1998, the parties agreed to a multistate settlement in the amount of $64.3 million, which was allocated among the actions. In approving state-specific settlements, the courts were highly complementary of the performance of counsel. In approving the Wisconsin Settlement, for example, Judge Moria G. Krueger commented that "this Court, in particular, has been helped along every step of the way by some outstanding lawyering and I believe that applies to both sides. ... You can hardly say that there's been anything but five star attorneys involved in this case". *Scholfield v. Abbott Laboratories*, No. 96 CV 0460, Transcript of Hearing at 31 & 33 (Cir. Ct., Dane Co., Wisc., Oct. 5, 1998). *See also McLaughlin v. Abbott Laboratories*, No. CV 95-0628, Transcript of Proceedings at 28 (Super. Ct., Yavapai County, Oct. 28, 1998) ("I think the quality of counsel is excellent."). Reported decisions include: *Goda v Abbott Labs*, No. 01445-96, 1997 WL 156541, 1997-1 Trade Cas. (CCH) ¶71,730 (Superior Court D.C., Feb 3, 1997) (granting class certification); *In re Brand Name Prescription Drugs Antitrust Litig.* (*Holdren, Yashin, Meyers*), 1998 WL 102734, 1998-1 Trade Cas. (CCH) ¶72,140 (N.D. Ill., Feb. 26, 1998) (remanding three actions to state courts).

**In Re Cellular Phone Cases**, Coordination Proceeding No. 4000 (Superior Court, San Francisco County, Cal.). Class action under California's Cartwright Act, which alleged price-fixing of cellular telephone service in the San Francisco area market. On March 27, 1998, the court granted final approval to a settlement that provides $35 million in in-kind benefits to the Class and a release of debt in the amount of $35 million.

**Garabedian v. LASMSA Limited Partnership**, No. 721144 (Superior Court, Orange County, Cal.). Class action under California's Cartwright Act which alleged price-fixing of cellular telephone service in the Los Angeles area market. By order of January 27, 1998, the court granted final approval to two settlements that provide $165 million in in-kind benefits.

**Lobatz v. AirTouch Cellular**, 94-1311 BTM (AJB) (S.D. Cal.) Class action alleging price-fixing of cellular telephone service in San Diego County, California. On June 11, 1997, the court approved a partial settlement in the amount of $4 million. On October 28, 1998, the Court approved another settlement that entailed $4 million worth of in-kind benefits. In an order entered May 13, 1999, Judge Moskowitz stated that "[t]hrough the course of this complex and four-year long litigation, Class Counsel demonstrated in their legal briefs and arguments before this Court their considerable skill and experience in litigating anti-trust class actions..."



*In re Airline Ticket Commission Antitrust Litig.*, MDL No. 1058 (D. Minn.) Antitrust class action on behalf of travel agents against the major airlines for allegedly fixing the amount of commissions payable on ticket sales. The action settled for $87 million. *See* 953 F. Supp. 280 (D. Minn. 1997).

## IV. Commodities and Securities Class Actions and Derivative Litigation

*In re Kaiser Group International*, Case No. 00-2263 (Bankr. D. Del.). On December 7, 2005, Chief Judge Mary F. Walrath of the United States Bankruptcy Court for the District of Delaware granted final approval to a settlement that produced 175,000 shares of common stock for a class of former shareholders of ICT Spectrum Contructors, Inc. (a company that merged with ICF Kaiser Group International and ICF Kaiser Advanced Technology in 1998). The settlement followed Judge Joseph J. Farnan's ruling which upheld the Bankruptcy Court's decision to award common stock of the new Kaiser entity (Kaiser Group Holdings, Inc.) to the Class of former Spectrum shareholders based on contractual provisions within the merger agreement. *See Kaiser Group International, Inc. v. James D. Pippin* (*In re Kaiser Group International*), 326 B.R. 265 (D. Del. 2005).

*Danis v. USN Communications, Inc.,* No. 98 C 7482 (N.D. Ill.). Securities fraud class action arising out of the collapse and eventual bankruptcy of USN Communications, Inc. On May 7, 2001, the court approved a $44.7 million settlement with certain control persons and underwriters. Reported decisions: 73 F. Supp. 2d 923 (N.D. Ill. 1999); 189 F.R.D. 391 (N.D. Ill. 1999); 121 F. Supp. 2d 1183 (N.D. Ill. 2000).

*In re Sumitomo Copper Litig.*, 96 Civ. 4584(MP) (S.D.N.Y.). Class action arising out of manipulation of the world copper market. On October 7, 1999, the court approved settlements aggregating $134.6 million. *See* 189 F.R.D. 274 (S.D.N.Y. 1999). In awarding attorneys' fees, Judge Milton Pollack noted that it was "the largest class action recovery in the 75 plus year history of the Commodity Exchange Act". 74 F. Supp. 2d 393 (S.D.N.Y. Nov. 15, 1999). Additional reported opinions: 995 F. Supp. 451 (S.D.N.Y. 1998); 182 F.R.D. 85 (S.D.N.Y. 1998).

*In re Exide Corp. Sec. Litig.,* No. 98-CV-60061 (E.D. Mich.). Securities fraud class action arising out of sales and financial practices of leading battery manufacturer. On September 2, 1999, Judge George Caram Steeh approved a settlement in the amount of $10.25 million.

*In re Caremark International Inc. Sec. Litig.*, No. 94 C 4751 (N.D. Ill.). Securities fraud class action arising out of Caremark's allegedly improper financial arrangements with physicians. On December 15, 1997, the court approved a $25 million settlement.

*In re Nuveen Fund Litig.*, No. 94 C 360 (N.D. Ill.). Class action and derivative suit under the Investment Company Act arising out of coercive tender offerings in two closed-end mutual funds. On June 3, 1997, the court approved a $24 million settlement. Magistrate Judge Edward A. Bobrick commented that "there's no question that the attorneys for the plaintiffs and the attorneys for the defendants represent the best this city [Chicago] has to offer ... this case had the best lawyers I've seen



Chicago ● Philadelphia ● Ann Arbor
www.caffertyclobes.com

in a long time, and it is without question that I am committed to a view that their integrity is beyond reproach." (6/3/97 Tr. at 5-6.)

*In re Archer-Daniels-Midland, Inc. Sec. Litig.*, No. 95-2287 (C.D. Ill.).  Securities fraud class action arising out of the Archer-Daniels-Midland price-fixing scandal.  On April 4, 1997, the court approved a $30 million settlement.

*In re Soybean Futures Litig.*, No. 89 C 7009 (N.D. Ill.).  A commodities manipulation class action against Ferruzzi Finanziaria SpA and related companies for unlawfully manipulating the soybean futures market in 1989.  In December 1996, the court approved a settlement in the amount of $21.5 million.  *See* 892 F. Supp. 1025 (N.D. Ill. 1995).

*In re Prudential Securities Incorporated Limited Partnerships Litig.*, MDL 1005 (S.D.N.Y.).  A massive multidistrict class action arising out of Prudential Securities Incorporated's marketing and sale of speculative limited partnership interests.  On November 20, 1995, the court approved a partial settlement, which established a $110 million settlement fund.  *See* 912 F. Supp. 97 (S.D.N.Y. 1996).  On August 1, 1997, the court approved a partial settlement with another defendant in the amount of $22.5 million.

*Feldman v. Motorola, Inc.*, No. 90 C 5887 (N.D. Ill.)  Securities fraud class action against Motorola, Inc. and its high ranking officers and directors.  In June 1995, the court approved a $15 million settlement. *See* [1993 Transfer Binder], Fed. Sec. L. Rep. (CCH) ¶97,806 (N.D. Ill. Oct. 14, 1993).

*In re Salton/Maxim Sec. Litig.*, No. 91 C 7693 (N.D. Ill.).  Class action arising out of public offering of Salton/Maxim Housewares, Inc. stock.  On September 23, 1994, Judge James S. Holderman approved a $2.4 million settlement, commenting that "it was a pleasure to preside over [the case] because of the skill and the quality of the lawyering on everyone's part in connection with the case."

*Horton v. Merrill Lynch, Pierce Fenner & Smith, Inc.*, No. 91-276-CIV-5-D (E.D.N.C.).  A $3.5 million settlement was approved on May 6, 1994 in this securities fraud class action arising out of a broker's marketing of a speculative Australian security.  The Court stated that "the experience of class counsel warrants affording their judgment appropriate deference in determining whether to approve the proposed settlement."  855 F. Supp. 825, 831 (E.D.N.C. 1994).

*In re International Trading Group, Ltd. Customer Account Litig.*, No. 89-5545 RSWL (GHKx) (C.D. Cal.).  Class action alleging violation of the anti-fraud provisions of the Commodity Exchange Act.  The case settled with individual defendants and proceeded to a judgment against the corporate entity.  In that phase, the Court awarded the Class a constructive trust and equitable lien over the corporation's assets and entered a $492 million judgment in favor of the Class.  Approximately $7 million was recovered on the judgment.

*Hoxworth v. Blinder Robinson & Co.*, No. 88-0285 (E.D. Pa.).  Securities fraud and RICO class action resulting from alleged manipulative practices and boiler-room operations in the sale of "penny



Chicago ● Philadelphia ● Ann Arbor
www.caffertyclobes.com

stocks." *See* 903 F.2d 186 (3rd Cir. 1990). Judgment in excess of $70 million was obtained in February, 1992. The judgment was affirmed by the Third Circuit Court of Appeals, 980 F.2d 912 (3rd Cir. 1992). *See also Hoxworth v. Blinder*, 74 F.3d 205 (10th Cir. 1996).

***Benfield v. Steindler***, No. C-1-92-729 (S.D. Ohio). Shareholder derivative suit on behalf of General Electric Corporation shareholders arising out of the sale of military aircraft engines to the government of Israel in violation of U.S. law. On December 10, 1993, the Court approved a settlement in the amount of $19.5 million. In a January 13, 1994 Report to the Court Concerning Attorney Fees, the Special Master characterized the firm as a "leading litigation" firm, and stated that the "representation given plaintiff was first rate".

***In re Structural Dynamics Research Corporation Derivative Litig.***, No. C-1-94-650 (S.D. Ohio). Shareholder derivative action arising out of Structural Dynamics's inaccurate reporting of its financial performance. In approving a $5 million settlement on July 19, 1996, Judge Herman J. Weber stated that "in my mind the highest professional service a lawyer can give to his or her client is to terminate the litigation as early as possible and at the most economical cost to your clients. The Court finds that the lawyers in this case have done just that..."

## V.  Employee Benefits Class Actions

***Polk v. Hecht***, No. 92-1340 (D.N.J.). Class action brought under the Employee Retirement Income Act of 1974 on behalf of all participants or beneficiaries under the Mutual Benefit Life Savings and Investment Plan for Employees on July 16, 1991, when Mutual Benefit Life Insurance Corporation was placed in rehabilitation. On April 12, 1995, Judge Harold A. Ackerman approved a $4.55 million settlement, noting that "[c]ounsel did a darn good job, and the record should be clear on that point, that that is the opinion, for what it's worth, of this Court."

***In re Unisys Retiree Medical Benefits ERISA Litig.***, MDL No. 969 (E.D. Pa). Class action on behalf of over 25,000 retirees of Unisys Corporation concerning entitlement to retiree medical benefits. After trial, in November 1994, Chief Judge Cahn approved a partial settlement in the amount of $72.9 million. *See* 57 F.3d 1255 (3d Cir. 1995).

## VI.  Individual Biographies

### PARTNERS

**PATRICK E. CAFFERTY** graduated from the University of Michigan, with distinction, in 1980 and obtained his J.D., *cum laude*, from Michigan State University College of Law in 1983. In law school, he received the American Jurisprudence Award for study of commercial transactions law. From 1983 to 1985, he served as a prehearing attorney at the Michigan Court of Appeals and as a Clerk to Judge Glenn S. Allen, Jr. of that Court. Mr. Cafferty is admitted to the state bars of Michigan and Illinois,

Courts of Appeals for the Second, Third, Seventh, Tenth and Eleventh Circuits, and the United States District Court for the Eastern District of Pennsylvania.  In 2012 Ms. Meriwether was Chair of the Federal Courts Committee of the Philadelphia Bar Association, and has chaired several of its subcommittees. From 2000-2011, she was the course planner and moderator for the Committee's annual presentation of "My First Federal Trial," an award-winning program that gives young lawyers the opportunity to hear from a panel of federal judges from the Eastern District of Pennsylvania. Ms. Meriwether is a member of the Board of the Public Interest Law Center of Philadelphia (PILCOP), the Advisory Board of the American Antitrust Institute and the Editorial Board of ANTITRUST, a publication by the section of Antitrust Law of the American Bar Association.  She is a frequent presenter and lecturer on topics relating to complex, class action and antitrust litigation and has published a number of articles on those subjects including: *"Comcast Corp. v. Behrend:* Game Changing or Business as Usual?," *Antitrust*, (Vol. 27, No. 3, Summer 2013); "Class Action Waiver And the Effective Vindication Doctrine At the Antitrust/Arbitration Crossroads," *Antitrust*, (Vol. 3, Summer 2012); "The Hazards of <u>*Dukes*</u>: Antitrust Plaintiffs Need Not Fear the Supreme Court's Decision," *Antitrust*, (Vol. 26, No. 1, Fall 2011); "Economic Experts: The Challenges of Gatekeepers and Complexity," *Antitrust*, (Vol. 25, No. 3 Summer 2011); "Putting the 'Squeeze' on Refusal to Deal Cases: Lessons from *Trinko* and *linkLine*," (Vol. 24, No. 2, Spring 2010) and "Rigorous Analysis in Certification of Antitrust Class Actions: A Plaintiff's Perspective." (Vol. 21, No. 3, Summer 2007). Since 2010, Ms. Meriwether has been included in the US News and World Report Publication of "Best Lawyers in America" in the field of Antitrust Law. She has been named a "Pennsylvania Super Lawyer" for the past ten years and has attained the highest rating, "AV", from Martindale-Hubbell.

**JENNIFER WINTER SPRENGEL** is a 1990 graduate of DePaul University College of Law, where she was a member of the *DePaul University Law Review*.  She received her undergraduate degree from Purdue University in 1987.  Ms. Sprengel has handled a variety of commercial litigation matters in both state and federal court. Ms. Sprengel is admitted to practice law in Illinois, the United States District Court for the Northern District of Illinois and the United States Court of Appeals for the Third and Seventh Circuits.  Ms. Sprengel currently serves as Co-Chair of the Class Action and Derivative Suits Committee of the American Bar Association's Litigation Section.

**ANTHONY F. FATA** is a 1999 graduate of The Ohio State University College of Law, where he graduated with honors and was elected to the Order of the Coif, served as Managing Editor of The Ohio State Journal on Dispute Resolution, and earned the CALI award for Consumer Law and the CALI Excellence for the Future Award. Mr. Fata received his undergraduate degree from Miami University in 1995. Mr. Fata began his legal career in the trial and white collar practice groups at McDermott Will & Emery. Mr. Fata joined Cafferty Clobes Meriwether & Sprengel LLP in 2003. He has successfully prosecuted a wide range of commodities, securities, antitrust and consumer class actions. He has successfully represented the firm's business clients in a variety of commercial disputes and transactional matters and investor clients in securities arbitrations and regulatory proceedings. Among other publications, Mr. Fata authored *Doomsday Delayed: How the Court's Party-Neutral Clarification of Class Certification Standards in Wal-Mart v. Dukes Actually Helps Plaintiffs*," 62 DePaul Law Review 401 (Spring 2013), *Class Actions: Attaining Settlement Class Certification Under Amchem and Ortiz*, 19 *Product Liability Law & Strategy 1* (2001), and was a contributing author for *IICLE Securities Law*,



Chicago ● Philadelphia ● Ann Arbor
www.caffertyclobes.com

Chapter 15 – Civil Remedies (2003). Among other speaking engagements, Mr. Fata was a panelist for the 22nd Annual DePaul Law Review Symposium, *Class Action Rollback? Wal-Mart v. Dukes and the Future of Class Action Litigation* (2012), and has been selected to serve as a panelist for the Practising Law Institute's *Internal Investigations: What to Do, and What Not to Do* (2013). Mr. Fata is admitted to the bar in Illinois, as well as the Sixth, Seventh and Ninth Circuit Courts of Appeals, the Northern District of Illinois (including the Trial Bar) and the District of Colorado.

**NYRAN ROSE RASCHE** received her undergraduate degree *cum laude* from Illinois Wesleyan University in 1995, and earned her law degree from the University of Oregon School of Law in 1999. Following law school, Ms. Rasche served as a clerk to the Honorable George A. Van Hoomissen of the Oregon Supreme Court. She is the author of *Protecting Agricultural Lands: An Assessment of the Exclusive Farm Use Zone System*, 77 Oregon Law Review 993 (1998). Ms. Rasche is admitted to practice in the state courts of Oregon (inactive) and Illinois, as well as the United States District Courts for the Northern District of Illinois and the Southern District of Illinois. She is also a member of the Chicago Bar Association.

**CHRISTOPHER B. SANCHEZ** is a 2000 graduate of the DePaul University College of Law, where he wrote for the *Journal of Art and Entertainment Law* and was the school's student representative for the Hispanic National Bar Association. He received his undergraduate degree, *cum laude*, from the University of New Mexico in 1996. Mr. Sanchez is admitted to practice in Illinois, as well as the United States District Court for the Northern District of Illinois and United States Court of Appeals for the Seventh Circuit. He is also a member of the Illinois State Bar Association and of the Hispanic National Bar Association.

## ASSOCIATES

**KELLY L. TUCKER** received her law degree from Fordham University School of Law in 2010, where she was the Executive Notes and Articles Editor of the Fordham Journal of Corporate and Financial Law and a member of the Executive Board of Fordham Law Moot Court. While in law school, Ms. Tucker published a Note on the subject of antitrust litigation entitled, *In the Wake of Empagran—Lights out on Foreign Activity Falling under Sherman Act Jurisdiction?*, 15 FORDHAM J. CORP. & FIN. L. 807 (2010) and served as a Judicial Intern to the Honorable Douglas Eaton, a Magistrate Judge in the District Court for the Southern District of New York. She earned her undergraduate degree from the American University Honors Program in 2003. Since joining the firm, Ms. Tucker has had substantial experience in the litigation of complex class actions, including high-level involvement in the prosecution of several consumer class cases. Ms. Tucker joined the firm in 2011.

**DANIEL O. HERRERA** received his law degree, *magna cum laude*, and his MBA, with a concentration in finance, from the University of Illinois at Urbana-Champaign in 2008. Mr. Herrera received his bachelor's degree in economics from Northwestern University in 2004. Mr. Herrera joined CCMS as an associate in 2011 and is resident in its Chicago, Illinois Office. Prior to joining CCMS, Mr. Herrera was an associate in the trial practice of Chicago-based Mayer Brown LLP, where



Chicago ● Philadelphia ● Ann Arbor
www.caffertyclobes.com

he defended corporations in securities and antitrust class actions, as well as SEC and DOJ investigations and enforcement actions.   Mr. Herrera also routinely handled commercial matters on behalf of corporate clients.  Mr. Herrera is licensed to practice in Illinois and before the U.S. District Court for the Northern District of Illinois.

## OF COUNSEL

**DOM J. RIZZI** received his B.S. degree from DePaul University in 1957 and his J.D. from DePaul University School of Law in 1961, where he was a member of the *DePaul University Law Review*.  From 1961 through 1977, Judge Rizzi practiced law, tried at least 39 cases, and briefed and argued more than 100 appeals.  On August 1, 1977, Judge Rizzi was appointed to the Circuit Court of Cook County by the Illinois Supreme Court.  After serving as circuit court judge for approximately one year, Judge Rizzi was elevated to the Appellate Court of Illinois, First District, where he served from 1978 to 1996.  Judge Rizzi also teaches at both the undergraduate and graduate level: since 1980, he has been a part-time faculty member of the Loyola University School of Law and, since 1992, he has been a part-time faculty member at the University of Illinois-Chicago.  Judge Rizzi became counsel to the firm in October 1996.



**Markun Zusman Freniere & Compton, LLP** was founded in 2003 and maintains offices in Los Angeles, San Francisco, Boston and Portland, Oregon.  MZFC is devoted to serving clients with top-tier legal representation.  The firm maintains the highest standards of excellence and accomplishment resulting in a proven record of precedent-setting wins and favorable outcomes.

**MZFC** has considerable experience managing, resolving and trying multi-party and complex claims in nearly every substantive area of commercial law.   Our broad range of industry experience gives us the knowledge to successfully and clearly present the most complicated cases to judges, juries, arbitrators and mediators alike.  Our reputation enables clients to send the strong message that they are unshaken by the possibility of trial.

Our areas of commercial litigation include:

- Class actions
- Business disputes
- Breach of commercial contracts (private and government)
- Real estate
- False advertising and unfair competition
- Fraud
- D&O/Shareholder litigation
- Trade secrets
- Defamation, libel and slander
- Product liability
- Consumer protection statutes

While we do not believe every case should go to trial, we do believe every case gains a competitive advantage from a trial-ready approach. Leveraging the unique perspective of a well-experienced lawyer is the most powerful positioning tool for achieving the best possible solution in arbitration, mediation or other negotiated settlement forums.

MZFC has the depth of experience required to identify, very early in the evaluation of the case, the primary issues of law and fact, provide reliable outcome scenarios, and develop realistic alternative resolution options. We also aggressively pursue pre-trial strategies, including opportunities to win on dispositive motions, which could lead to favorable resolution before trial.

MZFC has represented classes and obtained court approval for class settlements in matters involving wage and hour violations; illegal bank practices; the Fair Credit Reporting Act; illegal tape recording; junk faxes; unlawful practices on insurance policy pricing; and defective products.

**DAVID MARKUN- MANAGING PARTNER**

David Markun is the firm's managing partner and a co-founder of the firm. Prior to starting the firm, David was the head of the securities practice group of a Los Angeles based firm, and, prior to that, he was the managing partner of the Los Angeles office of a national firm. In the last ten years, David has helped grow Markun Zusman Freniere and Compton from seven attorneys to almost twenty attorneys, with an expanding national practice. Under his watch, the firm has opened offices in Portland, and more recently, Boston, where the firm can better serve several of its East Coast clients. David is an experienced trial lawyer, and has significant experience in complex litigation and professional liability matters. His practice focuses on securities arbitration and litigation, employment, consumer fraud and investment-related class actions. He has defended broker-dealers and financial professionals in hundreds of arbitrations, and has defended broker-dealers in class actions in state and federal courts. He also has been retained as co-counsel in wage and hour class actions, as well as significant consumer class actions. David has been retained on matters of sensitive importance to the firm's clients, including employment and trade secrets issues, even before such matters result in litigation. David also regularly advises broker-dealer clients on risk management and litigation prevention.
David received his law degree from Boalt Hall School of Law, University of California at Berkeley, in 1982. He received a

Master of Arts degree from Brandeis University in 1979, and a Bachelor of Arts degree in Political Science, with Honors, in 1976, from the University of California at Berkeley. David was admitted to the California Bar in 1983.

**JEFFREY COMPTON - PARTNER**

Jeff Compton, a partner and co-founder of the firm, concentrates his practice on commercial litigation and arbitration. Throughout Jeff's career, he has handled hundreds of commercial litigation cases, including securities arbitrations and litigation, antitrust, lender liability, ERISA, real estate, intellectual property, unfair competition, and employment matters. Jeff tries to take a creative approach to his cases, determining at the early stages of a case the most cost-effective options for achieving a client's desired result as promptly as possible and working toward that objective. Jeff has served as lead counsel in dozens of cases around the country in matters ranging from employment law to complex financial litigation. In recent years, Jeff's practice has focused on employment matters and representing independent broker-dealers and financial advisors in securities disputes and regulatory investigations. Jeff also counsels financial services professionals in litigation prevention and compliance matters.

Jeff received his law degree from the University of Michigan in 1989, *cum laude*. He received his Honors Bachelor of Science degree in Political Science, with Highest Distinction, from the University of Iowa in 1986. Jeff was admitted to the California Bar in 1989.

**DARIA CARLSON - PARTNER**

Daria Dub Carlson primarily practices employment law, representing both employers and employees. She handles claims for sexual harassment, wrongful termination, gender, race, age and disability discrimination, unpaid wages and overtime, commission disputes, breach of contract, misappropriation of trade secrets, and unfair competition. Daria has represented plaintiffs and defendants in numerous employment and consumer class actions. Daria has conducted trials in state courts and before the California Labor Commissioner, and has conducted arbitrations in various forums, including the Screen Actors Guild. Daria also provides general advice regarding employment related risk management.

Daria received her Juris Doctor degree from Pepperdine University School of Law, and received undergraduate degrees, magna *cum laude*, in Honors Philosophy, Rhetoric and Communications from the University of Pittsburgh. She is licensed to practice in California and Pennsylvania.



**FIRM BIOGRAPHY**

***WILLIAM J. PINILIS, ESQ.***

Mr. Pinilis is certified by the Supreme Court of New Jersey as a Civil Trial Attorney. He concentrates primarily on handling consumer claims, complex commercial litigation, and class action litigation.

Mr. Pinilis has served as an adjunct professor at Seton Hall School of Law since 1995, where he currently teaches Consumer Law and New Jersey Practice. Mr. Pinilis was voted a "Super Lawyer" by his peers every year since 2009, and has appeared as a legal analyst and commentator on both CNBC and Court TV/TruTV. Mr. Pinilis has also appeared as a regular guest on the Troubleshooter Show – a nationally syndicated consumer advocacy radio talk show.

**Education:**

- B.A., Hobart College (1989)
- J.D., Benjamin Cardozo School of Law (1992)

**Recent Results in Cases Where William Pinilis and/or PinilisHalpern, LLP Served as Class Counsel:**

- *In re Providian Financial Corp. Credit Card Terms Litigation*, MDL 1301 (E.D. Pa.) ($105 million recovered)
- *Markowitz v. Cytodyne et al.*, Civil Case No. 03-441747 (D.N.J.) (GEB) (recovered over $5 million)
- *Lenahan v. Sears*, Civil Case No. 3-02-CV-00045 (D.N.J.) (SEC) (recovered $15 million)
- *Friedman v. Samsung*, BER-L-7250-01, (Superior Court of N.J.) (recovered in excess $5 million)
- *Roberts v. LG Electronics USA, Inc.*, 06-CV-05609 (D.N.J.) (JLL) (benefit of bargain relief calling for warranty extensions and repair and/or replacement of thousands of high definition televisions)
- *Lynne H. Sinay v. Boron Lepore & Associates, et als.*, 99-CV-2231 (D.N.J.) (DRD) (multi-million dollar settlement)
- *Ford Motor Credit Company LLC d/b/a Mazda American Credit, v. Sharon Calandra, et al.*, MID-L-1929-08

**Lectures and Seminars**

In addition to his adjunct professorship at Seton Hall Law School, and teaching a bar review class for Kaplan/PMBR on New Jersey Civil Procedure, Mr. Pinilis regularly lectures with the New Jersey Institute for Continuing Legal Education, where he has moderated the following seminars:

- *Consumer Fraud Litigation*, New Jersey Institute for Continuing Legal Education, December 19, 2000
- *Consumer Fraud Litigation,* New Jersey Institute for Continuing Legal Education, January 22, 2002
- *Consumer Fraud Litigation*, New Jersey Institute for Continuing Legal Education, March 27, 2003
- *2004 Consumer Law Day for Attorneys*, New Jersey Institute for Continuing Legal Education, March 24, 2004
- *Fair Credit Reporting Act*, Volvo North America, 2004
- *New Developments in Consumer Fraud*, New Jersey Institute for Continuing Legal Education, April 8, 2005
- *Consumer Law:  Update 2005*, New Jersey Institute for Continuing Legal Education, December 2, 2005
- *Consumer Law Day 2006*, New Jersey Institute for Continuing Legal Education, September 27, 2006
- *Consumer Protection Litigation Essentials*, New Jersey Institute for Continuing Legal Education, June 29, 2007
- *Meadowlands Seminar 2009 (Beyond Consumer Fraud:  Other Actions to Consider)*, New Jersey Association for Justice, November 13, 2009
- *Keeping Up-To-Date With Consumer Protection Litigation Issues*, New Jersey Institute for Continuing Legal Education, December 16, 2009.
- *Meadowlands Seminar 2011 (Federal Consumer Statutes and Causes of Action)*, New Jersey Association for Justice, November 11, 2011
- *Meadowland Seminar 2012 (Recognizing the Many Potential Consumer Class Action Cases for Litigation or Referral)*, New Jersey Association for Justice, November 16, 2012
- *Boardwalk Seminar 2013 (Expanding Your Practice:  How Do You Know a Good Consumer Class Action When You See It?)*, New Jersey Association for Justice, April 18, 2013
- *Meadowlands Seminar 2013, Consumer Law Update*, New Jersey Association for Justice, November 15, 2013
- *Fee Applications*, New Jersey Institute for Continuing Legal Education, June 23, 2014
- *Youth Sports:  More Than Just Fun & Games*, New Jersey Institute for Continuing Legal Education, September 11, 2014
- *Consumer Law:  Issues & Strategies 2014*, New Jersey Institute for Continuing Legal Education, October 8, 2014
- *Refocusing on Fraud,* New Jersey Civil Justice Institute, October 2, 2014

**Publications:**
- "The *Lampf* Decision: An appropriate Period of Limitations?," *New Jersey Trial Lawyer*, May 1992
- "Consumer Fraud Act Permits Private Enforcement," *New Jersey Law Journal*, Aug. 23, 1993

- "Lawyer-Politicians Should Be Sanctioned for Jeering Judges," *New Jersey Law Journal*, July 1, 1996
- "No Complaint, No Memo – No Whistle-Blower Suit," *New Jersey Law Journal*, Sept. 16, 1996
- "Work-Product Privilege Doctrine Clarified," *New Jersey Lawyer*, Aug. 2, 1999
- "Article on CFA Faulted," *New Jersey Lawyer*, January 29, 2007, Cite 16 NJL 167
- *The Time is Right: A Rebuilding of Consumer Trust and Confidence is Forthcoming*, 196 N.J.L.J. 115 (2009).
- "NJ Consumer Fraud Act Is Not 'Devolving,'" *Law360* (December 1, 2014)
- "Grinchy Hackers Haven't Ruined Christmas", *Law360* (December 18, 2014)
- Blog www.consumerfraudforum.com

**Published Opinions:**
- *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234 (2005)
- *Miller v. American Family Publishers*, 284 N.J. Super 67 (Ch. Div. 1995)
- *Union Ink Co., Inc. v. AT&T Corp.*, 352 N.J. Super 617 (App. Div. 2002)
- *Muhammad v. County Bank of Rehoboth Beach*, 379 N.J. Super 222 (App. Div. 2005)
- *Smerling v. Harrah's Entertainment, Inc.*, 389 N.J. Super 181 (App. Div. 2006)
- *Weiss v. Regal Collections*, 385 F.3d 337 (3d Cir. 2004)

**Bar affiliations and court admissions:**
- New Jersey Bar
- State Bar of New York
- United States Court of Appeals for the Third Circuit
- U.S. District Court for the District of New Jersey
- U.S. District Court for the Southern District of New York
- U.S. District Court for the Eastern District of New York
- Special Assistant Attorney General for North Dakota, appointed to represent the interests of the State of North Dakota and the North Dakota Retirement and Investment Office in the New Jersey Bankruptcy Court Adversary Proceeding, No. 04-2192, Official Committee of Asbestos Claimants of G-1 Holdings, f/k/a GAF Corporation, suing on behalf of the Chapter 11 Estate of G-1 Holdings v. Building Materials Corporation of America, et als.

**Professional affiliations:**
- Morris County Bar Association
- New Jersey State Bar Association
- National Association of Consumer Advocates
- Association of Trial Lawyers of America
- Graduate, Brennan Inn of Court
- Class Action Section, New Jersey State Bar Association
- Consumer Law Section, New Jersey State Bar Association

**_GABRIEL H. HALPERN, ESQ._**

       Mr. Halpern is certified by the Supreme Court of New Jersey as a Civil Trial Attorney. He has also been voted by his peers as a *New Jersey Super Lawyer*.  He concentrates on complex commercial and personal injury litigation. Mr. Halpern has also served as litigation counsel for municipal government in all aspects of litigation.

       Mr. Halpern's litigation experience includes cases involving real estate matters, partnership and shareholder disputes; personal injury and negligence cases; medical malpractice, architect/engineer malpractice; construction defects; product liability; employment agreements (trade secret agreements and restrictive covenants); employment discrimination matters; UCC agreements (sale contracts, letters of credit, security agreements); insurance coverage matters; zoning and planning matters; lender liability matters; franchise agreements; brokerage commission disputes, environmental litigation and other commercial disputes.

**Education:**
- J.D. (cum laude), Georgetown University School of Law (1985)
- B.A. (summa cum laude), Fairleigh Dickinson University (1982)
- 

**Bar affiliations and court admissions:**
- New Jersey Bar, 1985
- United States District Court, District of New Jersey, 1985
- United States Court of Appeals, Third Circuit, 1989
- United States Tax Court, 1990
- 

**Professional affiliations:**
- American Bar Association
- New Jersey Bar Association
- Morris County Bar Association
- Association of Trial Lawyers of America
- New Jersey Association of Justice
- 

**Published Opinions:**
- Mesalic v. Fiberfloat, 897 F.2d. 696, (3rd Cir. 1990);z
- In re: Buildings by Jamie; Straffi v. Buildings By Jamie, Inc., 230 B.R. 36 (1998);
- Bellemead v. Roseland, 16 N.J. Tax 369 (1996); 17 N.J. Tax 155 (1997) and 18 N.J. Tax 17 (1998);
- In re: Warren Township et als., 132 N.J. 1 (1993);
- Rizzo v. Prudential Securities; 287 N.J. Super. 523 (App. Div. 1998);
- Higg-a-Rella v. County of Essex, 141 N.J. 35 (1995*);*
- Weiss v. Regal Collections, 385 F.2d 337 (3rd Cir. 2004).

<u>*JUDITH FAIRWEATHER, ESQ.*</u>

Ms. Fairweather practices on real estate development matters, including applications for land use approvals from municipal, county, state and federal agencies; environmental permitting; leasing; and construction contracts.  Also, Ms. Fairweather has significant experience in the area of telecommunications law.

Ms. Fairweather clerked for the Honorable Wilfred P. Diana, A.J.S.C., Chancery/ Assignment Judge, Somerset County.

**Practice Areas**
- Represents Telecommunications companies and fiber optic companies in regard to leasing
- Represents solar companies in regard to local and state approvals
- Represents telecommunications companies in regard to land use approvals
- Represents earth station in regard to expansion of facilities
- Represents tower companies in negotiations and land use
- Represented power company in land use approvals and construction of a cogeneration plant
- Represented developers in connection with the approval and construction of hotels and restaurants
- Represented developers in the land use approval of car dealerships
- Represented nursing home in connection with expansion of facility and environmental approvals
- Represented many corporate clients for approvals from the FCC, New Jersey Department of Environmental Protection, Pinelands Commission, New Jersey Highlands Commission, and the Casino Commission
- Worked with the Pinelands and Highlands Commission in amendments to regulations

**News, Publications & Presentations**
- Recognized by *Super Lawyers*, 2012, 2011
- Co-author, "NJ Streamlines Land Use Approvals for Certain Wireless Collocations," January 18, 2012
- Featured, "Cash-strapped companies rethink pricing options:  More businesses offer discounts, promotional programs to win clients," NJBiz, September 7, 2009
- Co-author, "Sprouting Up All Over:  Increased Mobile Technology Use Has Meant a Surge in Zoning Applications for Cell Towers," *New Jersey Law Journal*, June 12, 2006

**Education**
- Rutgers University School of Law - Newark, J.D., 1990
- University of Montana, B.S., *cum laude*, 1976

**Admissions**

- State of New Jersey, 1990

**Professional Affiliations**
- New Jersey State Bar Association
- New Jersey Women Lawyers Association
- New Jersey Wireless Association
- PCIA, Member

### ***CHRISTOPHER QUINN, ESQ.***

Christopher Quinn concentrates his practice in commercial real estate, land use and zoning and project development.   Chris represents developers, land owners, telecommunications companies, institutions, utility companies and other applicants in a broad range of residential, commercial, redevelopment, office, industrial, retail and mixed use projects. He navigates clients through every phase of obtaining project approvals from Municipal, County and State agencies.  In addition, Chris guides purchasers, sellers, landlords and tenants in the acquisition, sale and leasing of commercial and residential real estate.

Chris' expertise and experience promotes development of strong relationships with governmental officials and brings a practical approach to cut through red tape and think outside the box to solve complicated issues and obtain project approvals.

**Admitted to Practice**
- New Jersey, 1999
- New York, 1999

**Education**
- J.D., Villanova University School of law, 1999
- B.S. in Electrical Engineering, Villanova University, 1996

**Professional Affiliations**
- New Jersey Wireless Association
- New York State Wireless Association
- New Jersey State Bar Association
- Essex County Bar Association

**Publications**
- Co-author, *Sprouting Up All Over:  Increased Mobile Technology Use Has Meant a Surge in Zoning Applications for Cell Towers*," New Jersey Law Journal, June 12, 2006



# Kiesel Law LLP

8648 Wilshire Boulevard
Beverly Hills, California  90211

Telephone:  (310) 854-4444
E-mail:  info@kiesel-law.com
Facsimile:  (310) 854-0812

www.kiesel-law.com

**Kiesel Law LLP** is one of the most accomplished consumer law firms in the United States.  KL successfully represents classes or groups of persons, individuals, businesses, and public and private entities in courts nationwide in the areas of personal injury, mass torts, pharmaceutical and medical device litigation, privacy, construction and product defects, toxic exposure, consumer protection, professional malpractice, financial fraud, insurance bad faith, and human rights.  We possess the sophisticated skills and financial resources necessary to litigate and resolve large, complex cases on our clients' behalf.

KL and its predecessor firms have a long history of extensive litigation in complex matters.  KL has litigated and resolved some of the most important civil cases in the nation.  Our attorneys possess a diverse range of professional skills and come from a wide variety of backgrounds.

## A.    CASE PROFILES

### 1.    Mass Torts

*Clergy Cases I, II, & III*, California JCCPs 4286, 4297, and 4359.  In 2002, the state of California passed a law that opened a one-year window of time to file civil suits based on claims of sexual abuse of a minor that would otherwise have been time-barred as of January 1, 2003.  That year, in the wake of the very public Clergy sexual abuse scandal involving Boston's Archdiocese, many hundreds of survivors came forward to file civil suits based on these revived claims.  These survivors alleged that the Church was liable for the molestations because, among other things, it (1) knew or had reason to know that the priests were molesting minors, and yet failed to supervise the priests to ensure that the priests would not molest again; (2) concealed facts relating to the priests' molestations; and (3) harbored, aided, and concealed the priests to avoid arrest and prosecution.

KL led the fight for justice and accountability in California against numerous corrupt Church entities on behalf of hundreds of these survivors, and was appointed Liaison Counsel on behalf of hundreds more who filed revived claims against the Dioceses of Orange, Los Angeles, San Diego, and Fresno.



Kiesel Law LLP
Page 2

### Diocese of Orange

Ninety survivors of Clergy sexual abuse filed lawsuits against the Roman Catholic Diocese of Orange.  In December 2004, after nearly two years of intense negotiations, the firm helped to successfully settle all claims against the Roman Catholic Diocese of Orange ("Diocese of Orange") for $100 million.  One of the key terms of the settlement was a promise that the secret files of the Diocese of Orange would be made public.

### Archdiocese of Los Angeles

Five-hundred and eight survivors of clergy sexual abuse filed lawsuits against the Roman Catholic Archbishop of Los Angeles ("Archdiocese of Los Angeles"). KL was appointed Liaison Counsel on behalf of these individuals, all of whom were sexually abused as minors, and many of whom were abused by priests who were incardinated.

Over the course of five years and as a result of hard-fought discovery battles, the mountain of damning evidence in support of the plaintiffs' claims continued to grow.  For example, many of the accused priests had multiple victims because they were moved by their superiors from one parish to another as accusations arose.  The documents from priest-perpetrator files revealed that the Church had failed time and again to protect its most innocent and vulnerable parishioners from harm.

In July 2007, on the very eve of the first of more than a dozen scheduled trials, KL reached an agreement with the Roman Catholic Archbishop of Los Angeles ("Archdiocese of Los Angeles") to settle all cases against it for $660 million.  KL is well-regarded for having successfully negotiated this, the largest settlement with any diocese in the United States. More importantly, KL never faltered in keeping its promise to ensure that the Archdiocese of Los Angeles kept one of the key terms of the settlement: that it make certain of its confidential files public to shed light on exactly what Church officials knew about the abuse accusations, and when they learned about them.

### Archdiocese of San Diego

One-hundred and forty-four survivors were sexually abused by Clergy members in the Roman Catholic Diocese of San Diego under lax supervision by the Church. In September 2007, the Diocese agreed to pay nearly $200 million to these 144 survivors. This is the second-largest settlement by a Roman Catholic diocese nationwide since claims of sexual abuse by clergy members came to light in 2002.



Kiesel Law LLP
Page 3

***Chatsworth Metrolink Collision Cases***, Lead Case No. PC043703, Los Angeles Superior Court.  On the afternoon of Friday, September 12, 2008, Metrolink Train 111 collided head-on with a Union Pacific freight train in the Chatsworth district of Los Angeles, resulting in twenty-four passenger deaths and numerous passenger injuries, many of them serious and permanent.

The family members of deceased passengers and most of the injured passengers filed suit against Metrolink and other defendants to recover through the California judicial system.  KL represented passengers and family members in eleven of the cases, and in 2008 Paul Kiesel was selected and appointed Plaintiffs' Liaison Counsel in the coordinated proceedings.  Working closely with other members of the Plaintiffs' Steering Committee and with counsel for the defendants, Mr. Kiesel successfully negotiated the recovery of $200 million for the plaintiffs, the maximum amount that the defendants could be required to pay under federal law.

***Federal Express Vehicle Collision Cases,*** Judicial Council Coordination Proceeding No. 4788, Los Angeles Superior Court. Interim Lead and Liaison Counsel for Plaintiffs. On Thursday, April 10, 2014, a Federal Express truck driver towing two 28 foot-long freight trailers began to make a lane change from the southbound Interstate 5 number two lane into the number one southbound lane. However, the tractor and trailers did not stop and, instead, crossed over the rumble strip on the eastern edge of the southbound lanes, veered into and crashed through and across a 58' center median, crossed over the rumble strip on the western edge of the northbound lanes, entered into the northbound number one lane of I-5 where it struck a Nissan Altima automobile, continued into the number two northbound lane and, four seconds after beginning his original lane change, struck a northbound 2014 Setra bus. The impact was so massive that it forced the tractor trailer and the bus onto the shoulder where they caught fire and burned in an uncontrolled conflagration.

2.  <u>Privacy</u>

***In re: Pellicano Cases***, Lead Case No. BC316318 (Los Angeles Superior Court). Once a high-profile private investigator, Anthony Pellicano is currently serving a lengthy sentence in federal prison for unlawful wiretapping and racketeering. In 2008, KL was appointed Co-Lead Class Counsel in this putative class action case arising from Mr. Pellicano's wiretapping in violation of California Penal Code Sections 630 *et seq*.

***Nader v. Capital One Bank (U.S.A.), N.A.*** (United States District Court – Central District of California), Case No. 12-CV-01265-DSF; ***Stone v. Howard Johnson International, Inc.*** (United States District Court – Central District of California), Case No. 12-CV-1684-PSG; ***Greenberg v. E-Trade Financial Corporation***, Case No.



Kiesel Law LLP
Page 4

BC360152 (Los Angeles Superior Court); *Mount v. Wells Fargo Home Mortgage, Inc*., Case No. BC395959 (Los Angeles Superior Court); *Raymond v. Carsdirect.com*, Case No. BC256282 (Los Angeles Superior Court). Businesses must provide the familiar admonition that telephone calls with consumers "may be recorded for quality assurance and training purposes" in order to comply with California law, which requires the consent of all parties to a telephone conversation before it may be recorded. Failure to comply with this requirement constitutes a serious personal privacy violation for which consumers may recover monetary damages. In these cases, KL represented classes of California individuals, in both federal and state court, whose calls were recorded without their knowledge or permission.

3.    <u>Construction Defect</u>

*In Re: Galvanized Steel Pipe Litigation*, Case No. BC174649 (Los Angeles Superior Court). As Class Counsel, KL prosecuted and settled claims made on behalf of thousands of named plaintiff and class member homeowners against the developer defendants and cross-defendants for defective plumbing in this complex suit involving nineteen separate individual and class action product liability cases. The actions resolved for more than $41 million.

*Silver v. Del Webb*, Nevada Case No. A437325. Paul Kiesel and Bill Larson were appointed Lead Counsel in this certified class construction defect suit to recover for the installation of faulty plumbing systems in approximately 3,000 new homes in Las Vegas. KL negotiated a resolution of the case for $21 million on the day before trial was to begin. At the time, this was the largest construction defect case in Nevada history.

4.    <u>Economic Injury Product Defects</u>

*In Re: Avandia Marketing, Sales Practices and Product Liability Litigation*. The Plaintiffs' Steering Committee for this multi-district litigation selected Paul Kiesel to serve as Lead Counsel for the Plaintiffs' Steering Committee in March 2011. This national litigation involves numerous federal lawsuits brought against defendant GlaxoSmithKline PLC, manufacturer of the onetime "blockbuster" type 2 diabetes drug Avandia, which has been pulled from the shelves in Europe, India, and New Zealand, and which is only available in the United States as a drug of last resort. KL represents the County of Santa Clara in a claim for the return of all moneys used to purchase this toxic drug.

*In re: Rio Hair Naturalizer Products Liability Litigation*, MDL 1055 (E.D. MI). In 1995, Paul Kiesel was appointed Co-Lead Counsel in multi-district litigation arising from a defective hair straightening product that injured over 50,000 plaintiffs. The matter resolved successfully as a limited fund, non-opt-out class action.



Kiesel Law LLP
Page 5

*In re: Packard Bell Consumer Certified Class Action Litigation*, Case No. BC125671 (Los Angeles County Superior Court).  In 1995, Paul Kiesel was a member of the Plaintiffs' Steering Committee in this consumer class action involving product defect claims, which resolved successfully.

*Mikhail  v. Toshiba America Inc.*, Case No. BC278163 (Los Angeles Superior Court); *Kan v. Toshiba, Inc.*, Case No. BC327273 (Los Angeles Superior Court).  KL was appointed Lead Counsel in these class actions brought to recover for the distribution of faulty computers.  The cases resolved with class members eligible to receive up to $36 million (*Kan*) and $50 million (Mikhail).

*Anderson v. Toshiba America*, Case No. BC299977 (Los Angeles Superior Court).  In 2003, KL was counsel for the plaintiffs in a class action alleging product defects, which resolved successfully.

5.  <u>Personal Injury Product Defects</u>

*Wright Hip System Cases*, California JCCP 4710. In November, 2012, KL was appointed Liaison Counsel in this coordinated proceeding involving injuries arising out of the defective design of metal-on-metal hip implants.

*In Re: Wright Medical Technology, Inc., Conserve Hip Implant Products Liability Litigation*, Multidistrict Litigation 2329. In May 2012, KL was appointed Co-Lead Counsel in this federal coordinated action arising out of injuries sustained as a result of implantation of defective metal-on-metal hip devices.

*Yaz, Yasmin and Ocella Contraceptive Cases*, California JCCP 4608.  KL was appointed Co-Liaison Counsel in this litigation arising out of injuries and deaths that occurred following the ingestion of oral contraceptives.

*In Re: Toyota Motor Corp. Hybrid Brake Marketing, Sales Practices, and Products*, Federal Multidistrict Litigation 2172.  KL was appointed Liaison Counsel in this case involving defective automotive brakes.

*Serrano v. City of Los Angeles*, Case No. BC144230, Los Angeles County Superior Court.  Paul Kiesel was appointed Lead Counsel in this multi-fatality product liability litigation which led to an $8.2 million settlement.

*In Re: Diet Drug Litigation*, California JCCP 4032.  In 2003, KL served as the Plaintiffs' Lead Counsel in this action involving claims arising out of use of the diet drug Phen-Fen, which settled confidentially.

*Algario et al. v. Eli Lilly and Company et al.*, Lead Case No. BC347855, Los Angeles Superior Court.  In 2006, KL was appointed Lead Counsel in this class



Kiesel Law LLP
Page 6

action to recover for injuries resulting from ingestion of the medication Zyprexa. The case settled favorably.

*In Re: Vioxx Cases*, California JCCP 4247.  In 2007, KL served on the Plaintiffs' Executive Committee for this California JCCP which involved claims arising out of the use of the drug Vioxx.

6.      Unfair Employment Practices

*In Re: The Securitas Security Services*, California JCCP 4460.  KL represented the plaintiffs in this class action to recover for violations of California labor laws, which resolved successfully.

7.      Toxic Exposure

*In Re: Unocal Refinery Litigation*, Case No. C94-0414.  Paul Kiesel served as a member of the Direct Action Steering Committee and as Chair of the Allocation Committee in this case involving the toxic contamination of several communities. Mr. Kiesel developed a methodology and plan of allocation for an $80 million settlement on behalf of approximately 1,500 plaintiffs.

*Zachary, et al. v. Arco, et al.*, Case No. BC 209944 (Los Angeles County Superior Court).  Paul Kiesel was appointed Lead Counsel in this mass toxic tort case resulting from a ruptured oil pipeline.  The case resolved successfully.

*Tosco Refinery Fire*, Lead Case No. NC028924 (Los Angeles Superior Court).  KL was appointed Lead Counsel in the Tosco Refinery Fire mass toxic tort litigation, in which thousands of people were affected as a result of an explosion and blaze at the Tosco refinery facility in Wilmington, California.  The toxic plume caused by this massive fire affected over three thousand people. The matter settled with all defendants on July 1, 2005.

8.      Consumer Protection

*Pilkington v. U.S. Search.com*, Case No. BC234858 (Los Angeles Superior Court). In 2000, Paul Kiesel was appointed Lead Counsel in this matter involving a technically flawed online search facility which purported to provide adoptees and their biological parents with information about one another upon demand.

*Black v. Blue Cross of America*, Case No. BC250339 (Los Angeles Superior Court). KL was co-counsel in this class action against the largest health care service plan in California for improper mid-year contract modifications.  KL prosecuted and settled claims made on behalf of the named plaintiff and class members. Following a finding of liability against the insurer for breach of contract and



Kiesel Law LLP
Page 7

breach of the covenant of good faith and fair dealing, KL successfully reached agreement to settle all claims for $25 million.  The terms of the settlement called for a reimbursement of 100 percent of the actual damages to nearly 66,000 overpaying subscribers.

*Draucker Development and True Communication, Inc. v. Yahoo!, Inc.*, Case No. CV06-2737 JFW (Rcx) (C.D. Cal.).  KL was a member of the Plaintiffs' Steering Committee in this matter in which advertisers sought to recover from an online search engine for breach of contract and unfair business practices.

*In re Carrier IQ, Inc. Consumer Privacy Litigation*, Case No. 3:12-md-2330 (N.D. Cal).  KL is a member of the Plaintiffs' Executive Committee in this class action involving alleged interception and manipulation of consumers' personal communications on smart phones.

*In re Facebook Internet Tracking Litigation*, Case No. 5:12-md-02314 (N.D. Cal.) KL serves as Liaison Counsel for Plaintiffs in this proceeding alleging the interception of Facebook users' internet communications and activity after logging out of Facebook.

9.   Antitrust

*In re: Wholesale Electricity Antitrust Cases I & II*, California JCCP 4204-00005 and 4204-00006.  In 2000, Paul Kiesel was a member of the Plaintiffs' Steering Committee in this litigation which the plaintiffs sought to recover damages from energy traders for unfair business practices.

10.   Financial Misconduct

*In re: Transient Occupancy Tax Cases*, California JCCP 4472.  In 2004, KL acted as Co-Lead Counsel representing the City of Los Angeles in a class action on behalf of all cities in the state of California to recover unremitted occupancy taxes from certain online travel companies.

*American Medical Association, et al. v. Wellpoint, Inc.*, MDL 09-2074 (C.D. Cal.). In 2009, KL was appointed Co-Lead Counsel in this multi-district litigation in which physicians and physician groups seek to recover payments for treatment that they provided to certain of their medical patients.

*Murray v. Belka - "First Pension"*, California JCCP 3131.  KL joined forces with Aguirre & Meyer to take on a corrupt pension plan administrator, one of the nation's largest law firms, and the world's largest accounting firm to achieve settlements in providing full restitution for 340 mostly elderly consumers who had lost their life savings to a Ponzi scheme.  In July 2000 after a six month trial, the



Kiesel Law LLP
Page 8

jury found the accounting firm liable for fraud, misrepresentation, aiding and abetting a fraud, and concealment, and issued eighteen findings supporting punitive damages. PWC subsequently settled for a confidential amount which made the investors whole.

*In re: Hilton Hotels Corporation Shareholder Litigation*, Case No. BC373765 (Los Angeles Superior Court). In 2007, KL was appointed Co-Lead Counsel in this class action in which Hilton shareholders sought to block a proposed merger with the Blackstone Group.

11.  <u>Insurance Bad Faith</u>

*In re: Northridge Earthquake Litigation*, Lead Case No. BC265082 (Los Angeles Superior Court). In 2002, KL served as Plaintiffs' Liaison Counsel in suits against State Farm Insurance, 21st Century Insurance, Farmers Insurance, and the USAA Insurance Company.

B.  <u>FIRM BIOGRAPHY</u>

1.  <u>Partners</u>

**PAUL R. KIESEL,** admitted to practice in California, 1985; admitted to practice before the United States Supreme Court; United States District Court, Central District of California; United States District Court, Northern District of California; Southern District of California; United States District Court, Eastern District of California. *Education.* Connecticut College, B.A. 1982; Whittier College School of Law, J.D. 1985, Honorary Doctor of Law 2005. *Awards and Honors.* California Judicial Council 2014 Distinguished Service Award—Stanley Mosk Defender Of Justice Award; 2014 State Bar President's Access to Justice Award; 2014 Daily Journal Top 100 Attorneys in California; Chief Justice Award for Exemplary Service and Leadership, 2012; Named one of the Twelve Techiest Lawyers in America, ABA Journal, 2012; Access to Justice Award Lawyers' Club of San Francisco, 2012. Named one of 500 Leading Lawyers in America, Lawdragon, 2009-2011; AV Peer Review Rated, Martindale-Hubbell; Named one of the one hundred most influential attorneys in California by the California Business Journal; Named one of the top fifty trial lawyers in Los Angeles by the Los Angeles Business Journal. *Publications and Presentations.* Co-author, Matthew Bender Practice Guide: California Pretrial Civil Procedure (treatise); Co-author, Matthew Bender Practice Guide: California Civil Discovery (treatise); frequent presenter for continuing legal education programs; frequent speaker and writer on subjects related to technology in the practice of law. *Member.* California State Bar Association; Appointed by California Supreme Court Chief Justice Ronald George to the California Judicial Council Civil and Small Claims Advisory Committee; Executive Committee, President-Elect, Los Angeles County Bar



Kiesel Law LLP
Page 9

Association; Co-Chair, California Open Courts Coalition; Board of Governors, Association of Business Trial Lawyers, 2001-2005; Emeritus Member of the Board of Governors, Consumer Attorneys of California; Emeritus Member of the Board of Governors, Consumer Attorneys Association of Los Angeles.

**HELEN E. ZUKIN**, admitted to practice in California, 1985; admitted to practice before the United States Supreme Court; United States District Court, Central District of California; United States District Court, Northern District of California; Southern District of California; United States District Court, Eastern District of California. *Education*: University of California at Santa Cruz, B.A., 1980; Loyola Law School, J.D. 1985. *Employment*. Greene, O'Reilly, Agnew & Broillet, 1985-1990; Simke, Chodos, Silberfeld & Anteau, 1990-95; Special Indoor Air Quality Counsel, Carrier Corporation, Syracuse, New York, 1991-98; Law Offices of Helen E. Zukin, 1995-2007; Kiesel Law, 2007-present. *Member*. Los Angeles County Superior Court Committee on Cost Reduction and Judicial Efficiency in Civil Operations, Member, 2012, Federal Magistrate Judge Merit Selection Panel, 2011-present, Los Angeles County Bar Association Judicial Appointments Committee, Vice-Chair, 2011-present, The Chancery Club, Member, 2011-present, Los Angeles Ethics Commission, President, 2008-2011, Vice President, 2007-2008, Commissioner, 2007-2007, Temporary Judges Program Los Angeles Superior Court, Participant, 2005-present, Commission on Judicial Nominees Evaluation (JNE) of the State Bar of California, Chair, 1998-99, Vice-Chair, 1997-98, Review Committee Chair, 2004-05, Annual Lecturer, 1999–present, Member, 1995-99, 2002-04; Chancery Club, Los Angeles County Bar Association; Executive Committee, Litigation Section, Los Angeles County Bar Association; Board Member Emeritus, Consumer Attorneys Association of Los Angeles; Board of Governors, Consumer Attorneys Association of Los Angeles; Consumer Attorneys of California; American Association for Justice; Women Lawyers Association of Los Angeles. *Awards & Honors*. City of Los Angeles City Council Commendation for Service to the Los Angeles City Ethics Commission; Commendation, Consumer Attorneys Association of Los Angeles, 2002; President's Award for Outstanding Contribution to the Association; Consumer Attorneys Association of Los Angeles, 2000. *Publications*. Editor in Chief, *Indoor Air Pollution Law Report* (1991-94); *How to Identify a Good Toxic Tort Case*, Consumer Attorneys Association of Los Angeles, 1997; Editor, Indoor Air Quality Handbook for Building Owners and Operators, Carrier Corporation, March 1997; *Proving Causation in a Toxic Tort Case*, Consumer Attorneys Association of Los Angeles, 1996; *How to Avoid Becoming a Target Defendant in an Indoor Air Quality Case*, American Society of Heating and Refrigerating Engineers Annual Journal, April 1992; *Legal Ramifications of Indoor Air Pollution*, University of Tulsa Environmental Journal, May 1992; *The Use of Experts in an Indoor Air Quality Case*, Indoor Air Pollution Law Report, March 1992; *What Is a Sick Building Syndrome Case?*, The Advocate, February 1992; *How to Prove a Sick Building Syndrome Case*, Indoor Air Pollution Law Report,



Kiesel Law LLP
Page 10

December 1992; *Emerging Issues in Toxic Tort Cases*, Environmental Law Reporter, November 1990. *Presentations*. American Institute of Architecture; American Society of Heating and Refrigerating Engineers; Building Owners & Managers Association; Consumer Attorneys Association of Los Angeles; Continuing Education of the California State Bar; The Rutter Group; Mealey's Legal Publications; University of Tulsa Annual Environmental Symposium. *Community Service*. Los Angeles City Ethics Commission, President, 2008-11, Vice President, 2007-08, Commissioner, 2006-07; Temporary Judges Program, Los Angeles Superior Court, 2005-09; Environmental Protection Agency/Santa Susan Field Laboratory Task Force, 1990-97; Board of Directors, The Buckley School; Board of Trustees, California Historical Society; Chair, Board of Directors, The Brandeis-Bardin Institute.

**STEVEN D. ARCHER**, admitted to practice in California, 1975; United States Supreme Court, 1980; United States District Court, Central District of California, 1975; United States District Court, Eastern District of California; United States District Court, Southern District of California; United States District Court, Northern District of California; United States District Court, Eastern District of Pennsylvania; United States Court of Appeals, Ninth Circuit; United States Court of Federal Claims. *Education*. University of California at Los Angeles, B.A. in American History, Dean's List, 1970; Loyola Law School, Los Angeles, J.D., Dean's Honor List, 1974. *Employment*. Silber, Benezra & Taslitz, 1973-78; Belli & Choulos / Belli, Sayre, Archer & Sabih, Associate, Partner, 1978-82; Simke, Chodos, Silberfeld & Soll, Inc. / Simke, Chodos, Silberfeld & Anteau, Inc., Associate, Partner, 1982-95; Robins, Kaplan, Miller & Ciresi L.L.P., Partner, 1995-2010; Kiesel Law LLP, Partner, 2010-present. *Awards & Honors*. AV Peer Review Rated, Martindale-Hubbell; Super Lawyer, Law & Politics, 2006-present; Humanitarian Award, American Civil Liberties Union of Southern California, 2008; Advocate of the Year, Public Counsel, 2009; Nominee, Consumer Lawyer of the Year, Consumer Attorneys of California, 2009. *Publications*. *Update: Increased Concern over Mounting Numbers of Reported Deaths and Serious Injuries Prompt the FDA to Order Testing of Medical Devices Containing Heparin*, June 13, 2008; *Consumer Alert: Digitek Heart Failure Medications Recalled - A Serious Risk of Injury or Death to the Patient*, May 21, 2008; *Federal Judge Approves Settlement Over Baxter Infusion Pumps*, July 13, 2006; *Consumer Alert: Bausch & Lomb's Renu with MoistureLoc Soft Contact Lens Solution Recalled*, April 26, 2006; *The Dangers of the "Usual Stipulation" in Deposition Practice*, Los Angeles County Bar Association New Lawyers Manual, Fall 2005; *Consumer Alert: F.D.A. Orders Class 1 Recall of Baxter International's Colleague Volumetric Infusion Pumps*, July 13, 2006; *Consumer Alert: Guidant Ancure Endograft System Abdominal Aortic Stents*, September 2003; *Consumer Alert: St. Gobain Prozyr Zirconia Ceramic Coated Femoral Head Hip Implant Components*, February 2002; *A Practical Guide to Code of Civil Procedure Section 2032 - Taking Control of Defense Medical Examinations*, The Advocate,



Kiesel Law LLP
Page 11

September 2000; *Trying the Soft Tissue Damages Case in California*, The National Business Institute, October 1995 (co-authored); Auto Accident Manual, Los Angeles Trial Lawyers Association, March 1985 (contributing author); *Using Thermograms to Argue Soft Tissue Damages*, Trial Magazine, February 1983. *Presentations.* Using Tort Law to Effect Social Change, Pepperdine University School of Law, November 17, 2009; Getting the Most Out of Discovery: Parts I and II, State Bar of California Continuing Education of the Bar, July 13, 2009, August 3, 2009; Discovery - Planning, Strategy and Dealing with Abusive Discovery Tactics, State Bar of California Continuing Education of the Bar, July 25, 2008; The Art of Advocacy: Tailoring the Message - Storytelling and Framing (moderator), American Association for Justice, July 14, 2008; Mock Mediation: Strategies for Successful Mediation of the Toxic Tort Case, ABA Tort Trial and Insurance Practice Section, April 12, 2008. *Member.* State Bar of California; American Association of Justice; Public Justice; Consumer Attorneys of California, Consumer Attorneys Association of Los Angeles; Los Angeles County Bar Association. *Community Service.* Pending Legislation Sub-Committee, Consumer Attorneys of California; Past Vice-Chair, Member, Client Relations Committee, Los Angeles County Bar Association; Los Angeles County Bar Association Lawyer Referral and Information Service (past member); Dependency Court Tort Committee, Los Angeles Juvenile Court (past member); Advisory Board, Loyola Law School Center for Conflict Resolution; Board of Directors, Public Counsel; Board of Directors, Los Angeles Conservancy (past member); Member Development Committee, Los Angeles Conservancy (past member); Legal Committee, Los Angeles Conservancy (past member); Board of Directors, Mt. Olympus Property Owners' Association (past member); Legal Counsel to the Board of Directors, Mt. Olympus Property Owners' Association.

**JEFFREY A. KONCIUS**, Admitted to practice in California, 1997; New Jersey, 1995; New York, 1997; admitted to practice before the United States District Court, Central District of California; United States District Court, Southern District of California; United States District Court, Northern District of California; United States District Court, Eastern District of California; United States District Court, District of New Jersey; United States District Court, Eastern District of New York; United States District Court, Southern District of New York; United States Court of Appeals for the Ninth Circuit. *Education.* Johns Hopkins University, B.A., 1989; Benjamin N. Cardozo School of Law, J.D., 1995. *Reported Decisions. Spielman v. Ex'pression Center for New Media*, 191 Cal. App. 4th 420 (2010); *Loeffler v. Target Corp.*, 58 Cal. 4th 1081 (2014); *Pioneer Electronics (USA) Inc. v. Superior Court*, 40 Cal. 4th 360 (2007); *Bush v. Cheaptickets, Inc*., 425 F.3d 683 (9th Cir. 2005); *Morohoshi v. Pacific Home*, 34 Cal. 4th 482 (2004); *Bird, Marella, Boxer & Wolpert v. Superior Court*, 106 Cal. App. 4th 419 (2003). *Awards and Honors.* Supervising Editor, Cardozo Law Review, 1994-95. *Employment.* Cohn Lifland Pearlman Herrmann & Knopf, 1995-97; Law Office of Joseph J.M. Lange, 1997-2000; Lange & Koncius,



Kiesel Law LLP
Page 12

LLP, 2000-11; Kiesel Law LLP, 2011-present. *Member*. Board of Governors, Association of Business Trial Lawyers (Los Angeles); California State Bar Association; New York State Bar Association; New Jersey State Bar Association; American Association for Justice; Consumer Attorneys Association of Los Angeles; Los Angeles County Bar Association; Public Justice Foundation. *Additional*. Past entrepreneur.

## 2.   Associates

**MARIANA ARODITIS,** admitted to practice in California, 2010; admitted to practice before the United States District Court, Central District of California; United States District Court, Southern District of California; United States District Court, Northern District of California; United States District Court, Eastern District of California; *Education.* Pepperdine University, B.A., 2007; Southwestern Law School, J.D., *cum laude*, 2010; *Awards and Honors.* Paul Wildman Merit Scholarship, 2007-2010; Dean's Merit Scholarship, 2008-2010; Dean's List, 2008-2010; Super Lawyers Rising Star, 2015; *Employment.* Judicial Extern for the Honorable S. James Otero, 2007; Girardi & Keese, 2008-2013. *Member*. Los Angeles County Bar Association, Barristers Section Executive Committee Member, 2012-Present, Barristers Vice President, 2015-16; Consumer Attorneys of California, Board of Governors; Consumer Attorneys Association of Los Angeles. *Community Service.* Junior League of Los Angeles.

**CHERISSE HEIDI A. CLEOFE**, admitted to practice in California, 2013, U.S. District Court, Central District of California, 2013. *Education*. University of California, San Diego, B.S. in Management Science, 2003, University of San Francisco School of Law, J.D., 2012. *Employment.* Practice Development Coordinator for JAMS, 2012-2013; Frank C. Newman Intern for the University of San Francisco International Human Rights Clinic, 2012; Law Clerk for Law Offices of Waukeen McCoy, 2011; Acción Política y Redes Legal Research Intern for ALBOAN. *Awards and Honors*: University of San Francisco Student Bar Association Award, 2012; Zeif Award Scholarship Recipient, 2011; Blum Fund Scholarship Recipient, 2009. *Member*. State Bar of California, American Bar Association, Los Angeles County Bar Association, Orange County Bar Association, Philippine American Bar Association. Community Service: Volunteer Attorney at Legal Aid Society of Orange County, 2013 -2014; Volunteer Attorney at Filipino Migrant Center and the Marian Outreach Center Community Legal Clinic, 2013.

**JOEL M. GORDON**, admitted to practice in California, 2011, U.S. District Court, Central District of California, 2011. *Education*. Washington University in St. Louis, B.A. in History, 1997; University of Southern California, PhD, 2010; University of Southern California Gould School of Law, J.D., 2011. *Employment.* Extern for the Honorable Gregory Alarcon in the Los Angeles Superior Court, 2009; Law clerk for



Kiesel Law LLP
Page 13

the Federal Trade Commission (specializing in consumer fraud); Intern for the Los Angeles District Attorney's Office in the habeas and appellate divisions, 2011. *Member.* Los Angeles County Bar Association, Beverly Hills Bar Association.

**MELANIE MENESES**, admitted to practice in California, 2012, U.S. District Court, Northern District of California, 2012. *Education.* University of San Francisco, B.A. in Psychology, 2009; University of San Francisco School of Law, J.D., 2012. *Experience.* Deputy City Attorney for the City of Los Angeles, 2013-2014; Certified Clerk, Child Advocacy Clinic for the University of San Francisco School of Law, 2011-2012; Certified Clerk, Children's Law Center Los Angeles, 2011; Criminal Defense Extern, Law Office of Jonah Chew, 2010; Juvenile Rights Intern, Legal Aid of Cambodia, 2010. *Awards and Honors*: Grant from the University of San Francisco Public Interest Law Foundation, 2011. *Member*. State Bar of California, American Bar Association, Los Angeles County Bar Association, Philippine American Bar Association, Beverly Hills Bar Association, Consumer Attorneys Association of Los Angeles. Community Service: Board Member, Search to Involve Pilipino Americans, 2014; Americorps VISTA, Los Angeles County Community Development Commission, 2009-2010.

**MATTHEW A. YOUNG**,  admitted to practice in California, 2009; United States Court of Appeals, Ninth Circuit, 2009; United States District Court, Central District of California, 2009. *Education*. University of California at Berkeley, B.A. with honors in Economics, 2005; University of Southern California School of Law, J.D., 2009; Southern California Interdisciplinary Law Journal, 2007-2009. *Publications*. *Adapting to Adaptive Reuse: Comments and Concerns About the Impacts of a Growing Phenomenon*, 18 S. Cal. Interdisc. L.J. 703 (2009) (proposals set forth in article subsequently adopted by the City of Los Angeles); *"Personal Injury: survive the changing court environment*," L.A. Daily Journal, Vol. 126, No. 078 (Apr. 23, 2013). *Member*. State Bar of California; American Bar Association; Los Angeles County Bar Association; Association of Business Trial Lawyers, Young Lawyers Division Advisory Board; Consumer Attorneys of California; Beverly Hills Bar Association; Public Justice Foundation. *Employment*. Los Angeles City Attorney's Office, extern, 2007-2008. *Community Service*. Oakland Asian Students Educational Services.



# AHDOOT & WOLFSON, PC

## ATTORNEYS

Ahdoot & Wolfson ("AW") is a top tier law firm specializing in complex and class action litigations.  The attorneys at AW vigorously litigate against large corporations to vindicate the rights of millions of consumers in protracted, complex litigation, to successful results.

AW has been appointed class counsel in numerous class actions, and, as a founding member, Tina Wolfson has extensive experience in prosecuting complex class action and representative lawsuits.  She has served as plaintiffs' counsel and class counsel and litigated numerous class actions or representative actions.

Tina Wolfson attended and graduated Harvard Law School *cum laude* in 1994.  She began her civil litigation career at the Los Angeles office of Morrison & Foerster, LLP, where she defended major corporations in complex actions and represented indigent individuals in immigration and deportation trials as part of the firm's *pro bono* practice.  Ms. Wolfson then gained further invaluable litigation and trial experience at a boutique firm, focusing on representing plaintiffs on a contingency basis in civil rights and employee rights cases.

Robert Ahdoot graduated from Pepperdine Law School *cum laude* in 1994, where he had served as Literary Editor of the Pepperdine Law Review.  Mr. Ahdoot clerked for the Honorable Paul Flynn at the California Court of Appeals, and then began his career as a civil litigator at the Los Angeles office of Mendes & Mount, LLP, where he defended large corporations and syndicates such as Lloyds of London in complex environmental and construction-related litigation as well as a variety of other matters.  In March 1998, Mr. Ahdoot and Ms. Wolfson founded AW.

AW is comprised of eight attorneys and their support staff.  Senior attorneys, Theodore Maya and Bradley King, also have participated in this litigation.

Theodore Maya is an attorney at AW working on this matter. He graduated from UCLA Law School in 2002 after serving as Editor-in-Chief of the UCLA Law Review. From July 2003 to August 2004, Mr. Maya served as Law Clerk to the Honorable Gary

Allen Feess in the United States District Court for the Central District of California.  Mr. Maya was also a litigation associate in the Los Angeles offices of Kaye Scholer LLP for approximately eight years where he worked on a large variety of complex commercial litigations from inception through trial.  Mr. Maya was named "Advocate of the Year" for 2007 by the Consumer Law Project of Public Counsel for successful pro bono representation of a victim of a large-scale equity fraud ring.

Bradley King is another attorney at AW working on this matter.  Mr. King graduated from Pepperdine University School of Law, where he served as Associate Editor of the Pepperdine Law Review.  He worked as a law clerk for the California Office of the Attorney General, Correctional Law Section in Los Angeles and was a certified law clerk for the Ventura County District Attorney's Office.  Mr. King began his legal career at a boutique civil rights law firm, gaining litigation experience in a wide variety of practice areas, including employment law, police misconduct, municipal contract, criminal defense, and premises liability cases.  At AW, Mr. King focuses on consumer class actions.

AW has been appointed lead counsel in numerous complex consumer class actions, some times in contested leadership applications. The following actions are some examples of recently resolved or pending class actions which AW has or is currently litigating on behalf its clients:

- *Pappas v. Naked Juice Co. of Glendora, Inc.*, Case No. 2:11-cv-8276-JAK-PLA (C.D. Cal.) (appointed co-lead counsel after contested application; resulted in the second largest food false advertising case ever ($9,000,000 non-revertible fund)).

- *Trammell v. Barbara's Bakery, Inc.*, Case No. 3:12-cv-02664-CRB (N.D. Cal.) (nationwide settlement of food false advertising case, non-revertible fund; when preliminarily approving the settlement, Judge Breyer commented that the settlement is an "excellent settlement" and that both sides did "an excellent job of resolving the case," doing a "superb job" and presenting "a model of good lawyering on both sides"; when granting final approval to the settlement, Judge Breyer reiterated that the settlement was "very good" and that the case was "quite a successful class action").

- *Cassidy v. Reebok International Ltd.*, Case No. 2:10-cv-09966-AHM (C.D. Cal.) (nationwide settlement of apparel false advertising case; non-revertible fund).

- *Carey v. New Balance Athletic Shoe, Inc.*, Case Nos. 1:11-cv-10632-LTS & 1:11-cv-10001-LTS (D. Mass.) (nationwide settlement of apparel false advertising case; non-revertible fund).

- *West v. Examsoft Worldwide Inc.*, Case No. 14-cv-22950-UU (S.D. Fla.)

(nationwide settlement preliminarily approved arising from software error on bar exam)

- *Mirto v. AIG/Granite State Insurance Co. et al.*, Case No. HG 04180408 (Cal. Super. Ct., Alameda Cty.).
- *Axen v. Ginco International, et al.*, Case No. 427033 (SFSC).
- *Citizens for Responsible Business v. Rite Aid Corporation, et al.*, Case No. 414831 (SFSC) (prosecuted claims of false and illegal labeling in the herbal supplement industry against 107 retailers and manufacturers, who were gleaning millions of dollars from this nationwide practice; AW was successful in completely eradicating the alleged illegal practice in the United States).
- *In Re: Hain Celestial Seasonings Products Consumer Litig.*, Case No. 13-cv-01757-AG-AN (C.D. Cal.) (appointed co-lead counsel after contested application; class certification motion pending).
- *In re: Whole Foods Market, Inc., Greek Yogurt Marketing and Sales Practices Litig.*, Case No. 1:14-MC-02588-SS (W.D. Tex.) (appointed co-lead counsel by the MDL court).
- *Lavinsky vs. City of Los Angeles*, Case No. BC542245 (LASC) (challenging allegedly illegal utilities taxation practices).
- *Kirby v. McAfee, Inc.*, Case No. 14-cv-02475-EJD (N.D. Cal.) (challenging the defendant's auto renewal and false discount practices).
- *Feliciano v. General Motors LLC*, Case No. 14-cv-06374-AT (S.D.N.Y.) (product defect regarding Chevy Cruze vehicles).
- *Weiss v. Los Angeles*, No. BC 141354 (LASC) (challenging the defendant's review of parking violations, won *writ of mandate* to stop the allegedly illegal practice).
- *In re: SFPP Right-of-Way Claims*, No. 8:15-cv-00718-JVS-DFM (C.D. Cal.).
- *In re: Daily Fantasy Sports Marketing and Sales Practices Litig.*, MDL No. 2677 (pending before J.P.M.L.); underlying case: *Moton v. FanDuel, Inc.*, Case No. 2:15-cv-08557-JFW-PLA (C.D. Cal.).
- *A.Y. v. The Regents of the University of California*, Case No. BC590344 (Cal. Super. Ct., Los Angeles Cty. ("LASC")).
- *Bishop v. Shorter University, Inc.*, Case No. 4:15-cv-00033-HLM (N.D. Ga.).
- *In re: Uber FCRA Litigation*, Case No. 3:14-cv-05200-EMC (N.D. Cal.) (challenging the defendant's alleged violations of the FCRA).
- *Whalen v. Michaels Stores, Inc.*, Case No. 2:14-cv-07006-JS-ARL (E.N.D.Y.).
- *Bhuta v. Experian Information Solutions, Inc.*, Case No. 8:15-cv-01592-AG-DFM (C.D. Cal.).

3

- *Preston v. Excellus Health Plan, Inc.*, Case No. 6:15-cv-06577-CJS (W.D.N.Y.).
- *In re: U.S. Office of Personnel Management Data Security Breach Litigation*, Case No. 1:15-cv-01394-ABJ (D.D.C.).
- *In re: Intuit Data Litigation*, Case No. 5:15-cv-01778-EJD (N.D. Cal.).
- *Wood v. American Eagle Outfitters, Inc.*, Case No. 1:15-cv-02370-VEC (S.D.N.Y.).
- *Chimeno-Buzzi v. Hollister Co.*, Case No. 1:14-cv-23120-MGC (S.D. Fla.).
- *Pandol v. Go Daddy Operating Company, LLC*, Case No. 2:15-cv-07794-DSF-KLS (C.D. Cal.).
- *Moody v. Ocwen Loan Servicing, LLC*, Case No. 2:15-cv-05186-DMG-GJS (C.D. Cal.).
- *DiFrancesco v. UTZ Quality Foods, Inc.*, Case No. 1:14-cv-14744-DPW (D. Mass.).
- *In re: Kind LLC "All Natural" Litig.*, No. 1:15-md-02645-WHP (S.D.N.Y.).
- *Mena v. Uber Technologies, Inc.*, Case No. 3:15-cv-00064-JST (N.D. Cal.).
- *Ellinghaus v. Educational Testing Service*, No. 2:15-cv-03442-SJF-AKT (E.D.N.Y.).
- *Tucker v. Wal-Mart Stores, Inc.*, Case No. 15SL-CC02693-BWW (Mo. Cir. Ct., 21st Cir., St. Louis Cty.).

Ms. Wolfson and Mr. Ahdoot were among the first group of attorneys who successfully litigated the privacy rights of millions of consumers against major financial institutions, where the plaintiffs alleged that the defendants used their personal information to compile detailed financial dossiers to use for internal marketing purposes and to sell them to third party telemarketers, without their consent.  As lead counsel in these privacy class actions, AW brought the consumer claims to successful conclusion on a class-wide basis, conferring millions of dollars of benefits to consumers.  The business practices that AW's clients challenged in these cases later became the subject of Graham Leach Bliley Act regulation. These consumer class actions included, without limitation:

- *Zadeh v. Chase Manhattan Bank, et al.*, Case No. 323715 (SFSC).
- *Steinhaus v. American Express Travel Related Services Co. et al.*, Case No. 416248 (SFSC).
- *Bernard v. MBNA America Bank, et al.*, Case No. 408700 (SFSC).
- *Shakib v. Discover Bank, et al.*, Case No. 416194 (SFSC).
- *Baumsteiger v. FleetBoston, et al.*, Case No. 408698 (SFSC).
- *Lanchester v. Washington Mutual Bank, et al.*, Case No. 429754 (SFSC).

AW was also instrumental to the consumer plaintiffs' efforts in the Target data breach litigation.  *In re: Target Corporation Customer Data Security Breach Litigation*, Case No.

14-md-2522 (D. Minn.)   AW contributed considerable effort to vetting hundreds of potential class representatives, legal research involving the different state laws in play, the consolidated complaint, and significant discovery efforts.

Ms. Wolfson is currently serving, by court appointment, on the Consumer Plaintiffs' Steering Committee in the current MDL action entitled *In re: The Home Depot, Inc., Customer Data Security Breach Litigation*, Case No. 1:14-md-02583-TWT (N.D. Ga.) (Judge Thrash presiding).   She is also serving, by court appointment, on the Plaintiffs' Executive Leadership Committee in the current MDL action entitled *In re: Premera Blue Cross Customer Data Security Breach Litigation*, Case No. 3:15-md-02633-SI (D. Or.) (Judge Simon presiding).

Ms. Wolfson was elected as co-lead class counsel in the consumer class action stemming out of the Neiman Marcus data breach, entitled *Remijas, et al. v. Neiman Marcus Group, LLC*, Case No. 14-cv-1735 (N.D. Ill.).   AW, with Ms. Wolfson at the helm, was responsible for briefing and arguing the groundbreaking appeal from the trial court's order granting the Motion to Dismiss on the pleadings based on lack of Article III standing.   The Seventh Circuit's landmark opinion was the first appellate decision issued after the Supreme Court's decision in *Clapper v. Amnesty Intern. USA*, 133 S.Ct. 1138 (2013).   The defense bar has aggressively advocated that *Clapper* set a more rigorous standard for Article III standing inquiries and required a finding of no standing on behalf of plaintiffs in a data breach case, unless plaintiffs were able to show that they suffered unreimbursed fraudulent charges.   The *Neiman Marcus* opinion was the first appellate court to reject this view of *Clapper* and, adopting the plaintiff's reasoning, established, among other things, that data breach victims have standing to pursue claims based on the increased risk of identity theft and fraud, even before that theft or fraud materializes.   *Remijas v. Neiman Marcus*, Case No. 14-3122 (7th Cir. July 20, 2015) (reversed and remanded).

AW also was a member of the Executive Committee in the consolidated actions entitled *Whitaker v. Health Net*, Case No. 2:11-cv-00910-KJM (E.D. Cal.), and in the *Sutter Medical Information Cases*, Case No. JCCP 4698 (Cal. Super. Ct., Sacramento Cty.).

Additionally, Ms. Wolfson frequently lectures on numerous topics related to class action litigation across the country.   An incomplete list of her speaking engagements is as follows:

- American Association for Justice: AAJ 2015 Annual Convention, July 2015, Montreal: "The Mechanics of Class Action Certification."
- HarrisMartin: Data Breach Litigation Conference: The Coming of Age, March 2015, San Diego: "The First Hurdles: Standing and Other Motion to Dismiss

5

Arguments."

- Bridgeport: 2015 Annual Consumer Class Action Conference, February 2015, Miami: Co-Chair.
- Venable, LLP: October 2014, San Francisco: invited by former opposing counsel to present mock oral argument on a motion to certify the class in a food labeling case, Hon. Marilyn Hall Patel (Ret.) presiding.
- Bridgeport: 15th Annual Class Action Litigation Conference, September 2014, San Francisco: "Food Labeling and Nutritional Claim Specific Class Actions" (Co-Chair and Panelist).
- Bridgeport: 2014 Consumer Class Action Conference, June 2014, Chicago: "Hot Topics in Food Class Action Litigation."
- Perrin Conferences: Challenges Facing the Food and Beverage Industries in Complex Consumer Litigations, April 2014, Chicago, where I was invited to discuss cutting edge developments in settlement negotiations, notice, and other topics.
- Bridgeport: Class Action Litigation & Management Conference, April 2014, Los Angeles: "Getting Your Settlement Approved."
- HarrisMartin: Target Data Security Breach Litigation Conference, March 2014, San Diego: "Neiman Marcus and Michael's Data Breach Cases and the Future of Data Breach Cases."
- Bridgeport: Advertising, Marketing & Media Law: Litigation and Best Management Practices, March 2014, Los Angeles: "Class Waivers and Arbitration Provisions Post-*Concepcion / Oxford Health Care.*"
- [Upcoming] Federal Bar Association: The Future of Class Actions, featuring the Hon. Jon Tigar and the Hon. Laurel Beeler, November 2015, San Francisco: "Cutting Edge Topics in Class Action Litigation" (Co-Chair and Faculty).

## MORGAN & MORGAN COMPLEX LITIGATION GROUP

### JOHN YANCHUNIS

Mr. Yanchunis leads the National Consumer Class Action and False Claims Act sections of Morgan & Morgan's Complex Litigation Group.  Morgan & Morgan is among the largest, if not the largest, exclusively plaintiffs' law firms in the United States, employing 272 lawyers and 1,500 support staff who serve consumers in 25 offices, in New York, New Jersey, Georgia, Florida, Mississippi, Kentucky, and Tennessee.  Morgan & Morgan is composed of outstanding trial lawyers who have recovered groundbreaking multi-million dollar verdicts, held significant roles in government, and played pivotal roles in shaping the outcome of class actions across the country.

Morgan & Morgan's Complex Litigation Group includes 17 dedicated attorneys supported by skilled paralegals and state-of-the-art technology, and also benefits from the experience, commitment, and resources of the entire firm.  Unique assets to this practice group are four former FBI agents who assist with fact gathering and investigations for the group's cases.

Morgan & Morgan has had a number of notable recent successes in class litigation, including the settlement of In re Black Farmers Discrimination Litigation, Misc. No. 08-mc-0511 (PLF) (D.C. Aug. 23, 2013), where it served as co-lead class counsel.  The settlement with the federal government resulted in the creation of a fund of more than $1.2 billion for distribution to African-American farmers against whom, between 1981 and 1996, the USDA discriminated on the basis of race—wrongfully denying them farm loans, loan servicing, and other benefits, or extending them loans with unfair terms.

Mr. Yanchunis has had a long career representing consumers in class litigation on a wide array of consumer issues , including defective products , insurance , antitrust and security litigation. As a result of this experience , he served as lead counsel for  the insurance regulators for the state of Florida in connection with their investigations of a number of insurance companies and brokers of allegations of price fixing, bidding rigging, undisclosed compensation and other related conduct, and negotiated a number of settlements with insurance companies and brokers of those investigations.  These investigations resulted in the recovery of millions of dollars for Florida policyholders and the implementation of changes to the way insurance is sold in Florida and throughout this Country.

Mr. Yanchunis has extensive experience in multi-district class action litigation, and is presently co-lead counsel in In re: Home Depot, Inc., Customer Data Security Litigation, Case 1:14-md-02583-TWT (N.D. Ga.), liaison counsel in In re: Ford Fusion and C-Max Fuel Economy Litigation, 7:13-md-2450-KMK (S.D.N.Y.)( a case which addresses the misleading and deceptive conduct of Ford in the marketing of two hybrid vehicles) , and a member of the Five-member Executive

Committee in In re: Target Corporation Customer Data Security Breach Litigation, MDL No.:
2522 (PAM/JJK) (D. Minn.) The Court inTarget recently entered an order approving the
settlement of the case on a class basis .

He was co-lead counsel in the successful prosecution of the two largest class action cases in the
United States: Fresco v. Automotive Directions, Inc., Case No. 0:03-cv-61063-JEM (S.D. Fla.), and
Fresco v. R.L. Polk, Case 0:07-cv-60695-JEM (S.D. Fla.). These cases were filed against the
world's largest data and information brokers, Experian, R.L. Polk, Acxiom, Reed Elsevier (which
owns LexisNexis) and others to protect the important privacy rights of consumers.

Mr. Yanchunis is a frequent lecturer in the area of class litigation around the country.  This year
alone ,  Mr. Yanchunis was a speaker at multiple such seminars:  Harris Martin's Data Breach
Litigation Conference: The Coming of Age on March 25, 2015 in San Diego, CA; Practising Law
Institute's 20th Annual Consumer Financial Services Institute on April 6-7, 2015 in New York,
NY, and again on April 27-28, 2015 in Chicago, IL; and at the State of Privacy Litigation at the
NetDiligence Cyber Risk & Privacy Liability on October 6, 2015 in Santa Monica, CA. Mr.
Yanchunis has also served as an expert to The Florida Bar on ethics issues in class action
litigation.